No. 2023-1495, 2023-1496

# United States Court of Appeals for the Federal Circuit

CUPP COMPUTING AS,
*Appellant*,

v.

TREND MICRO INC.,
*Appellee.*

Appeals from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Nos. IPR2021-01236, IPR2021-01237.

## OPENING BRIEF FOR APPELLANT CUPP COMPUTING AS

Paul J. Andre
James Hannah
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700

Jeffrey Price
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-7502

*ATTORNEYS FOR CUPP COMPUTING AS*

## PATENT CLAIM AT ISSUE PURSUANT TO FED. CIR. R. 32(A)(3)

**U.S. Patent No. 10,951,632 (Claim 1 is representative, and reproduced below)**

1.    A security system, comprising:

security system memory;

a communication interface configured to communicate with a mobile device and configured to communicate over a network with a security administrator device, the mobile device including a mobile device processor and including a security agent configured to cooperate with the security system, the security administrator device having a security administrator processor different than the mobile device processor, the mobile device being remote from the security administrator device, the mobile device being a first computer system, the security system being a second computer system, the security administrator device being a third computer system, the first computer system, the second computer system and the third computer system being separate computer systems; and

a security system processor being different than the mobile device processor and different than the security administrator processor, the security system processor being configured to:

store in the security system memory at least a portion of wake code, the wake code being configured to detect a wake event and to send a wake signal to the mobile device in response to detecting the wake event, the security agent of the mobile device being configured to receive the wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal, the security agent of the mobile device being configured to perform security services after the at least a portion of the mobile device has been woken;

detect a particular wake event;

prepare a particular wake signal in response to detecting the particular wake event; and

send the particular wake signal to the mobile device in response to detecting the particular wake event, the security agent of the mobile device being configured to wake the at least a portion of the mobile device in response to receiving the particular wake signal and being configured to perform particular security services after the at least a portion of the mobile device has been woken.

## CERTIFICATE OF INTEREST

Counsel for CUPP Computing AS certifies the following:

1.    The full name of every entity represented by us is:

CUPP Computing AS

2.    The name of the real party in interest for the entity. Do not list the real party if it is the same as the entity:

Not applicable.

3.    All parent corporations and any other publicly held companies that own 10 percent or more of the stock of the party or amicus curia represented by me are listed below:

Not applicable.

4.    The names of all law firms, and the partners or associates that have not entered an appearance in the appeal, and (a) appeared for the entity in the lower tribunal; or (b) are expected to appear for the entity in this court:

Jonathan Caplan of Kramer Levin Naftalis & Frankel LLP

5.    Other than the originating case number(s), any related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a) that will directly affect or be directly affected by this court's decision in the pending appeal.

*CUPP Cybersecurity, LLC v. Trend Micro, Inc. et al.*, No. 3:18-cv-01251 (consolidated with 20-cv-03206 (N.D. Tex.)).

6.    All information required by Fed. R. App. P. 26.1(b) and (c) in criminal cases and bankruptcy cases.

None.

Respectfully submitted,

Dated: July 25, 2023           By: */s/ Paul J. Andre*
                              Paul J. Andre
                              James Hannah
                              Kramer Levin Naftalis & Frankel LLP
                              333 Twin Dolphin Drive, Suite 700
                              Redwood Shores, CA 94065
                              Tel: (650) 752-1700
                              Fax: (650) 752-1800
                              pandre@kramerlevin.com
                              jhannah@kramerlevin.com

                              Jeffrey H. Price
                              Kramer Levin Naftalis & Frankel LLP
                              1177 Avenue of the Americas
                              New York, NY 10036
                              Tel: 212.715.7502
                              Fax: 212.715.8302
                              jprice@kramerlevin.com

                              *Attorneys for Appellant*
                              CUPP Computing AS

# TABLE OF CONTENTS

**Page(s)**

STATEMENT OF RELATED CASES ................................................................... 1

JURISDICTION .................................................................................................... 2

INTRODUCTION ................................................................................................. 3

STATEMENT OF THE ISSUES ........................................................................... 7

STATEMENT OF THE CASE ............................................................................... 8

I.      BACKGROUND OF THE TECHNOLOGY ................................................. 8

     A.    Mobile Security ..................................................................... 8

     B.    The '632 Patent .................................................................. 10

II.     THE *INTER PARTES* REVIEW PROCEEDINGS ................................. 12

     A.    The Asserted Prior Art ...................................................... 12

         1.    Hall ........................................................................... 12

         2.    Joseph ...................................................................... 14

         3.    Gordon in view of Gardner ..................................... 16

     B.    The Board's Claim Constructions ...................................... 17

         1.    The Parties' Arguments and the Board's Findings Regarding "particular wake event," "particular wake signal," and "particular security services" (All Claims) .................................... 17

         2.    The Parties' Arguments and the Board's Findings Regarding "Security Agent" (All Claims) ........................................................ 19

     C.    The Board's Obviousness Determination ........................... 22

SUMMARY OF THE ARGUMENT .................................................................... 23

STANDARD OF REVIEW .................................................................................. 26

ARGUMENT ..........................................................................................27

I.    THE COURT SHOULD REVERSE THE BOARD'S DETERMINATION THAT CLAIMS 1, 7, 9, 16, AND 22 ARE OBVIOUS BECAUSE ITS CONSTRUCTION OF THE "PARTICULAR" LIMITATIONS ARE LEGALLY FLAWED ...............................................................27

    A.    The Board's Flawed Construction of the "Particular" Limitations is Divorced from the Intrinsic Evidence .................................................28

    B.    The Board's Construction of the "Particular" Limitations Renders the Term "Particular" Superfluous ........................................32

    C.    The Board's Construction of the "Particular" Limitations Ignores the Stated Purpose of the Claimed Invention ......................................35

    D.    Reversal is Warranted Under the Appropriate Construction ..............36

II.    THE COURT SHOULD REVERSE THE BOARD'S CONCLUSION THAT CLAIMS 1, 7, 9, 16, 22, AND 24 ARE OBVIOUS BECAUSE ITS CLAIM CONSTRUCTION OF "SECURITY AGENT" IS LEGALLY FLAWED .............................................................................39

    A.    The Board's Flawed Construction of "Security Agent" is Directly Contrary to the Intrinsic Record ........................................................41

    B.    The Board's Flawed Construction Improperly Encompasses Computer Programs Generally ...........................................................46

    C.    The Board Disregarded an Appropriate Definition that is Consistent with the Intrinsic Evidence .................................................................48

    D.    Under the Correct Construction, None of the Asserted References Teaches or Suggests the Claimed "Security Agent" ...........................50

    E.    Reversal is Warranted Under the Correct Construction.....................52

III.    THE BOARD'S OBVIOUSNESS DECISION SHOULD BE REVERSED BECAUSE THE BOARD DID NOT ADEQUATELY EXPLAIN ITS OBVIOUSNESS DECISION .........................................................53

CONCLUSION ....................................................................................57

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*,
  811 F.3d 1334 (Fed. Cir. 2016) .......................................................34

*Apple Comput., Inc. v. Articulate Sys., Inc.*,
  234 F.3d 14 (Fed. Cir. 2000) ............................................................35

*Arendi S.A.R.L. v. Apple Inc.*,
  832 F.3d 1355 (Fed. Cir. 2016) .......................................................53

*Blue Calypso, LLC v. Groupon, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016) .......................................................26

*Celgene Corp. v. Peter*,
  931 F.3d 1342 (Fed. Cir. 2019) .......................................................26

*Cisco Sys., Inc. v. Cirrex Sys., LLC*,
  856 F.3d 997 (Fed. Cir. 2017) .........................................................41

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019).....................................................................55

*Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*,
  423 F.3d 1343 (Fed. Cir. 2005) ....................................40, 42, 45, 46

*Game & Tech. Co. v. Activision Blizzard Inc.*,
  926 F.3d 1370 (Fed. Cir. 2019) .......................................................53

*In re Gartside*,
  203 F.3d 1305 (Fed. Cir. 2000) ...................................................26, 27

*In re Hodges*,
  882 F.3d 1107 (Fed. Cir. 2018) ...................................................28, 41

*In re Kahn*,
  441 F.3d 977 (Fed. Cir. 2006) .........................................................27

*KSR Int'l Co. v. Teleflex, Inc.*,
  550 U.S. 398 (2007)..........................................................................26

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ........................................................52

*Moba, B.V. v. Diamond Automation, Inc.*,
    325 F.3d 1306 (Fed. Cir. 2003) ......................................................49

*In re NTP, Inc.*,
    654 F.3d 1279 (Fed. Cir. 2011) ......................................................42

*In re NuVasive, Inc.*,
    842 F.3d 1376 (Fed. Cir. 2016) ......................................................55

*Outdry Techs. Corp. v. Geox S.p.A.*,
    859 F.3d 1364 (Fed. Cir. 2017) ......................................................56

*Owens Corning v. Fast Felt Corp.*,
    873 F.3d 896 (Fed. Cir. 2017) ...................................................36, 52

*Pers. Web Techs., LLC v. Apple, Inc.*,
    848 F.3d 987 (Fed. Cir. 2017) ........................................................27

*Personalized Media Commc'ns, LLC v. Apple Inc.*,
    952 F.3d 1336 (Fed. Cir. 2020) ......................................................26

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...........................26, 45, 46

*Renishaw PLC v. Marposs Societa'per Azioni*,
    158 F.3d 1243 (Fed. Cir. 1998) ...........................................42, 47, 49

*St. Jude Med., LLC v. Snyders Heart Valve LLC*,
    977 F.3d 1232 (Fed. Cir. 2020) ......................................................34

*Unique Concepts, Inc. v. Brown*,
    939 F.2d 1558 (Fed. Cir. 1991) ......................................................35

*In re Warsaw Orthopedic, Inc.*,
    832 F.3d 1327 (Fed. Cir. 2016) .................................................55, 57

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ...................................................................2

35 U.S.C. § 103 .................................................................................12

35 U.S.C. § 141(c) .....................................................................................2

35 U.S.C. § 314 ..........................................................................................2

Administrative Procedure Act....................................................................26

**Other Authorities**

37 C.F.R. § 42.100(b) ..............................................................................26

## **STATEMENT OF RELATED CASES**

Pursuant to Federal Circuit Rule 47.5, CUPP Computing AS states that:

(1) no appeal other than the current appeal has been taken in or from the United States Patent and Trademark Office, Patent Trial and Appeal Board's decisions in Case Nos. IPR2021-01236, IPR2021-01237.

(2) CUPP Computing AS and Trend Micro, Inc., are parties to *CUPP Cybersecurity, LLC v. Trend Micro Inc.*, 3:18-cv-01251 (consolidated with 20-cv-03206 (N.D. Tex.)).

(3) no other cases will directly affect or be directly affected by the Court's decision in this appeal.

## <u>JURISDICTION</u>

On January 17, 2023, the Patent Trial and Appeal Board (the "Board") issued Final Written Decisions in IPR2021-01236 (Appx1-49) and IPR2021-01237 (Appx50-79), determining that certain claims of CUPP Computing AS's ("CUPP") '632 Patent were unpatentable as obvious. The Board had jurisdiction pursuant to 35 U.S.C. § 314. Patent Owner CUPP timely filed Notices of Appeal on February 3, 2023 (Appx760-764, Appx3050-3054). This Court has jurisdiction over CUPP's appeal pursuant to 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## **INTRODUCTION**

CUPP's '632 Patent describes and claims systems and methods for providing distinct security services that are tailored to respond to a distinct threat to a mobile device (such as a cellphone) that has traveled outside of a trusted, secure network. In a significant change over network security systems disclosed in the prior art, the '632 Patent's claimed inventions do not require that the mobile device be fully powered on or "awake" for the distinct security response to occur. Prior systems required that the mobile device be present in a known and secure network and fully powered on or "awake."

As the '632 Patent teaches, a mobile device can sense and respond to a distinct "wake event." The event causes a distinct signal to be generated, which identifies the nature of the wake event, which in turn causes the device to execute distinct security services tailored to the perceived threat. All of this occurs while the mobile device remains in a "power management" mode, which is a mode where only portions of the mobile device are woken up (not the entire device).

Key in the '632 Patent's inventions is the idea of distinct security services. Such services respond to distinct signals generated by distinct "wake events." A distinct wake event could be the occurrence of a certain time of day, the expiration of a predetermined amount of time, or the receipt of data from an external source. Such distinct events cause a portion of the device to sends a signal to the device's

"security agent," a module within the device configured to activate distinct, tailored security services to respond to the distinct event.

For example, upon receipt of an encrypted communication, the security agent may wake portions of the device to authenticate the encryption key to ensure that the communication is secure and authentic before activating distinct security services to protect the device. Or the security agent could respond to another distinct wake event, such as receipt of an encrypted wake signal to wake the device, by performing security services tailored to that distinct signal (such as waking only portions of the device to decrypt the signal, and subsequently requiring a username and password to access the device).

Importantly, the claimed "security agent" is an autonomous module within the security system of the mobile device that senses its outside environment, may respond and act on that environment, and does not rest when the device is powered down. In other words, the claimed "security agent" is a continuously acting security feature that can perceive potential threats, respond to them in different ways by activating some portion of the device that is tailored to that distinct threat, and affect its environment for the benefit of the device.

The Board's Final Written Decisions in *inter partes* reviews IPR2021-01236 and IPR2021-01237 fail to account for these key inventive features.[1]  The Board's claim constructions are divorced from the intrinsic evidence and fail to give significance to the claim terms "particular wake event," "particular wake signal," "particular security services" (the "particular" limitations) and "security agent," which embody these inventive features.  Thus, the Board's claim constructions incorrectly broaden what falls within the scope of the challenged claims.  At the same time, the Board's overbroad constructions swept in prior art that does not relate to providing these kinds of distinct security services to mobile devices, and that fails to disclose or suggest these key inventive concepts.  Accordingly, the Board's ultimate obviousness determinations rest on an incorrect legal foundation and should be reversed.

The Board's errors are three-fold.  The Board committed its first legal error when it construed the "particular" limitations and "security agent" in a manner far broader than their language requires and in a manner contrary to the '632 Patent and the intrinsic evidence.  Moreover, the Board's constructions fail to give patentable weight to the claim limitations "particular" and "security," and render them superfluous.

---

[1] Because the evidence and arguments in the 1236 and 1237 IPR proceedings are substantially the same, CUPP cites the 1236 IPR proceeding record unless specific to the 1237 IPR proceeding.

The Board committed its second legal error when it applied these incorrect and broad constructions to the disclosures in the asserted references Hall, Joseph, and Gordon.  The Board's overbroad constructions of the "particular" limitations and "security agent" incorrectly encompassed disclosures in Hall, Joseph, and Gordon that are not a "particular wake event," "particular wake signal," "particular security service," or a "security agent" as the terms are used in the '632 Patent.

The Board compounded these legal errors in its obviousness analysis, and did not adequately explain its obviousness decision.  Specifically, while the Board found that the challenged claims were obvious over Hall, Joseph, and Gordon as single references, the Board did not describe why a person of ordinary skill in the art would be motivated to modify the disclosures in any of Hall, Joseph, or Gordon to arrive at the inventions described and claimed in the '632 Patent.  The Board's obviousness analysis does not present a reasoned, independent decision; instead, the Board summarized the parties' arguments, stated which argument(s) it found persuasive, and provided its ultimate obviousness determination in a "Summary" paragraph, at times adopting Trend Micro's analysis wholesale.

Because the Board's ultimate decision is not supported by substantial evidence, was inadequately explained, and incorrectly broadened both the scope of the claims and the prior art disclosures, it should be reversed or, at a minimum, vacated and remanded.

## STATEMENT OF THE ISSUES

1.      Whether the Board erred when it construed the claim terms "particular wake event," "particular wake signal," and "particular security services" such that the Board's construction renders the term "particular" superfluous.

2.      Whether the Board erred when it construed the claim term "security agent" such that the Board's construction incorrectly encompasses computer programs generally that are not "agents."

3.      Whether the Board erred when it determined that challenged claims 1, 7, 9, 16, 22, and 24 of the '632 Patent are obvious over the prior art where its ultimate obviousness determination rests entirely on its legally flawed claim constructions of "particular wake event," "particular wake signal," and "particular security services" and "security agent" and is unsupported by substantial evidence.

4.      Whether the Board erred in failing to explain adequately in its obviousness analysis why a person of ordinary skill in the art would be motivated to modify any of asserted references Hall, Joseph, or Gordon to arrive at the inventions described and claimed in the '632 Patent.

## STATEMENT OF THE CASE

## I.    BACKGROUND OF THE TECHNOLOGY

### A.    Mobile Security

Traditional enterprise network systems employ two lines of defense to protect users from malicious code received over the internet, such as viruses, spyware, adware, worms, and trojan horses.  Appx120 ('632 Patent at 1:45-65).  The first line of defense is provided by the enterprise network's security system, which sits at or near the boundary of a network and protects all devices located on the network.  *Id.* at 1:51-54.  The second line of defense is provided by security applications installed on individual devices, whether inside or outside of the trusted enterprise network. *Id.* at 1:54-57.

As mobile devices began to proliferate in the early 2000s, mobile device security became increasingly important because such devices did not enjoy the same level of security outside of an enterprise network as would be provided by the enterprise network's security system.  *Id.* at 2:33-37.  In particular, mobile devices traveling outside of the trusted enterprise network lose the first line of defense and become more susceptible to attacks.  Figure 2 of the '632 Patent, reproduced below, shows a traditional network system architecture in which a mobile device has traveled outside the trusted enterprise and is no longer protected by network security system 120, which provides the first line of defense to devices on the network, like desktop 105:



**FIG. 2**
(PRIOR ART)

Appx102 ('632 Patent at FIG. 2). This loss of security is problematic not only for the mobile device but also for the trusted enterprise network. Specifically, the mobile device risks transferring any malicious code to the trusted enterprise if the code travels back into the trusted enterprise and reconnects to it. Appx120 (2:28-32, 2:38-41). Accordingly, a need arose for a mobile security system that, by paralleling the enterprise network security system, provides security to a mobile device when it travels outside the protected enterprise network. *Id.* at 1:45-2:54.

An additional disadvantage of the traditional enterprise network systems is that users typically leave their mobile devices powered on overnight to reduce the impact of scanning and security updates. *Id.* at 2:55-61. However, this consumes a

significant amount of power and computing resources. *Id.* Therefore, a need arose for providing security services during a power management mode. *Id.*

### B.    The '632 Patent

The '632 Patent met these needs by describing and claiming a security system and a security administration device coupled to a mobile device for providing security services during a power management mode. Appx97 (Abstract). Figure 3 of the '632 Patent reproduced below illustrates the claimed system including the security administrator device (outlined in purple), security system (outlined in blue), and the mobile device (outlined in red):



FIG. 3

Appx103 (annotated, *see* Appx256).

10

The security system includes a memory that stores security code, security policies, and security data, some or all of which may be managed by the security administrator device.  Appx122 ('632 Patent at 6:7-11) ("A security administrator 325 manages the mobile security system 345*a*, the mobile security system 345*b*, and the network security system 320 to assure that they include the most current security protection."), Appx126 (13:16-19) ("The security administrator 325 includes a wizard 745 for enabling substantially automatic initial and possibly dynamic setup of the security engines 530, security policies 535 and security data 540 . . . .").  In this way, the security system provides the mobile device with a line of defense from a remote location outside a trusted enterprise.  Appx122 (6:23-28).

To provide security services during a power management mode the security system sends a particular wake signal to a security agent to wake up at least a portion of the mobile device.  *See* Appx135 (claim 1).  When the mobile device, including its programs and components, is in a power management mode, the security agent remains active to receive the particular wake signal, and then wakes up at least a portion of the mobile device and performs particular security services.  Appx130-131 (21:56-23:54).  For instance, the security system "may provide one or more signals to trigger various scans, updates, and maintenance functions" to be performed by the mobile device.  Appx133 (28:41-53).

## II.    THE *INTER PARTES* REVIEW PROCEEDINGS

Trend Micro filed two petitions for *inter partes* review on July 9, 2021.  In the 1236 IPR proceeding, Trend Micro challenged claims 1, 9, 16, and 24 as obvious under 35 U.S.C. § 103 in view of either U.S. Patent App. Pub. No. 2008/0120423 to Hall ("Hall") or U.S. Patent App. Pub. No. 2010/0218012 to Joseph ("Joseph"). Appx343.  In the 1237 IPR proceeding, Trend Micro challenged claims 1, 7, 9, 16, 22, and 24 as obvious under pre-AIA 35 U.S.C. § 103 in view of either U.S. Patent No 7,818,803 to Gordon ("Gordon") in view of U.S. Patent App. Pub. No. 2006/0272020 to Gardner ("Gardner").  Appx2664.  The Board instituted review of all challenged claims on January 19, 2022.

### A.    The Asserted Prior Art

#### 1.    Hall

The Hall reference is directed to performing actions if a subscriber device has been reported stolen, lost, or misplaced.  It does not relate to providing security services to a mobile device that has traveled outside of its secure network, nor does it relate to providing such security services where only a portion of the mobile device is powered on.  Appx1297-1298 (Hall at ¶¶ 51, 64-66), Appx1286 (FIG. 6D).

Under Hall, if subscriber device $110_1$ has been reported stolen, subscriber device $110_2$ communicates with a backend service center 150 and sets the status of subscriber device $110_1$ to stolen.  Appx1292 (FIG. 13).  As shown in Figure 13 (reproduced below), if the stolen device is in a power-saving (S3-S5) state, the

device is put in an operational (S0) state and, as a result, MySync module is activated to connective to the backend service center 150. Appx1300-1301 (Hall at ¶¶ 105-111), Appx1292 (FIG. 13). Once connected, the MySync module receives a message from the backend service center 150 to launch the MyGuard application to perform actions such as shutdown. Appx1299 (¶¶ 84-86), Appx1300 (¶ 107), Appx1292 (FIG. 13).



Appx1292 (FIG. 13).

Trend Micro asserted that Hall discloses a "security agent" because Hall discloses the MySync module 240 and MyGuard application $270_1$. Appx163-165

(Petition, IPR2021-01236).    Trend Micro also asserted that Hall discloses the "particular" limitations because "[a]ny wake event that backend service center 150 (a security system) detects is a particular wake event because it is distinguishable from the other wake events that backend service center 150 may detect."  Appx177.

### 2.    Joseph

Like Hall, the Joseph reference is directed to performing actions if a laptop computer is stolen, lost or otherwise missing.  Appx1332 (Joseph at ¶¶ 3-7).  Joseph does not relate to providing security services to a mobile device that has traveled outside of its secure network, nor does it relate to providing such security services where only a portion of the mobile device is powered on.

Joseph discloses that the network entity 66 allows a user to register with a wireless security service provider to activate the service.  Appx1351 (¶ 200), Appx1351-1352 (¶¶ 207-214) (describing the user registration process).  Once activated, interaction between the security/diagnostics unit (SDU) 14 of the laptop computer 12 and the security/technical support entity 20 can occur, where, for example, the laptop computer 12 has been lost or stolen.  Appx1340 (¶ 90).  Figure 4 reproduced below shows that a user 10 can contact the security/technical support entity 20 that may interact with SDU 14 to "shutdown the laptop computer 12" or "prevent access to data stored in the memory system."  Appx1341 (¶ 98), Appx1344 (¶ 134), Appx1322 (FIG. 4).



FIG. 4

Appx1322 (FIG. 4).

Trend Micro asserted that Joseph discloses a "security agent" because Joseph discloses a laptop containing an SDU configured to receive messages (wake signals) because upon receiving the messages, the laptop wakes up from a sleep mode to a wake mode, and, once awakened, the SDU performs a variety of security services. Appx201-202 (Petition, IPR2021-01236). Trend Micro also asserted that Joseph discloses the "particular" limitations because the security system in Joseph detects "particular" wake events distinguishable from other wake events. Appx204-205.

### 3.    Gordon in view of Gardner

Like Hall and Joseph, the Gordon reference is also directed to performing actions if a mobile computer is stolen or lost.  Appx3573 (Gordon at 1:13-21), Appx3575 (5:27-37).  Specifically, the commercial uses of the Gordon's disclosed technology include "theft recovery of stolen computers and asset tracking management of computers."  Appx3575 (5:27-37).  It does not relate to providing security services to a mobile device that has traveled outside of its secure network, nor does it relate to providing such security services where only a portion of the mobile device is powered on.

The disclosed technology includes a host monitoring system and two independently operating agents: (1) a host agent operating on the host device, and (2) a secondary agent (of the security module) deployed in the host device. Appx3567 (Gordon at Abstract) ("The invention is directed to a security module deployed in a host device, which provides a secondary agent that operates in coordination with the host agent in the host device, but operates independent of the host operating system of the host device . . . ."), Appx3574 (3:36-45).  For instance, if the host device has been stolen, the secondary agent may wake up the host agent such that the host monitoring system can instruct the host agent to call in more frequently or carry out protective tasks.  Appx3578 (12:21-39), Appx3579-3580 (14:53-15:11).

16

Gardner discloses that, like Gordon, the host monitoring system includes "web-based or network based console[s]" that can be authorized by administrators. Appx3603 (Gardner at ¶ 57); *see also* Appx2500-2501 (Petition, IPR2021-01237).

Trend Micro asserted that Gordon discloses a "security agent" because Gordon's security module 19 and host agent 14 are, together, a "security agent." Appx2505-2506 (Petition, IPR2021-01237). Trend Micro also asserted that Gordon discloses the "particular" limitations because Gordon's security system (monitoring center 70 / host monitoring system C) detects wake events distinguishable from other wake events, such as those that occur at other times. Appx2518-2519.

## B.    The Board's Claim Constructions

### 1.    The Parties' Arguments and the Board's Findings Regarding "particular wake event," "particular wake signal," and "particular security services" (All Claims)

CUPP proposed that the claim terms "particular wake event," "particular wake signal," and "particular security services" be construed together and consistent with the plain and ordinary meaning of the word "particular" as "of, relating to, or being a single person or thing." Appx12-13 (Final Written Decision in IPR2021-01236). CUPP argued that, taken as a whole, these claim elements recite the inventive technique whereby a specific wake event triggers a specific wake signal, which in turn triggers the mobile device's security for a specific security service. Appx451-452.

Trend Micro did not propose a construction.  Appx153-155.  Instead, Trend Micro argued that "particular" merely means one "that is distinguishable from other[s]."  Appx501; *see also* Appx177.  CUPP explained that Trend Micro's interpretation rendered the term "particular" superfluous because the challenged claims would have the same meaning with and without the term "particular" under that interpretation.  Appx454-455 (Patent Owner's Response in IPR2021-01236).  CUPP argued that, under Trend Micro's approach, any generic wake signal meets the claim limitation of a "particular" wake signal simply because it occurs at some point in time.  *Id.*  To give patentable meaning to the term "particular," therefore, CUPP argued that the term must mean something specific, not merely an event that occurs at some measurable point in time.  *Id.*  In other words, the term "particular" as it modifies wake events, wake signals, and security services must refer to specific types, not different points in time.  Appx455-456.

In its Final Written Decision, the Board adopted Trend Micro's interpretation and found that the claims should not be limited to a "particular *type* of wake event or signal."  Appx13 (Final Written Decision in IPR2021-01236).  The Board concluded that the claims recite a "particular wake signal," not a particular *type* of wake signal, and that the same is true for wake events.  *Id.*  The Board reasoned that CUPP's argument would require that the Board "rewrite the claims to make a distinction between . . . 'generic' wake signals and events and 'particular' wake

signals and events." *Id.* The Board rejected CUPP's argument that Trend Micro's construction fails to give patentable weight to the word "particular." Appx14-15. In support of its construction, the Board also quoted a portion of the transcript from the oral argument that "[CUPP's] counsel acknowledged that a wake event occurring at every hour could be a particular wake event." Appx13-14. Thus, because certain wake events, wake signals, and security services were distinguishable in time, the Board concluded that that fact alone was *sufficient* to make them "particular" wake events, wake signals, and security services within the meaning of the claims.

### 2. The Parties' Arguments and the Board's Findings Regarding "Security Agent" (All Claims)

In its Petition, Trend Micro did not set forth an explicit construction for the term "security agent." Appx153-155 (Petition, IPR2021-01236). Instead, Trend Micro argued for an implicit interpretation centering around a mobile device's applications and hardware components. Appx163 (Hall's "laptop $110_1$ (a mobile device) includes a processor and a MySync module (a security agent)"); Appx193 (In Joseph's laptop 12 "[a]t least processor 48, power system 40, and SDU 14 together are the claimed 'security agent.'").

In its Patent Owner Response, CUPP argued that "security agent" should be construed as "*a security system situated within and a part of an environment that senses that environment and acts on it, over time, in pursuit of its own agenda and so as to effect what it senses in the future*." Appx456-459 (Patent Owner's Response

in IPR2021-01236) (citing Appx2385 ("Franklin")).[2]    Importantly, the Franklin

definition distinguishes "agents" from the broader term "programs."  By clarifying

that "agents" is more specific than "programs" generally, CUPP argued, the Franklin

definition is consistent with how the term is used in the '632 Patent specification and

how a person of ordinary skill in the art would understand it.   In other words, an

agent is distinguishable from a program that runs when executed and returns into a

"coma" when finished.   Appx458; Appx456-459 (Patent Owner's Response in

IPR2021-01236).   CUPP argued that this distinction is important because Trend

Micro's interpretation incorrectly encompasses computer programs and hardware

more broadly. *Id.*

In its Reply, Trend Micro cited broad dictionary definitions of "agent" ranging

from "a piece of software that performs a service for someone" to "a computer

application designed to automate certain tasks."   Appx507; Appx505-512 (Trend

Micro's Reply in IPR2021-01236) (citing Appx1901, Appx1905, Appx1908).

Trend Micro also argued that the Franklin definition obfuscates the meaning of

"agent" with the requirement of "pursuit of its own agenda," and that the definition

is not contemporaneous with the claimed invention.  Appx505-512 (Trend Micro's

Reply in IPR2021-01236).

---

[2]  The Franklin definition is "cited more than **456 times** (with citations
contemporaneous with the year the claimed invention was filed)."  Appx543-544
(Patent Owner's Sur-Reply in IPR2021-01236) (emphasis added).

In its Sur-Reply, CUPP argued that the Franklin definition is how a person of ordinary skill in the art would have understood the term "agent" because the Franklin definition is cited 456 times in publications and books written by skilled artisans in the field.  Appx543-544 (Patent Owner's Sur-Reply in IPR2021-01236).  According to the Franklin definition, agents are in pursuit of their own agenda because they are autonomous.  Appx2387 ("autonomous" meaning "exercises control over its own actions").  CUPP's expert, Dr. Goodrich, testified that an agent is "in pursuit of its own agenda" because it has "autonomy" and can do "whatever it wants to [do]."  Appx2001 (39:3-22); Appx1944-1945 (138:22-139:10, 142:22-25).  CUPP argued that this understanding is consistent with the '632 Patent's specification (Appx546-547; Appx456-458), which teaches that the security agent acts independently of the mobile device (and other programs and hardware components) when, for instance, the mobile device is in power management mode.  Appx130, Appx133-134 ('632 Patent at 22:13-27; 22:53-58; 28:4-29:4).  At that time, the security agent is continuously running to receive a wake signal and wake up a portion of the mobile device. *Id.*

The Board, however, adopted Trend Micro's "'broader' dictionary definition" of "agent."  Appx15-16 (Final Written Decision in IPR2021-01236) (adopting the "plain and ordinary meaning best expressed by Merriam-Webster" as "a computer program designed to automate certain tasks" (quoting Appx1908).

21

**C.    The Board's Obviousness Determination**

The Board's Final Written Decisions found that claims 1, 7, 9, 16, 22, and 24 of the '632 Patent are unpatentable as obvious over the prior art in light of the Board's constructions of the claim terms "particular wake event," "particular wake signal," and "particular security services" and "security agent."    Appx47-48; Appx78.

## SUMMARY OF THE ARGUMENT

The Board's findings that challenged claims 1, 7, 9, 16, 22, and 24 of the '632 Patent are obvious over the prior art should be reversed because they rest on unreasonable claim constructions that are divorced from the intrinsic evidence and far broader than the claims require. The Board's claim constructions do not give patentable weight to the terms "particular" and "security," and instead incorrectly broaden the scope of the claims. And because the Board's ultimate obviousness determination rests on those flawed constructions, it should be reversed.

*First*, the Board's claim construction opinion incorrectly construes the term "particular wake event," as used in the '632 Patent, to encompass any generic wake event, wake signal, or security service so long as the wake event, wake signal, or security service is distinguishable in time. But that construction is divorced from the '632 Patent and the intrinsic evidence, and fails to give meaning to the word "particular," rendering it superfluous. The claims use the word "particular" on purpose to embody the essence of the invention; namely, that the device recognizes a distinct wake event, and, in response to that distinct event, sends a signal to wake portions of the device (but not the entire device) to initiate security services tailored to respond to that "particular" threat. The Board's construction, which encompasses any wake event, wake signal, or security services so long as they can be

distinguished in time, impermissibly broadens the claims and ignores this key inventive concept.

***Second***, the Board's claim construction of "security agent" as "a computer program designed to automate certain tasks" is overbroad, is contrary to the '632 Patent's specification, and does not give meaning to the term "security." The '632 Patent specification repeatedly distinguishes the claimed "security agent" from the more general computer programs that the Board construed the term to include. The Board ignored the '632 Patent's specification, which repeatedly distinguishes the "security agent" from more general computer programs that perform certain tasks. Instead, the Board relied on a dictionary definition of "agent" that encompasses computer programs that automate tasks and that do not continuously monitor the environment. The Board's overbroad construction is contrary to how a skilled person reading the '632 Patent would understand the claimed "security agent" as described in the specification and claims.

***Third***, the Board applied those broad, unreasonable constructions to its obviousness analysis to determine whether the references asserted as prior art disclosed or suggested the "particular" and "security agent" limitations. The claimed invention is directed to methods of providing security services to a mobile device that has traveled outside of its secure network by waking only a portion of the device, yet the Board's overbroad constructions encompassed disclosures in the art that do

not disclose *or even relate to* that invention.   Because the Board's ultimate obviousness analysis depends on finding the claimed "particular wake event," "particular wake signal," "particular security services," or "security agent" in the asserted prior art based on overbroad and incorrect constructions, its obviousness findings are infected by legal error and cannot stand.

Additionally, the Board's obviousness analysis suffers from a second infirmity.  The Board concluded that each of the asserted references standing alone renders the challenged claims obvious, but it failed to explain why a person of skill in the art would have been *motivated* to modify the disclosures in those references to arrive at the claimed inventions in the '632 Patent.  The Board's Final Written Decisions merely summarized the parties' arguments, stated which argument(s) the Board found persuasive, and concluded from there that the challenged claims were obvious in a "Summary" paragraph.  At times, the Board's decision adopted Trend Micro's analysis wholesale.   Thus, the Board failed to provide an adequate explanation for its obviousness decision.

Accordingly, the Board's Final Written Decisions finding claims 1, 7, 9, 16, 22, and 24 of the '632 Patent unpatentable should be reversed.

## STANDARD OF REVIEW

This Court reviews the Board's decisions under the Administrative Procedure Act ("APA"). *In re Gartside*, 203 F.3d 1305, 1311 (Fed. Cir. 2000). This Court "review[s] the Board's conclusions of law *de novo* and its findings of fact for substantial evidence." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1337 (Fed. Cir. 2016).

This Court reviews the Board's claim construction decisions *de novo* where based on intrinsic evidence, and reviews any extrinsic findings of fact for substantial evidence. *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020). In an *inter partes* review proceeding, the Board applies the same construction standard as that applied in federal court. *See* 37 C.F.R. § 42.100(b); *Celgene Corp. v. Peter*, 931 F.3d 1342, 1349 n.8 (Fed. Cir. 2019). Claim terms are "generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).

Obviousness is a question of law based on underlying factual determinations, including the scope and content of the prior art, differences between the prior art and the claims at issue, and the level of ordinary skill in the art. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 427 (2007). This Court reviews the Board's ultimate obviousness determinations *de novo* while reviewing any underlying factual findings for

substantial evidence. *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 991 (Fed. Cir. 2017) (citation omitted). "Substantial evidence is something less than the weight of the evidence but more than a mere scintilla of evidence." *In re Kahn*, 441 F.3d 977, 985 (Fed. Cir. 2006). Substantial evidence does not exist where, as here, "a reasonable fact finder could [not] have arrived at the agency's decision." *Gartside,* 203 F.3d at 1312 (explaining that the substantial evidence standard "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision").

## ARGUMENT

### I.    THE COURT SHOULD REVERSE THE BOARD'S DETERMINATION THAT CLAIMS 1, 7, 9, 16, AND 22 ARE OBVIOUS BECAUSE ITS CONSTRUCTION OF THE "PARTICULAR" LIMITATIONS ARE LEGALLY FLAWED

This Court should reverse the Board's conclusions that claims 1, 7, 9, 16, 22 and 24 of the '632 Patent are obvious because the Board's ultimate obviousness determination rests on a legally flawed claim construction of the "particular" limitations, specifically "particular wake event," "particular wake signal," and "particular security services." The Board's broad construction is divorced from the intrinsic evidence, renders the term "particular" superfluous, and is at odds with the purpose of the claimed invention. Worse, the Board compounded its error when it applied its broad construction to its analysis of the prior art and found that the asserted references disclosed the "particular" limitations merely because the

"particular wake events," "particular wake signals," and "particular security services" could be distinguished based on time.

Under the correct construction, in which a distinct wake event triggers a distinct wake signal and in turn triggers distinct security services to respond to the event, the Board's obviousness determination contravenes the only permissible finding that the asserted references do not teach these limitations. *In re Hodges*, 882 F.3d 1107, 1115-17 (Fed. Cir. 2018) (reversing the Board's anticipation findings because they "contravene the only permissible findings that can be drawn from the prior art under the proper constructions of the relevant claim terms"). Accordingly, the Board's obviousness determination rests on a legally flawed foundation and should be reversed.

### A.    The Board's Flawed Construction of the "Particular" Limitations is Divorced from the Intrinsic Evidence

One need look no further than the '632 Patent claims and specification themselves to ascertain the error in the Board's claim construction of the "particular" limitations. The claim term "particular" distinguishes the wake events, wake signals, and security services that must be performed in the claimed method from generic, non-specific events, signals, and security services that can occur. Taken as a whole, these claim elements recite the inventive technique whereby a "particular wake event" triggers a "particular wake signal" which in turn triggers the security agent to perform a "particular security service." In other words, a distinct wake event

causes the mobile device to send a distinct wake signal to wake portions of the device, which in turn execute distinct security services to respond to the event.

For example, wake event $A$ triggers wake signal $A^1$ to wake only the hard drive, which in turn triggers security services $A^2$ (for example, authenticating a password) specifically for wake event $A$ while the device remains in a power saving mode. This would satisfy the claimed "particular" limitations: because security services $A^2$ respond to the signal generated only from wake event $A$ while remaining in a power management mode, these are "particular" security services within the meaning of the claims.

Now consider wake event $B$, which triggers a wake signal $B^1$ that wakes the entire device, thereby enabling the system to perform any desired security services. This would not satisfy the claimed "particular" limitations: enabling generalized security services operating on multiple fronts simultaneously are not "particular" security services, and wake event $B$ and the wake signal $B^1$ are not "particular" wake events and wake signals because they are intended to wake the entire device.

Also consider wake event $C$, which triggers a wake signal $C^1$ that wakes a separate portion of the device from wake event $A$ while the device remains in a power saving mode, to perform security services $C^2$ (for example, executing an algorithm to scan the hard drive) specifically to respond to the threat identified by wake event $C$. This would satisfy the "particular" limitations; because security

services $C^2$ respond to the threat posed by wake event $C$ through the wake signal that distinguishes that threat, they are "particular" within the meaning of the claims.

All of the above wake events, wake signals, and security services are capable of being distinguished in time (for example, a skilled person could measure and separately identify each wake event, wake signal, and security services, and confirm that they occurred). But not all of the above wake events are "particular" wake events within the meaning of the claims—only security services that are executed based on a distinct signal, which in turn is tied to a distinct event, are "particular" within the meaning of the '632 Patent claims.

The Board's construction of the "particular" limitations, however, is like the second example with wake event $B$, and leads to a result in which any generic wake event, wake signal, or security service satisfies the claim language merely because it can be distinguishable based on time (i.e. that a skilled person could confirm that it occurred). But that construction does not accord with the plain language in the specification or claims that reinforces the inventive idea that a distinct wake event triggers a distinct wake signal to perform specific security services in response to the perceived threat. *See* Appx130-133 ('632 Patent at 22:28-34; 22:36-38; 28:15-17); Appx452-453.

The plain language of the claims themselves supports rejecting the Board's construction. For example, independent claims 1 and 16 confirm that the mobile

device will "prepare a particular [i.e. distinct] wake signal in response to detecting the particular [i.e. distinct] wake event," which triggers the performance of "particular [i.e. distinct] security services" after a portion of the device has been woken up (but not the entire device). Appx135-136 (31:49-57, 32:57-33:8) The dependent claims further confirm this interpretation, and recite the distinct wake events (like an alert from a program, or that a predetermined amount of time has lapsed) that cause the device to prepare the specific wake signals to wake only a portion of the device. Appx135 ('632 Patent at claims 5-8).

In other words, claim 5 describes and claims the invention whereby "receiving an alert from a security administrator and determining that the alert is authentic" triggers a wake signal "particular" (i.e. distinct) to that event, which in turn triggers security services "particular" (i.e. distinct) to that signal. That is different from claim 6, which describes and claims the invention whereby "detecting that a predetermined time has elapsed" triggers a wake signal "particular" to that event (and thereby distinct from the signal triggered by the event described in claim 5), which in turn triggers "particular" security services to respond to the event (that are distinct from the security services triggered by the event in claim 5). And so on.

Dependent claims 9-15 also recite the distinct security services performed in response to the distinct wake signals caused to be generated by distinct wake events. Appx135 ('632 Patent at claims 9-15). Critically, the security services recited in the

claims are "particular" because they are triggered by a wake signal that is, in turn, triggered by a distinct event. The Board ignored this intrinsic evidence.

The Board's legally flawed construction should be rejected because it is inconsistent with the intrinsic evidence, the '632 Patent specification, and the plain language of the claims. The Board's incorrect construction does not require any distinct security services to be performed in response to the distinct signal generated by the distinct wake event, and thus is vastly overbroad.

### B. The Board's Construction of the "Particular" Limitations Renders the Term "Particular" Superfluous

The Board's construction of the "particular" limitations is also flawed because it renders meaningless the claim term "particular" in requiring that the wake event, wake signal, or security services be distinguishable based on time. Appx454-455. As explained above, the claims require a distinct wake event that triggers a distinct wake signal and that further triggers distinct security services be executed, and that the security services flow from a correlation with the "particular" event. The Board's substitution of a "time" requirement for the distinctness requirement renders the term "particular" meaningless because *every* wake event, wake signal, or security service can be distinguished based on time (for example, by the time the wake event occurred, the time the wake signal was sent or received, or the time that the security services were executed).

32

In making this substitution, the Board relied heavily on CUPP's counsel's oral hearing statements.   However, these statements do not support the Board's construction.   Appx13-14 ("[CUPP's] counsel acknowledged that a wake event occurring at every hour could be a particular wake event").   What counsel acknowledged was that an event with a particular characteristic "***could be***"—not "is" or "must be"—the type of event described in the patent.   A gathering of people outdoors ***could be*** a wedding, but whether it ***is*** a wedding depends on other characteristics such as the presence of a bride, a groom, and an officiant.   And that is exactly what counsel made clear *immediately* after the acknowledgment that the Board misleadingly cited:   "[a]nd ***then what the claim says or requires*** is that for each particular wake event, ***there has to be a particular wake signal that's associated with that particular [wake event]***. . . . And then from whatever that particular wake signal is for that particular wake event, then you have a particular security service that's offered."   Appx14 (citing Appx725-726 (50:10-51:3) (emphasis added)).   Although it is true that a wake event occurring at every hour is both distinguishable in time ***and possibly*** a "particular wake event," what makes it "particular" is whether it triggers a distinct signal, which also triggers distinct security services to respond to the event.   In other words, the claims use the term "particular" to identify the inventive concept that distinct wake events trigger

distinct wake signals, which in turn trigger distinct and specifically responsive security services.

The Board's improper substitution of a "time" requirement also runs afoul of this Court's precedent, which require that claim constructions avoid construing terms "in a way that renders them void, meaningless, or superfluous." *St. Jude Med., LLC v. Snyders Heart Valve LLC*, 977 F.3d 1232, 1241 (Fed. Cir. 2020) ("Claims are interpreted with an eye toward giving effect to all terms in the claim."); *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1339-40 (Fed. Cir. 2016) (same principle).  But that is precisely what the Board's construction does—it renders "particular" void, meaningless, and superfluous within the context of the claims.  Thus, it is legally flawed.

Under the Board's construction, any wake signal generated in response to any wake event is a "particular" wake signal generated in response to a "particular" wake event because they are distinguishable based on time.  But the specification and the claims explain that the claimed invention does not depend on events being distinguishable in time.  Rather, the claimed invention includes waking only a portion of the device (for example, the hard drive) in response to receiving a distinct type of wake signal that has been generated by a distinct type of wake event, which causes the device to execute distinct security services.  Appx130 ('632 Patent at 22:28-38); Appx452-453.  The Board's construction therefore fails to give weight

and meaning to "particular," because *every* wake event, wake signal, or security service would be distinguishable based on time. That is not what the claims recite or require.

The Board therefore erred in adopting an interpretation that renders "particular" meaningless in the context of the claims. *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1563 (Fed. Cir. 1991) ("When the language of a claim is clear, as here, and a different interpretation would render meaningless express claim limitations, we do not resort to speculative interpretation based on claims not granted.").

### C.    The Board's Construction of the "Particular" Limitations Ignores the Stated Purpose of the Claimed Invention

The Board's construction of the "particular" limitations is also flawed because it is at odds with the '632 Patent's stated purpose of the claimed invention. The '632 Patent is directed to inventions that detect a distinct event, send a distinct signal to a portion of the device, selectively wake a portion of the device and selectively activate distinct security services in response to the event. This linked functionality is itself the essence and purpose of the claimed inventions in the '632 Patent.

But the Board's flawed construction ignores that purpose and does not interpret the "particular" limitations "in light of the teachings of the written description and purpose of the invention described therein." *Apple Comput., Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000). Instead, under the Board's

construction, any wake event triggers a wake signal or security services is "particular" because it can be distinguished based on time. This is precisely the opposite of the claims and the '632 Patent's stated purpose; namely, that a distinct security service be executed in response to a distinct signal generated from detection of a distinct wake event, all of which occur while the device is not fully powered on.

### D.    Reversal is Warranted Under the Appropriate Construction

Under a correct construction that gives patentable meaning and weight to "particular" in the "particular" limitations, the Board's decision finding claims 1, 7, 9, 16, 22 and 24 of the '632 Patent to be obvious over the prior art cannot stand. *Owens Corning v. Fast Felt Corp.*, 873 F.3d 896, 901-02 (Fed. Cir. 2017) (finding that reversal is appropriate where, "[o]n the evidence and arguments presented to the Board, there is only one possible evidence-supported finding," that the Board's determination "when the correct construction is employed, is not supported by substantial evidence"). Because the Board's obviousness finding depends on the Board's flawed claim construction of the "particular" limitations, and the purported disclosure of the same in the asserted references, reversal of the claim construction requires reversal of the Board's obviousness determination. *Id.*

As a threshold matter, the Board's attempt to backfill its reasoning does not correctly apply "Patent Owner's construction." Appx36-37 (Final Written Decision in IPR2021-01236). As explained, CUPP's construction requires that a distinct

36

wake event trigger a distinct wake signal, which, in turn, triggers a distinct security service or services (all while the device remains in a power management mode, i.e., not fully powered on). Appx451-452 (Patent Owner's Response in IPR2021-01236). But the Board's analysis stops short of the claimed cascade, and purports to apply CUPP's construction whereby "particular type" means one type of identifiable wake event, wake signal, or security service. That is incorrect. The security services are "particular" *only* when they are triggered by a distinct wake signal that is itself triggered by a distinct wake event.

Critically, the error in the Board's obviousness determination is even more striking when viewed in the context of the asserted references, none of which are even directed to the technical problem solved by the '632 Patent. The '632 Patent teaches providing distinct security services to mobile devices that have traveled outside of their trusted networks based on receipt of a distinct signal, without the burdensome requirement that the device be fully powered on. By contrast, the asserted references—Hall, Joseph, and Gordon—are all directed to various actions if a device has been reported lost, stolen, or misplaced. A person skilled in the art would not have looked to any of Hall, Joseph, or Gordon for teachings or motivation to provide distinct security services (based on a distinct signal) to a device that has

traveled outside of its trusted network wherein only a portion of the device is activated.[3]

None of the asserted references teaches or suggests the claimed inventions as a whole, and none of the asserted references teaches or suggests the "particular" limitations contained in the properly construed claims. For example, Hall discloses only one wake message to cause the wakening of the device, so there is no disclosure of preparing and sending distinct wake signals in response to a wake event. Appx465-467 (Patent Owner's Response in IPR2021-01236). Hall also does not disclose "particular" security services because the security services described in Hall are not executed in response to a distinct wake signal that was caused by a distinct wake event. *Id.*

Joseph does not disclose a "particular" wake signal, but instead, at best, discloses a generic wake signal that is sent regardless of whether the device is in a power management mode. Appx476-478. A wake signal sent whether the device is asleep or awake is not "particular" within the meaning of the claims. Like Hall, Joseph also does not disclose "particular" security services that are executed in response to a "particular" wake signal because the security services are not related to waking portions of the device. *Id.*

---

[3] Indeed, in Hall, Joseph, and Gordon the ***entire*** device is woken up.

Gordon does not disclose "particular" wake signal prepared in response to a "particular" wake event because it discloses only one type of wake message that is sent regardless of whether the device is active. Appx2763-2767 (Patent Owner's Response in IPR2021-01237). Like Hall, there is no disclosure in Gordon of distinct wake messages being prepared in response to distinct wake events. Similarly, there is no disclosure of "particular security services" because there is no disclosure of distinct wake events triggering distinct wake signals to execute distinct security services. Appx2766-2767.

Accordingly, substantial evidence does not support the Board's finding under the correct construction that gives full weight and meaning to the term "particular" and therefore this Court should reverse the Board's obviousness determination.

## II. THE COURT SHOULD REVERSE THE BOARD'S CONCLUSION THAT CLAIMS 1, 7, 9, 16, 22, AND 24 ARE OBVIOUS BECAUSE ITS CLAIM CONSTRUCTION OF "SECURITY AGENT" IS LEGALLY FLAWED

A second error provides an independently sufficient ground for reversal. This Court should reverse the Board's determination that Claims 1, 7, 9, 16, 22 and 24 of the '632 Patent are obvious because the Board's ultimate obviousness determination depends upon the Board's legally flawed and overbroad construction of "security agent," which encompasses more general computer programs that "automate certain tasks." Appx15-16 (Final Written Decision in IPR2021-01236).

The '632 Patent does not expressly define the term "security agent," but the patent itself is replete with passages that describe what the claimed "security agent" does in the context of the claimed invention—it is software that is part of a larger environment (for example, part of a security system), that can sense the environment, and that can, if necessary, act on it in pursuit of its own agenda (for example, to perform security services).  The plain language of the claims themselves similarly confirms this understanding.  Again, as with the "particular" limitations, the Board ignored this intrinsic evidence in favor of its broader construction.

Instead, the Board's claim construction relies on a dictionary definition of "agent," which incorrectly encompasses computer programs generally, including those that may or may not perform security services.  *Id.*; *see also* Appx15 n.6.  In this way, the Board's construction reads the term "security" entirely out of the claims and renders it meaningless.  But this "broader" dictionary definition does not accord with the intrinsic record, or the manner in which a person of skill in the art would understand the term by reading the '632 Patent specification and its numerous references to performing "security" services.  The Board therefore failed to ensure that any reliance on extrinsic evidence, such as the dictionary definition it applied, "accords with the intrinsic evidence." *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1348-49 (Fed. Cir. 2005) (citation omitted).  As explained more fully below, the Board did not "scrutinize the intrinsic evidence in order to determine the

most appropriate definition." *Id.* at 1349. Therefore, substantial evidence does not support the Board's construction. *Cisco Sys., Inc. v. Cirrex Sys., LLC*, 856 F.3d 997, 1011 (Fed. Cir. 2017) (reversing the Board's patentability determination where substantial evidence did not exist to support the decision under a correct claim construction).

Under the correct construction, in which the term "security agent" is construed in a manner that aligns with the disclosure in the '632 Patent specification, the Board's obviousness determination contravenes the only permissible finding that can be drawn; specifically, that none of the asserted references teaches a "security agent" as required by the claims. *In re Hodges*, 882 F.3d at 1115-17 (reversing the Board's anticipation findings because they "contravene the only permissible findings that can be drawn from the prior art under the proper constructions of the relevant claim terms"). The Board's obviousness determination rests on a legally flawed foundation and should be reversed.

### A. The Board's Flawed Construction of "Security Agent" is Directly Contrary to the Intrinsic Record

The Board's claim construction of "security agent" is legally flawed because it is overbroad and directly contrary to the intrinsic evidence, particularly the '632 Patent's specification and claims. It is common ground between the parties that the '632 Patent does not expressly define "security agent," and that it is appropriate to consult extrinsic evidence to explain the meaning of the "security agent" claim term.

*Free Motion Fitness*, 423 F.3d at 1348 (explaining that "courts may rely on dictionary definitions when construing claim terms and that dictionaries . . . are often useful to assist in understanding the commonly understood meaning of words") (internal quotation marks and citations omitted).

But even a cursory inspection of the intrinsic evidence reveals that the term "security agent" as it is used in the '632 Patent is more specific than the broad claim construction adopted by the Board. *See In re NTP, Inc*., 654 F.3d 1279, 1288 (Fed. Cir. 2011) (explaining that the Board's claim construction "cannot be divorced from the specification and the record evidence"). Indeed, the '632 Patent's specification "point[s] away from the improper meanings and toward the proper meaning." *Renishaw PLC v. Marposs Societa'per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). The Board, however, incorrectly ignored the '632 Patent specification and the use of "security agent" therein, which points away from construing "security agent" to mean a more general computer program.

The '632 Patent's specification repeatedly distinguishes the claimed "security agent" from a more general computer program that "automate[s] certain tasks." Appx130 (22:16-18) ("security agent" is "configured to wake the mobile device or wake components of the mobile device when a wake signal from the wake module 1802 is received"); *id.* (22:21-27) ("security agent" "receives the wake command and may wake the mobile device from power management mode" such that the

device can enter an active state such that security functions can be executed); *id.* (22:28-34) ("security agent" may "activate the hard drive in order to execute security functions but not pull the mobile device from power management mode"); *id.* (22:34-38) ("security agent" may "selectively activate various components of the mobile device and perform security functions"); *id.* (22:62-67) ("security agent" will "allow security functions to be performed" once security system has verified a user name and password); Appx133 (28:4-7) ("security agent" communicates with the security system and "provide[s] security services"); *id.* (28:20-24) ("security agent" may put components back into power management mode "after the security services are completed"); *id.* (28:54-57) ("security agent" may be "configured to perform one or more security services"); Appx133-134 (28:57-29:4) (describing security services performed by the "security agent," such as scanning the hard drive or updating the mobile device).

There is also no dispute that the '632 Patent specification requires that the claimed "security agent" include at least two modules that are distinct from the other general computer programs of the mobile device. Appx118 (Fig. 19) (reproduced below).



As shown in the '632 Patent specification, the "security agent" comprises at least two modules, particularly an agent module 1904 and a component manager 1906. Appx133 (28:11-15; 28:25-28).  The agent module 1904 is "configured to wake one or more components of the mobile device 1900 from the power management mode without waking the entire mobile device 1900." *Id.* (28:11-15).  And the component manager 1906 is "configured to allow the mobile security system 1702 to control or perform security services on one or more components of the mobile device 1900." *Id.* (28:25-28).  In other words, the "security agent" modules consist of one module that selectively wakes portions of the device, and a second module that selectively performs security services on the woken components.

Similarly, the plain language of the '632 Patent's claims confirms that the claimed "security agent" is more specialized than a general computer program that "automate[s] certain tasks."  For example,  the "security agent" is "configured to cooperate with the security system," and is "configured to perform security services"

once the mobile device is woken up.  Appx135 (claim 1); Appx135-136 (claim 16) ("the security agent of the mobile device being configured to perform particular security services").

The '632 Patent, therefore, clearly distinguishes between the claimed "security agent" and a more general program, such as a security module 1908. Appx118 (Fig. 19).  As the '632 Patent makes clear, a more general computer program, like the security module 1908, may "comprise security applications (e.g., anti-virus applications and firewalls) as well as security data (e.g. anti-virus definitions, phishing filters, spam filters, and cookie filters)."  Appx133 (28:41-44). These general computer programs are *not* a "security agent" within the meaning of the '632 Patent.

The Board, however, incorrectly disregarded the intrinsic evidence in favor of a broader definition of "security agent" as a program that "automate[s] certain tasks."  Appx15-16 (Final Written Decision in IPR2021-01236).  That construction is untethered from the '632 Patent's specification and is contrary to this Court's instruction that the construing tribunal "must ensure that any reliance on dictionaries accords with the intrinsic evidence."  *Free Motion Fitness*, 423 F.3d at 1348; *accord Phillips*, 415 F.3d at 1314, 1322.  Worse, the Board's construction says nothing about "security" and runs afoul of the Board's requirement to "scrutinize the intrinsic evidence in order to determine the most appropriate definition."  *Free Motion*

45

*Fitness*, 423 F.3d at 1349 (citing *Phillips*, 415 F.3d at 1322-24).  Thus, the Board's construction is legally flawed.

### B.    The Board's Flawed Construction Improperly Encompasses Computer Programs Generally

"All software agents are programs, but not all programs are agents." Appx2386.  This simple dichotomy explains that, in the field of computer programming, all agents are, at their core, computer programs, but not all computer programs are agents because an "agent" must exhibit several key features.  Agents can sense the environment in which they exist and act on it (i.e. they are "reactive").  Agents continuously operate.  Agents pursue their own agenda (i.e. they are "autonomous") and strive to effect a result (i.e. they are "goal-oriented").  Appx2386-2387.  But the Board's flawed construction of "security agent" as a program that "automate[s] certain tasks" fails to account for these key features and incorrectly broadens the claimed "security agent" to mean nothing more than a computer program that executes a given task.

As CUPP explained, computer programs generally are not "agents," because they execute a program or function and then go into a "coma" until they are called upon to act again.  Appx458-459 (Patent Owner's Response in IPR2021-01236).  By contrast, the claimed "security agent" is a module of the mobile device that continuously senses its environment to react to security threats so that it can effect a result (the protection of the device from the threat).

46

Under the Board's overbroad construction, any general computer program that "automate[s] certain tasks" is a "security agent" within the meaning of the '632 Patent. Appx16 (Final Written Decision in IPR2021-01236). But that construction makes no sense in the context of the '632 Patent specification and claims, which require, among other things, that the security agent be "configured to receive the wake signal," "wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal," and, importantly, be "configured to perform security services." Appx135 ('632 Patent at claim 1).

The '632 Patent itself makes clear that the "security agent" does a much more specific job than merely "automate certain tasks." For example, it "may wake only one or more components of the mobile device without fully terminating the power management mode"; it "may activate the hard drive in order to execute security functions but not pull the mobile device from power management mode"; it "may selectively activate various components of the mobile device and perform security functions"; or it may verify user credentials before "allow[ing] security functions to be performed." Appx130 (22:28-67).

In this way, the '632 Patent specification points "toward the proper meaning" of "security agent" as a module of the mobile device that is part of the security system, and can sense the security environment and, if necessary, act on it over time to protect the mobile device from threats. *Renishaw PLC*, 158 F.3d at 1250. This

understanding of "security agent" is wholly consistent with the specification and intrinsic evidence, but the Board's is not.

### C.     The Board Disregarded an Appropriate Definition that is Consistent with the Intrinsic Evidence

CUPP proposed that the term "security agent" be construed as "a security system situated within and a part of an environment that senses that environment and acts on it, over time, in pursuit of its own agenda and so as to effect what it senses in the future."  Appx456 (Patent Owner's Response in IPR2021-01236).  CUPP's proposed construction incorporated "security" into its proposed definition of "security agent," in accord with the specification and claims.  Appx456-457.  This is a far more tailored and appropriate construction than the Board's.

In support, CUPP relied on an article by Franklin entitled, "Is it an Agent, or just a Program?: A Taxonomy for Autonomous Agents."  *Id.* (citing Appx2385).  The Franklin paper distinguishes agents (like the claimed "security agent," for example) from other more general programs, and explains that, "[a]ll software agents are programs, but not all programs are agents."  Appx2386-2387.  In making this distinction, the Franklin paper explains that all agents are distinct from more general programs because they share four common features: (1) an agent is "reactive," it senses the environment and acts on it; (2) an agent acts in a "temporally continuous" process (in other words, over time); (3) an agent is "autonomous," and acts in pursuit of its own agenda; and (4) an agent is "goal-oriented," so as to effect

what it senses in the future.  Appx2384-2385, Appx2387.  As CUPP argued (and as highlighted above), the '632 Patent is replete with descriptions of the claimed "security agent" that accords with the Franklin paper's definition.  As Franklin describes, the claimed "security agent" acts autonomously and continuously (features (2) and (3)) to sense and respond to a wake signal (feature (1)) so as to wake up at least a portion of the mobile device to perform security services while the device is not fully powered on (i.e., in a power management mode) (feature (4)).  Thus, the Franklin paper's definition is wholly consistent with the intrinsic evidence and the use of "security agent" throughout the '632 Patent.

But the Board looked to another dictionary definition to supply the meaning of the word "agent," despite the '632 Patent's specification and the intrinsic evidence, which all point to the Franklin paper's definition of "agent" as the correct definition.  *Renishaw PLC*, 158 F.3d at 1250 ("[W]here there are several common meanings for a claim term, the patent disclosure serves to point away from the improper meanings and toward the proper meaning."); *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1315 (Fed. Cir. 2003) ("[T]he best indicator of claim meaning is its usage in context as understood by one of skill in the art at the time of invention.").  The Board's error therefore lies in the fact that CUPP proposed a construction for "security agent" that relied on extrinsic support that most closely aligns with the '632 Patent, and the Board rejected it.

49

Importantly, the Franklin paper's definition of "agent" as distinct from more general computer programs is also consistent with how a person of skill in the art would understand the term "security agent" as used throughout the '632 Patent. The Franklin paper is widely cited (with more than 456 citations), indicating that it is a key article that skilled artisans would reference to understand the plain and ordinary meaning of "agent." Appx543-544. Ultimately, the great weight of the intrinsic evidence pointed toward the Franklin definition. The Board rejected it.

### D. Under the Correct Construction, None of the Asserted References Teaches or Suggests the Claimed "Security Agent"

As discussed above, none of Hall, Joseph, or Gordon teach or suggest providing distinct security services to mobile devices that have traveled outside of their trusted networks based on receipt of a distinct signal, wherein only a portion of the device is woken up. Additionally, none of the asserted references teaches or suggests the claimed "security agent," when the term is correctly construed in a manner consistent with the intrinsic evidence.

In Joseph, the Board concluded, processors 48 and power system 40 constitute the claimed "security agent." Appx27, 33-34 (Final Written Decision in IPR2021-01236); Appx193-194 (Petition, IPR2021-01236). But those modules do not act independently and continuously because they are powered down when the device is powered down. In Hall, the Board concluded, the MySync module and MyGuard application are programs that together constitute the claimed "security agent."

Appx42-45.  As with Joseph, however, the modules identified in Hall do not act independently and continuously because they are powered down when the device is powered down.  This is inconsistent with the intrinsic evidence that the "security agent" is capable of acting independently when the device is in power management mode.  Appx133 ('632 Patent at 28:11-15).

In the Gordon reference, the Board cobbled together a purported "security agent" by identifying two agents that would be understood to work independently of each other, not together.  Appx68-70 (Final Written Decision in IPR2021-01237). In finding that Gordon teaches a "security agent," the Board accepted Trend Micro's incorrect argument that Gordon teaches two continuously acting and autonomous modules, a host agent and a security module.  The Board went to reason that, because the '632 Patent contains an embodiment wherein the "security agent" contains two modules, the same is found in Gordon.[4]  Not so.

The Board's finding with respect to Gordon is correct insofar as the "security agent" can encompass two modules, but that is where the Board's analysis goes wrong.  A person of skill in the art would understand that the security module

---

[4] Tellingly, the Board's Final Written Decision in the -01237 IPR highlights its own erroneous construction of "security agent."  In discussing Gordon, the Board stated that "a security agent need only be computer program designed to automate *security* tasks."  Appx70 (Final Written Decision in IPR2021-01237) (emphasis added).  But that is not what it construed "security agent" to mean; instead, the Board adopted a broader definition that is inconsistent with the '632 Patent's disclosure as a "computer program designed to automate *certain* tasks."  Appx64 (emphasis added).

disclosed in Gordon is distinct from the host agent, and acts independently from the host agent.  Thus, the two modules cannot be cobbled together to form one autonomous "security agent" as claimed.

Critically, the Board's reasoning with respect to Gordon is also incorrect because it limits the claim construction of "security agent" to one embodiment described in the '632 Patent.  This Court has held that it is error to construe claims of a patent as limited to an embodiment described in the patent.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).  The mere fact that the '632 Patent provides an embodiment wherein a "security agent" can have two modules instead of one does not invite the Board to conjure a "security agent" where none exists by kluging together disparate computer programs and hardware components that otherwise have no role in autonomous, continuous security.

Ultimately, none of Hall, Joseph, or Gordon discloses or suggests the claimed "security agent" when the claim term is properly construed.

### E.    Reversal is Warranted Under the Correct Construction

Under a correct construction of "security agent," the Board's decision finding claims 1, 7, 9, 16, 22, and 24 of the '632 Patent to be obvious over the prior art cannot stand.  *Owens Corning*, 873 F.3d at 901-02 (finding that reversal is appropriate where, "[o]n the evidence and arguments presented to the Board, there is only one possible evidence-supported finding," that the Board's determination

"when the correct construction is employed, is not supported by substantial evidence").

Substantial evidence does not support the Board's finding under the correct construction that gives full weight and meaning to all terms in "security agent," and therefore this Court should reverse the Board's obviousness determination.

## III. THE BOARD'S OBVIOUSNESS DECISION SHOULD BE REVERSED BECAUSE THE BOARD DID NOT ADEQUATELY EXPLAIN ITS OBVIOUSNESS DECISION

In its Final Written Decisions, the Board conclusorily stated that the challenged claims of the '632 Patent are obvious over Hall, Joseph, and Gordon as single references (not combinations).  However, the Board's decisions do not explain why, in the Board's view, it would have been obvious to modify or combine the disclosures in any of Hall, Joseph, or Gordon to arrive at the '632 Patent's invention.  Thus, the Board's opinions do not provide a sufficient explanation for its decisions.

It is well-settled principle in this Court that, if alleged obviousness is based on a single prior art reference, a claim is obvious over that single reference *only* "if it would have been obvious to modify that reference to arrive at the patented invention."  *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016); *accord Game & Tech. Co. v. Activision Blizzard Inc.*, 926 F.3d 1370, 1381 (Fed. Cir. 2019).  Although the Board construed the claims and applied its constructions to the prior art to determine if the art taught or disclosed the claim elements, the Board's

analysis ultimately falls short because it does not explain why a skilled person reading any of Hall, Joseph, or Gordon would have been motivated to modify the disclosures therein to arrive at the '632 Patent.  At most, the Board summarized its conclusions by reference to the parties' arguments and identified which arguments it found persuasive, before ultimately concluding that the challenged claims were obvious.  This was error.

For example, the Board's Final Written Decision in IPR2021-01236 states the following with respect to challenged claims 1 and 16:

> We have considered Petitioner's analysis of claims 1 and 16 in relation to Joseph and the relevant arguments and evidence presented by Patent Owner. Taking into account the entire record, including the Petition, Patent Owner's Response, Petitioner's Reply, and Patent Owner's Sur-reply, as well as the evidence presented by the parties, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1 and 16 of the '632 Patent would have been obvious in light of Joseph.

Appx37-38 (Final Written Decision in IPR2021-01236).

The Board's -01236 Final Written Decision merely identifies where Joseph discloses the challenged claim limitations ("particular wake event," "particular wake signal," "particular security services," and "security agent"), and ultimately concludes that claim 1 is obvious over Joseph in a "Summary" paragraph.  But the Board's "Summary" provides no independent analysis to support or explain its decision finding the challenged claims obvious over Joseph.  Nor does it explain

why a skilled person would have been motivated to modify Joseph to arrive at the inventions claimed in the '632 Patent. This is insufficient as a matter of law. Worse, the Board repeated this error for both Hall and Gordon.

"The reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine explanations for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019). Under that bedrock principle, the Board was required to provide "a reasoned basis" for its action, and its "own explanation must suffice for [this Court] to see that the agency has done its job." *In re NuVasive, Inc.*, 842 F.3d 1376, 1383 (Fed. Cir. 2016) (citation omitted). Where this Court cannot "reasonably discern" parts of the Board's decision, the Board's "conclusory assertions" fail to provide "the reasoned explanation needed to support its conclusion." *In re Warsaw Orthopedic, Inc.*, 832 F.3d 1327, 1335 (Fed. Cir. 2016).

In *NuVasive*, the Board did not explain why a skilled person would have been motivated to combine the asserted prior art references, and the "majority of the PTAB's analysis was limited to summaries of the parties' arguments." 842 F.3d at 1384. This Court explained that the Board's conclusory statements that it was "not persuaded" by a party's argument was not sufficient. *Id.* (explaining that the arguments adopted by the Board amounted to "nothing more than conclusory

statements that a [skilled person] would have been motivated to combine the prior art references to obtain additional information").

So too here. For its analysis of each of Hall, Joseph, and Gordon, the Board does not provide any explanation as to how or why a skilled person would be motivated to arrive at the '632 Patent from the asserted reference. Indeed, the word "motivated" does not even appear in the Board's -01236 Final Written Decision, and it appears in the Board's -01237 Final Written Decision a mere two times.[5]

Other portions of the Board's obviousness decision are similarly flawed because they adopt Trend Micro's analysis wholesale. For example, when discussing Hall, the Board addressed the challenged elements and adopted Trend Micro's "analysis for the remaining claim elements" without explanation. Appx39 (Final Written Decision in IPR2021-01236). But, although the Board may "credit a party's argument as part of its reasoned explanation of its factual findings," the Board must explain how the argument supported the Board's ultimate finding and why the Board accepted the argument over others. *Outdry Techs. Corp. v. Geox S.p.A.*, 859 F.3d 1364, 1370 (Fed. Cir. 2017) (citation omitted). With respect to Hall, at least, the Board's analysis falls short.[6]

---

[5] As noted above, a skilled person would not have been motivated by any of Hall, Joseph, or Gordon because those references pertain to vastly different technologies than the '632 Patent. *See supra* at 37-39.

[6] Additionally, with respect to the claim term "security agent," the Board did not even reference its ***own*** adopted construction in its Final Written Decisions. Appx33-

Accordingly, the Board's Final Written Decisions finding the challenged claims obvious fails to explain adequately its obviousness determination. This was error and should be reversed.

## **CONCLUSION**

CUPP respectfully requests that the Court reverse the Board's Final Written Decisions in IPR2021-01236 and IPR2021-01237 and find patentable Claims 1, 7, 9, 16, 22, and 24 of the '632 Patent.

---

34, Appx42-45 (Final Written Decision in IPR2021-01236); Appx68-70 (Final Written Decision in IPR2021-01237). The Board's obviousness analysis with respect to this claim term does not provide a "reasoned explanation . . . to support its conclusion." *In re Warsaw*, 832 F.3d at 1334-35.

Respectfully submitted,

Dated: July 25, 2023          By:  */s/ Paul J. Andre*
                                   Paul J. Andre
                                   James Hannah
                                   Kramer Levin Naftalis
                                    & Frankel LLP
                                   333 Twin Dolphin Drive, Suite 700
                                   Redwood Shores, CA 94065
                                   Tel: 650.752.1700
                                   Fax: 650.752.1810
                                   pandre@kramerlevin.com
                                   jhannah@kramerlevin.com

                                   Jeffrey H. Price
                                   Kramer Levin Naftalis
                                    & Frankel LLP
                                   1177 Avenue of the Americas
                                   New York, NY 10036
                                   Tel:  212.715.7502
                                   Fax:  212.715.8302
                                   jprice@kramerlevin.com

                                   *Attorneys for Appellant*
                                   CUPP Computing AS

## ADDENDUM – TABLE OF CONTENTS

| Date | Document Description | Appx No. |
|------|---------------------|----------|
| 01/17/2023 | Final Written Decision – IPR2021-01236 | Appx1 |
| 01/17/2023 | Final Written Decision – IPR2021-01237 | Appx50 |
| | U.S. Patent No. 10,951,632 | Appx97 |

Trials@uspto.gov                                    Paper 37
571-272-7822                          Entered: January 17, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

TREND MICRO INC.,
Petitioner,

v.

CUPP COMPUTING AS,
Patent Owner.

_____

IPR2021-01236
Patent 10,951,632 B2

_____

Before THOMAS L. GIANNETTI, GARTH D. BAER, and
SHARON FENICK, *Administrative Patent Judges*.

GIANNETTI, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-01236
Patent 10,951,632 B2

# I. INTRODUCTION

## A. Background

Trend Micro Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 1, 9, 16, and 24 (the "challenged claims") of U.S. Patent No. 10,951,632 B2 (Ex. 1001, the "'632 patent"). Paper 1 ("Pet."). CUPP Computing AS ("Patent Owner") filed a Preliminary Response. Paper 9. Pursuant to 35 U.S.C. § 314, we instituted this *inter partes* review as to all of the challenged claims and all grounds raised in the Petition. Paper 16 ("Institution Dec.").

Following institution, Patent Owner filed a Response. Paper 25 ("PO Resp."). Subsequently, Petitioner filed a Reply to Patent Owner's Response (Paper 28, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 30, "PO Sur-reply").

On October 18, 2022, we held a consolidated oral hearing with IPR2021-01237, also involving the '632 patent. A transcript of the hearing is included in the record. Paper 36 ("Hearing Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision issued pursuant to 35 U.S.C. § 318(a). For the reasons we discuss below, we determine that Petitioner has proven by a preponderance of the evidence that all challenged claims of the '632 patent are unpatentable.

## B. Related Proceedings

The parties identify the following district court proceeding concerning the '632 patent: *CUPP Cybersecurity LLC v. Trend Micro, Inc.*, *et al.*, No.

2

IPR2021-01236
Patent 10,951,632 B2

3:20-cv-03206 (N.D. Tex.). Pet. 1–2; Paper 7. In addition, Petitioner challenges claims 1, 7, 9, 16, 22, and 24 of the '632 patent in IPR2021-01237 (the "1237 IPR"). A Final Written Decision in the 1237 IPR is being entered concurrently with this Decision.

A closely related patent, U.S. Patent No. 9,843,595 (the "'595 patent"),[1] was before the Board in IPR2019-00765 (the "765 IPR"). A Final Written Decision in the 765 IPR, finding all challenged claims of the '595 patent unpatentable, was entered on August 25, 2020. Ex. 1003. That Decision was appealed to the Federal Circuit and affirmed on November 16, 2022. *CUPP Computing AS v. Trend Micro Inc.*, 53 F.4th 1376 (Fed. Cir. 2022).

## C. Real Party-in-Interest

The Petition identifies Trend Micro as the real party-in-interest. Pet. 1. Patent Owner identifies CUPP Computing AS as the real party-in-interest. Paper 7, 1.

## D. The '632 Patent

The '632 patent describes a system and method for providing data and device security between external and host devices. Ex. 1001, 1:30–33. According to the patent, mobile devices are more vulnerable to attacks by malicious code when traveling outside an enterprise network. *Id.* at 1:61–65. The patent thus describes "a small piece of hardware [a 'mobile security system'] that connects to a mobile device and filters out attacks and

---

[1] The '632 patent is a continuation (through a chain of continuations) of the '595 patent (Ex. 1004), and shares a common specification with the '595 patent.

malicious code." *Id.* at 5:45–47. The patent explains that "[u]sing the mobile security system, a mobile device can be protected by greater security and possibly by the same level of security offered by its associated corporation/enterprise." *Id.* at 5:49–52.

This system is illustrated in Figure 3 of the '632 patent, which follows:



FIG. 3

Figure 3 of the '632 patent is a block diagram of a network system. Ex. 1001, 5:53–54. Network system 300 includes desktop 305, first mobile device 310a, and second mobile device 310b. *Id.* at 5:54–56. First mobile device 310a is within trusted enterprise network 340 and is coupled to the enterprise's intranet 315 via mobile security system 345a. *Id.* at 5:56–59. Figure 3 further shows mobile device 310c that has travelled outside trusted enterprise network 340 and is coupled to untrusted internet 330 via mobile

security system 345b. *Id.* at 6:3–5. This mobile device may be in use by an employee of trusted enterprise network 340 who is currently on travel. *Id.* at 6:6–7. Security administrator 325 manages mobile security systems 345a and 345b and network security system 320 to assure that they include the most current security protection. *Id.* at 6:7–11.

The '632 patent also describes a wake module configured to wake a mobile device from a power management mode. Ex. 1001, 21:63–64, Fig. 18. According to the patent, a power management mode "is a mode wherein the mobile device conserves power, usually after a predetermined period of inactivity (e.g., no input from a mouse and keyboard)." *Id.* at 21:64–67. During power management mode, the mobile device may reduce or eliminate power to one or more mobile device components such as a display and/or hard drive. *Id.* at 21:67–22:3.

*E. Illustrative Claim*

Claims 1 and 16 are independent. Claim 1 is representative of the challenged claims. Claim 1 recites[2]:

> [1.0] A security system, comprising:
>
> [1.1] security system memory;
>
> [1.2.a] a communication interface configured to communicate with a mobile device and configured to communicate over a network with a security administrator device,
>
> [1.2.b] the mobile device including a mobile device processor and including a security agent configured to cooperate with the security system,
>
> [1.2.c] the security administrator device having a security administrator processor different than the mobile device

---

[2] Paragraph numbering provided by Petitioner has been added.

IPR2021-01236
Patent 10,951,632 B2

processor, the mobile device being remote from the security administrator device,

[1.2.d] the mobile device being a first computer system, the security system being a second computer system, the security administrator device being a third computer system, the first computer system, the second computer system and the third computer system being separate computer systems; and

[1.3] a security system processor being different than the mobile device processor and different than the security administrator processor, the security system processor being configured to:

[1.4.a] store in the security system memory at least a portion of wake code, the wake code being configured to detect a wake event and to send a wake signal to the mobile device in response to detecting the wake event,

[1.4.b] the security agent of the mobile device being configured to receive the wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal, the security agent of the mobile device being configured to perform security services after the at least a portion of the mobile device has been woken;

[1.5] detect a particular wake event;

[1.6] prepare a particular wake signal in response to detecting the particular wake event; and

[1.7.a] send the particular wake signal to the mobile device in response to detecting the particular wake event,

[1.7.b] the security agent of the mobile device being configured to wake the at least a portion of the mobile device in response to receiving the particular wake signal and being configured to perform particular security services after the at

6

**Appx6**

IPR2021-01236
Patent 10,951,632 B2

least a portion of the mobile device has been
woken.

Ex. 1001, 31:15–58.

## F.  References and Other Evidence

The Petition relies on the following references:

U.S. Patent App. Pub. No. 2008/0120423 (Ex. 1007, "Hall").

U.S. Patent App. Pub. No. 2006/0101277 (Ex. 1008, "Meenan").

U.S. Patent App. Pub. No. 2010/0218012 (Ex. 1009, "Joseph").

In addition, Petitioner submits the Declaration of Dr. Markus
Jakobsson (Ex. 1020, "Jakobsson Decl.").  Patent Owner submits the
Declaration of Michael T. Goodrich, Ph.D. (Ex. 2011, "Goodrich Decl.").
The parties also submitted deposition transcripts for those witnesses.
Ex. 1026 ("Goodrich Dep."); Ex. 2015 ("Jakobsson Dep.").  In addition, the
parties have submitted expert declarations and deposition transcripts from
the 765 IPR.[3]

## G.  Asserted Grounds of Unpatentability

Petitioner asserts the challenged claims are unpatentable on the
following grounds:

---

[3] Patent Owner has submitted Dr. Jakobsson's declaration from the 765 IPR.
Ex. 2007.  In addition, Petitioner has submitted a deposition transcript of
Nenad Medvidovic, Ph.D., from the 765 IPR.  Ex. 1027.  Dr. Medvidovic
testified for Patent Owner in the 765 IPR.

IPR2021-01236
Patent 10,951,632 B2

| Claims Challenged | Basis (35 U.S.C.)[4] | Reference(s) |
|---|---|---|
| 1, 9, 16, 24 | § 103(a) | Hall |
| 9, 24 | § 103(a) | Hall, Meenan |
| 1, 16 | § 103(a) | Joseph |
| 9, 24 | § 103(a) | Joseph, Meenan |

Pet. 4.

## II.    PRELIMINARY MATTERS

### A. Level of Ordinary Skill

Petitioner contends "[a] person of ordinary skill in the art at the time of the alleged invention of the '632 patent (*i.e.*, August 4, 2008) . . . would have had a bachelor's degree in computer science, electrical engineering, or a comparable field of study, plus at least two years of professional experience with computer security systems, or the equivalent." Pet. 12 (citing Jakobsson Decl. ¶ 60).

Patent Owner contends "[a] person of ordinary skill in the art of the '632 Patent would be someone with a bachelor's degree in computer science or a related field and either (1) two or more years of industry experience and/or (2) an advanced degree in computer science or a related field." PO Resp. 7 (citing Goodrich Decl. ¶ 30). These formulations are similar, differing mainly in the specific reference, in Patent Owner's formulation, to

---

[4] Because the parties agree that the challenged claims of the '632 patent have an effective filing date before March 16, 2013, we apply the pre-AIA ("America Invents Act") version of § 103. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011).

IPR2021-01236
Patent 10,951,632 B2

"an advanced degree in computer science or a related field" as a possible alternative to experience in the field.

We adopt Patent Owner's description as it is consistent with the prior art and patent specification before us and supported by credible expert testimony. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). However, our decision would be the same under either formulation.

### B. *Claim Construction*

In an *inter partes* review, the claims of a patent shall be construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b), including construing the claims in accordance with the ordinary and customary meaning of such claims as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005). Under that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning, as would be understood by one of ordinary skill in the art at the time of the invention. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Any special definitions for claim terms must be set forth with reasonable clarity, deliberateness, and precision. *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

We construe claim terms only as relevant to the parties' contentions and only to the extent necessary to resolve the issues in dispute. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999);

9

IPR2021-01236
Patent 10,951,632 B2

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013,
1017 (Fed. Cir. 2017).

### *1. power management mode (all challenged claims)*

This term has been construed in the 765 IPR and in district court
litigation involving the '595 patent as "a mode where the mobile device
conserves power." Pet. 12; PO Resp. 18–19. There is no dispute over this
construction. *See* Ex. 1006, 6.[5] The construction is supported by the '632
patent specification. *See* Ex. 1001, 21:62–64 ("A power management mode
is a mode wherein the mobile device conserves power."). We, therefore,
agree with this construction, and we adopt it for this decision.

### *2. security administrator device (all challenged claims)*

Petitioner contends "the plain and ordinary meaning of this term
includes a device that performs security administration." Pet. 13 (citing
Jakobsson Decl. ¶ 65). Petitioner asserts that "[t]his is consistent
with the '632 patent's disclosure that the security administrator device 325
may perform various security administration tasks." *Id.*

Patent Owner responds that "[t]his term is defined in the '632 Patent
as a device that manages the security of a security system." PO Resp. 15
(citing Ex. 1001, 6:7–11) (emphasis omitted). Patent Owner asserts that
"Petitioner's proposed construction includes the phrase 'security
administration,' but it is unclear as Petitioner leaves unsaid what 'security
administration' does and does not encompass." *Id.* at 17.

---

[5] Unless otherwise indicated, citations to exhibits use the page numbers
assigned by the parties, not the original page numbers.

IPR2021-01236
Patent 10,951,632 B2

We are persuaded to adopt Petitioner's construction. Petitioner's construction reflects its position that "[i]n no place do the claims recite that the 'security administrator device' must manage the 'security system,' let alone manage the security of the security system.'" Pet. Reply 12. We agree that a security administrator device need not "*manage*" the security of a security system as Patent Owner asserts. PO Resp. 15. Our construction is consistent with the term's plain language as well as the '632 patent claims and is supported by expert testimony. Jakobsson Decl. ¶ 65.

As Petitioner points out, the claims themselves make no mention of managing the security of a security system. Pet. Reply 12. Claim 1 recites that the security system is "configured to communicate over a network with a security administrator device." Ex. 1001, 31:18–19. Claim 16 recites that the security administrator device is "a third computer system," but does not recite a relationship between the security administrator device and the security system. *Id.* at 32:61–63; *see also* Jakobsson Decl. ¶ 65 ("The plain and ordinary meaning of this term includes a device that performs security administration.").

Petitioner's construction also is consistent with the '632 patent's disclosure that the security administrator device may perform various security administration tasks. Pet. 13; Ex. 1001, 24:55–57 (describing security administrator 325 as an "administrator device"). As Petitioner points out, "[a]lthough management is a type of administration, administration includes other activities more broadly related to running a system, such as maintaining routing tables." Pet. Reply 13 (citing Ex. 1001, 12:28–30; Ex. 1024, 3).

11

**Appx11**

IPR2021-01236
Patent 10,951,632 B2

We do not agree with Patent Owner's argument that Petitioner's proposed construction is "unclear." PO Resp. 17. As Petitioner points out, the relationship between the security system and the security administrator device is recited in the claims. Pet. Reply 12. The claims do not recite that the security administrator device manages the security device, "let alone manage[s] the security of the security system." *Id.*

We do not agree with Patent Owner's argument that the term "security administrator device" is "defined in the '632 Patent." PO Resp. 15 (citing Ex. 1001, 6:6–11). We are not convinced that the reference to this phrase in the '632 patent specification cited by Patent Owner sets forth with sufficient "clarity, deliberateness, and precision" a lexicographic definition. *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998); *In re Paulsen*, 30 F.3d at 1480. Instead, Patent Owner's argument is an attempt to incorporate limitations from a particular embodiment that are not recited in the claims. *See* Pet. Reply 13–14.

We, therefore, do not adopt Patent Owner's proposed construction for this term. Adopting Petitioner's construction, we construe the term as "a device that performs security administration." Pet. 13; Jakobsson Decl. ¶ 65.

### 3. *particular wake event/particular wake signal/particular security services (all claims)*

Patent Owner contends that "[t]aken as a whole, these claim elements recite a technique whereby a wake event triggers a particular *type* of wake signal, which triggers the mobile device's security for a particular *type* of security service." PO Resp. 7–8. Citing Merriam-Webster's dictionary, Patent Owner contends that "[t]his interpretation is consistent with the plain

IPR2021-01236
Patent 10,951,632 B2

and ordinary meaning of the word 'particular,' which is 'of, relating to, or being a single person or thing . . . .'" *Id.* at 8 (citing Ex. 2012, 3).

Petitioner responds that a "particular" wake signal includes one that is distinguishable from other wake signals, such as a wake signal that occurs at a specific time." Pet. Reply 1. Therefore, "[a] wake signal that occurs at a specific time is a specific, single, and individual wake signal, distinguishable from wake signals that occurred at other times. Thus, it is a 'particular' wake signal." *Id.* at 2. Petitioner argues that the Board should reject Patent Owner's argument "that these claim terms should be limited to a 'particular type of' wake signal, wake event, and security service." *Id.* at 4–5.

We agree with Petitioner that the claims should not be limited to a particular *type* of wake event or signal. The claims themselves recite a "particular wake signal," not a particular *type* of wake signal. The same is true for wake events. Patent Owner's argument would, therefore, require us to rewrite the claims to make a distinction between what Patent Owner refers to as "generic" wake signals and events and "particular" wake signals and events. *See* Hearing Tr. 38:26–39:7, 41:6–19. This distinction is not reflected in the claims or specification.

At the oral hearing, Patent Owner's counsel was questioned by the panel exploring the differences between particular and generic wake events. Hearing Tr. 50:10–51:3. Ultimately, Patent Owner's counsel acknowledged that a wake event occurring at every hour could be a particular wake event:

> [THE BOARD:] What if there was a wake event that was wake at noon and a wake event that was wake at midnight? . . . [W]ould one of those qualify as a particular wake event?

13

**Appx13**

[PATENT OWNER'S COUNSEL:] Yeah. I believe each one because that's the -- what's described and what's claimed is that you -- there is a particular wake event which has to be detected. It's not limited to only one, so it could be -- it could be every hour. *There could be a particular wake event which is each hour.* So, you know, *that's the particular wake event. Or it could be just, like you said, at noon -- or at noon or at midnight. Those would each be a particular wake event.*

And then what the claim says or requires is that for each particular wake event, there has to be a particular wake signal that's associated with that particular. And it could be that what you do at noon or what you do at midnight *are the same*, or it could be different. And then from whatever that particular wake signal is for that particular wake event, then you have a particular security service that's offered.

Hearing Tr. 50:10–51:3 (emphasis added).

Patent Owner argues that "[u]nder Petitioner's interpretation, the Challenged Claims would have the same meaning with and without the word 'particular' because *every* detected wake event would occur at some point in time." PO Resp. 11; *see also* PO Sur-reply 1 ("Petitioner's proposal . . . should be rejected because it renders the word 'particular' superfluous."). We disagree that under Petitioner's construction, the term "particular" would be meaningless or superfluous. We agree with Petitioner and find that "[a] signal sent at time $T_1$ is not the same signal sent at time $T_2$." Pet. Reply 2. As Petitioner explains, "[a]lthough the signals may have the same form, each is individually identifiable." *Id.* Two wake signals of the same form sent at the same time would not be "particular" wake signals because they would not be distinguishable on the basis of time. *Id.* at 2–3. Thus, we find that Petitioner's interpretation provides a meaningful

14

**Appx14**

identification of particular wake events and wake signals. For the reasons given we adopt Petitioner's construction of these claim elements.

This construction will be further discussed in Section III.B, *infra*, in connection with our consideration of the prior art.

### 4. security agent (all claims)

Patent Owner contends that "[t]he plain and ordinary meaning of the term 'security agent' is a security system situated within and a part of an environment that senses that environment and acts on it, over time, in pursuit of its own agenda and so as to effect what it senses in the future." PO Resp. 12 (emphasis omitted). For support, Patent Owner relies on a paper by Franklin titled "Is it an Agent, or just a Program?: A Taxonomy for Autonomous Agents." *Id.* (citing Ex. 2013, 1).

Petitioner responds that "Patent Owner's construction comes from Franklin's definition of '<u>autonomous</u> agent,' not 'security agent' or 'agent.'" Pet. Reply 6. Petitioner explains that "Franklin . . . acknowledges that some agents may not be autonomous." *Id.* (citing Ex. 2013, 6). Petitioner presents several "broader" dictionary definitions of "agent." *Id.* at 7–8 (citing Exhibits 1023 (from "Barron's Dictionary of Computer and Internet Terms"), 1014 (from "Concise Oxford English Dictionary") and 1025 (from "Merriam-Webster's Collegiate Dictionary")). Petitioner contends that Merriam-Webster's definition ("a computer application [sic[6]] designed to

---

[6] The correct quote from the dictionary is "a computer *program* designed to automate certain tasks." Ex. 1025, 3 (emphasis added). We do not regard this minor error as affecting our analysis.

automate certain tasks") has been adopted as an "accepted, ordinary meaning" in another proceeding. *Id.* at 8.

Petitioner contends that Patent Owner's construction is unsupported by the intrinsic evidence. Pet. Reply 9–10. Petitioner explains that in the '632 patent, the cited security agent does not act "in pursuit of its own agenda" because it sometimes acts on behalf of the mobile security system. *Id.* at 9 (citing Ex. 1001, 28:25–28, 28:44–53).

We agree with Petitioner that Patent Owner's construction based on Franklin is not supported by the intrinsic evidence. First, neither the written description nor the claims of the '632 patent themselves recite "autonomous agent." Nor do Patent Owner's references to the specification demonstrate that the agent described in the '632 patent acts "in pursuit of its own agenda." PO Resp. 12–13. In addition, Franklin presents "autonomous" as a property of a special type of agent, one where the agent "exercises control over its own actions." Ex. 2013, 5–6. For the reasons given, we are not persuaded that the "security agent" recited in the '632 patent claims and described in the specification is an "autonomous" agent as discussed in Franklin. We, therefore, do not adopt Patent Owner's construction for "security agent." Instead, we adopt the plain and ordinary meaning best expressed by Merriam-Webster, namely, "a computer program designed to automate certain tasks." Ex. 1025, 3.

### C. Description of the Principal Prior Art References

#### 1. Joseph

Joseph is a published patent application titled "Methods and Systems for Providing a Wireless Security Service and/or a Wireless Technical Support Service for Personal Computers." Ex. 1009, (54). Petitioner

IPR2021-01236
Patent 10,951,632 B2

contends that Joseph's effective date as prior art is at least as early as May 26, 2008.  Pet. 45.  Petitioner contends that this date is before the earliest possible effective filing date for the '632 patent, thus qualifying Joseph as prior art under pre-AIA 35 U.S.C. § 102(e).  *Id.*  Patent Owner does not challenge Joseph's availability as prior art.

Joseph is directed to "enhancing security of personal computers and facilitating recovery of stolen, lost or otherwise missing personal computers."  Ex. 1009 ¶ 7.  Joseph discloses providing the laptop computer with an "integrated" security diagnostics unit ("SDU").  *Id.* ¶ 60.

The SDU provides wireless security service or wireless technical support services to the laptop computer.  *Id.*  The SDU communicates with a network entity referred to as a "security/technical support entity" at a remote location by sending and receiving messages via a wireless network.  *Id.* ¶ 61.

17

IPR2021-01236
Patent 10,951,632 B2

The SDU is shown as element 14 in Figure 3 of Joseph, reproduced here:



FIG. 3

Figure 3 of Joseph is a block diagram showing personal computer 12 including SDU 14. *Id.* ¶¶ 39, 79. SDU 14 is connected to power management system 40 of the personal computer through system management bus 78. *Id.* SDU 14 includes control unit 30, which contains hardware and software for implementing interface 61 and processing element 63. *Id.* ¶ 73. The processing element comprises one or more processors 74 for performing processing operations to implement the functionality of the control unit. *Id.* ¶ 74. These processors may be general purpose computers that execute code to implement the functionality of control unit 30. *Id.* As shown in Figure 3, these processors are different

18

**Appx18**

IPR2021-01236
Patent 10,951,632 B2

from processor 48 that is part of main processing unit 35 of the laptop computer. *Id.* ¶ 54.

Figure 14 of Joseph is reproduced here:



**FIG. 14**

Figure 14 shows a process by which a user may register for and activate the wireless security service or the wireless technical support service. Ex. 1009 ¶ 200. Security/technical support entity 20 includes server 50 connected to data network 52 (e.g., the Internet). *Id.* ¶ 201. User 10 uses laptop computer 12 to interact with the network site implemented by server 50 to register for the wireless security service and the wireless technical support service. *Id.* ¶ 202.

The network site implemented by server 50 prompts user 10 to enter registration information. *Id.* ¶ 205. Server 60 causes transmission of message 104 to network entity 66 operated by the wireless network provider. *Id.* ¶ 207. Message 104 is a request to obtain from the wireless network

19

IPR2021-01236
Patent 10,951,632 B2

provider "activation information," to be subsequently transmitted to SDU 14 via wireless network 24 in order to activate the SDU on the personal computer. *Id.* ¶ 208.

Having obtained the activation information, network entity 66 sends message 106 conveying the activation information to server 60 via communication link 68. *Id.* ¶ 212. Server 60 passes this information to server 50. *Id.* ¶ 213. Upon completion of the registration phase, the network site implemented by server 50 informs the user that registration is completed and instructs the user to proceed to the activation phase. *Id.* ¶ 215.

An objective of the activation phase is to activate SDU 14, i.e., to cause the SDU to be granted access to wireless network 24 by the wireless network provider such that the SDU can communicate with security/technical support entity 20 via wireless network 24. *Id.* ¶ 217. During the activation process, server 60 transmits a message to SDU 14 via wireless network 24. *Id.* ¶ 229. Prior to transmission of this message, the SDU is in sleep mode. *Id.* This message conveys a command to put the sleeping SDU in wake mode. *Id.*

In response to receiving this message, SDU 14 puts itself in wake mode. *Id.* ¶ 230. SDU 14 also sends a message to server 60 via wireless network 24 to acknowledge receipt of the "wake up" message and confirm that it is in wake mode. *Id.* Upon receiving this message, server 60 determines that the SDU has received message 148 and placed itself in wake mode. *Id.* ¶ 231. The server proceeds to transmit a message to the SDU via

20

IPR2021-01236
Patent 10,951,632 B2

wireless network 24 that conveys a command to put the SDU in sleep mode. *Id.*

In response to receiving this message, the SDU puts itself back in sleep mode. *Id.* ¶ 232. SDU also sends a message to server 60 via wireless network 24 to acknowledge receipt of the message and confirm that it is in sleep mode. *Id.*

Upon receiving this message, the server determines that the SDU has received the message and placed itself in sleep mode. *Id.* ¶ 233. The server concludes that the SDU is operating correctly and that the wireless security service and the wireless technical support service have been activated. *Id.*

### 2. Hall

Hall is a published patent application titled "System and Method of Actively Establishing and Maintaining Network Communications for One or More Applications." Ex. 1007, (54). Petitioner contends that Hall's effective date as prior art is at least as early as May 22, 2008. Pet. 14. Petitioner contends that this date is before the earliest possible effective filing date for the '632 patent, thus qualifying Hall as prior art under pre-AIA 35 U.S.C. §§ 102(a) and (e). *Id.* Patent Owner does not challenge Hall's availability as prior art.

21

IPR2021-01236
Patent 10,951,632 B2

Figure 1 of Hall follows:



Figure 1 illustrates a network with subscribers $110_1$ and $110_2$ implemented with backend service center 150. Ex. 1007 ¶ 7. As shown in Figure 1, subscriber device $110_1$ is in communication with backend service center 150, which includes a collection of one or more databases and/or network servers. *Id.* ¶ 33.

Each subscriber device is provided with a communication module (referred to as "MySync module"), which is a series of instructions that run as a Windows Service. *Id.* ¶ 37. The MySync module communicates with the backend service center and performs various services on the laptop, including security services. *Id.* ¶¶ 42–45. For example, the backend service center may send a wake-up signal to the laptop and instruct the laptop to perform security services if the laptop has been reported stolen. *Id.*, Fig. 12, ¶¶ 100–104.

22

IPR2021-01236
Patent 10,951,632 B2

## III.  ANALYSIS OF THE CHALLENGED CLAIMS

The Petition challenges claims 1, 9, 16, and 24 of the '632 patent. Petitioner asserts unpatentability of the claims based on obviousness. Pet. 3–4.

### A.  Obviousness

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) so-called "secondary considerations," including commercial success, long-felt but unsolved needs, failure of others, and unexpected results.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966) ("the *Graham* factors").  Neither the Petition nor the Patent Owner Response presents evidence on the fourth *Graham* factor.  We therefore do not consider that factor in this decision.

### B.  Challenges Based on Joseph

Petitioner contends claims 1 and 16 would have been obvious over Joseph and claims 9 and 24 would have been obvious over Joseph and Meenan.  Pet. 4.

### 1.  Claim 1

Petitioner asserts that each element of claim 1 is disclosed or suggested by Joseph.  Pet. 45–64; Jakobsson Decl. ¶¶ 134–172.  Petitioner's

23

IPR2021-01236
Patent 10,951,632 B2

element-by-element analysis of claim 1 in relation to Joseph appears at pages 47–63 of the Petition. Petitioner supports its analysis with testimony by its expert, Dr. Jakobsson. Jakobsson Decl. ¶¶ 139–172.

Patent Owner's principal argument challenges Petitioner's assertion that Joseph teaches "particular" wake events and wake signals as claimed. PO Resp. 32–33. Patent Owner contends that "Petitioner only argues that *Joseph* teaches 'particular' wake events and wake signals because they 'would occur at a specific time' or 'sent at a specific time,' respectively." *Id.* at. 32. Patent Owner continues that "[b]ecause the word 'particular' cannot refer merely to a something that occurs at a specific time, Petitioner's arguments about how *Joseph* allegedly teaches these limitations necessarily fails." *Id.* We do not agree with this argument by Patent Owner because it is based on a construction of the terms "particular wake event" and "particular wake signal" that we do not adopt. *See* Section II.B.3, *supra*.

For the reasons that follow, we determine that Petitioner has demonstrated by a preponderance of evidence that Joseph teaches or suggests each element of claim 1.

### a. Preamble [1.0]

The preamble of claim 1 recites a "security system." Petitioner contends this element is found in Joseph's security/technical support entity 20. Pet. 47 (citing Ex. 1009, Fig. 14, ¶ 61). Patent Owner's Response does not challenge this contention.

24

IPR2021-01236
Patent 10,951,632 B2

We find that for the reasons given, Petitioner demonstrates that Joseph teaches the preamble of claim 1.[7]

### b. Claim element 1.1

Claim element 1.1 calls for a "security system memory." Petitioner contends this element is met by the memory "inherently and necessarily" present in server 50, server 60, and database 58 in Joseph. Pet. 48–49 (citing Jakobsson Decl. ¶ 141). Patent Owner's Response does not challenge this contention.

We find that for the reasons given, Petitioner demonstrates that Joseph teaches element 1.1 of claim 1.

### c. Claim element 1.2.a

This claim element calls for "a communication interface configured to communicate with a mobile device and configured to communicate over a network with a security administrator device." Petitioner identifies network entity 66 in Joseph as the claimed "security administrator device." Pet. 49. According to Petitioner, "[t]he network entity 66 is a security administrator device because it is used for administrative tasks such as user registration and security service activation for Joseph's security services." *Id.* at 49–50 (citing Ex. 1009 ¶¶ 205–212, 222–227, Figs. 14, 15). *See also* discussion of registration and activation in Joseph, *supra*, Section II.C.1.

Patent Owner challenges Petitioner's identification of network entity 66 in Joseph as the claimed "security administrator device." PO Resp. 39–40. According to Patent Owner, "*Joseph's* network entity 66 does not

---

[7] We do not express an opinion on whether the preambles of the '632 patent claims are limiting.

IPR2021-01236
Patent 10,951,632 B2

manage the security engines and security policies and data of a security system, as required by the claim language." *Id.* at 39. For reasons that follow, we do not agree with Patent Owner's contention.

Referring to the petition in the 595 IPR, Patent Owner contends that "[n]owhere did Petitioner mention that network entity 66 is part of *Joseph's* architecture that maps to a security administrator device." PO Resp. 39. Petitioner responds that this observation regarding the 595 IPR "is irrelevant." Pet. Reply 25. We agree. As we stated in our Institution Decision, a petitioner may analyze a prior art reference differently in two different proceedings, including identifying different elements of the prior art with similar elements of different claims. Institution Dec. 35. We therefore analyze the disclosure of the reference to determine whether it supports the Petitioner's contentions in this proceeding.

Patent Owner contends "*Joseph's* network entity 66 does not manage the security engines and security policies and data of a security system, as required by the claim language." PO Resp. 39. Patent Owner explains that "the network entity merely processes message requests." *Id.* Further, "the network entity 66 merely retrieves activation information that is intended for the SDU 14; it does not manage the security of a security system." *Id.* at 40.

We do not agree with Patent Owner's argument because it is based on a construction of "security administrator device" that we did not adopt. *See supra*, Section II.B.2. Patent Owner's construction would require "a device that manages the security of a security system." PO Resp. 15 (emphasis omitted). Instead, we adopt Petitioner's construction based on plain and ordinary meaning, which is "a device that performs security administration." Pet. 13 (citing Jakobsson Decl. ¶ 65). Under this construction, Joseph's

26

**Appx26**

IPR2021-01236
Patent 10,951,632 B2

network entity 66 is a security administrator device because it performs user activation and user registration, which are administrative tasks. *Id.* at 49–50; *see* description in Section II.C.1, *supra*.

Further, Petitioner contends Joseph meets the "network interface" limitation of this claim element because "security/technical support entity 20 (a security system) includes a network interface (a communication interface) to communicate with laptop 12 (a mobile device) and network entity 66 (a security administrator device) over a network." Pet. 50 (citing Ex. 1009, Fig. 14). Petitioner reasons that in order to communicate over a network, security/technical support entity 20 "necessarily and inherently includes a network interface (a communication interface) to communicate with both laptop 12 and network entity 66." *Id.* at 51–52 (citing Jakobsson Decl. ¶ 145). Patent Owner does not challenge this contention.

We find that for the reasons given, Petitioner demonstrates that Joseph teaches element 1.2.a of claim 1.

### d. Claim element 1.2.b

This claim element calls for "the mobile device including a mobile device processor and including a security agent configured to cooperate with the security system." Petitioner asserts Joseph discloses this element. Pet. 52–53; Jakobsson Decl. ¶¶ 146–148. Referring to Figure 2 of Joseph, Petitioner asserts "[a]t least processor 48, power system 40, and SDU 14 together are the claimed 'security agent.'" Pet. 52.

Patent Owner challenges Petitioner's identification of the claimed "security agent" in Joseph. PO Resp. 34–38. Referring to the language of claim element 1.7.b, Patent Owner contends that Joseph does not disclose a security agent configured to "wake the at least a portion of the mobile device

IPR2021-01236
Patent 10,951,632 B2

in response to receiving the particular wake signal" and "perform particular security services after the at least a portion of the mobile device has been woken" because Joseph does not disclose any "particular wake signal" or "particular security services." *Id.* at 34. We do not agree for the reasons given in Section III.B.1.i, *infra*.

Patent Owner contends also that "[i]n the embodiments [of Joseph] in which the SDU wakes itself, neither it nor any other components of the mobile device perform security services . . . in response to receiving a particular wake signal." PO Resp. 34–35. We disagree. As Petitioner points out, the claims require performing the particular security services *after* at least a portion of the mobile device has been woken (not *in response to* a particular wake signal as Patent Owner asserts). Pet. Reply 22. We agree with Petitioner that the claims require a temporal relationship between the security services and wake event, not a causal one. *Id.* at 17 ("'After' recites a temporal relationship, not a causal relationship.") Petitioner demonstrates that the SDU, once awakened, performs a variety of security services. *Id.* at 61–62 (citing Ex. 1009 ¶¶ 75, 134–135, 144; Jakobsson Decl. ¶ 164). *See also* the discussion in Section III.B.1.h, *infra*. Petitioner shows that these security services occur after SDU 14 receives a wake signal (message 148). Pet. 62; Jakobsson Decl. ¶ 166 (citing Ex. 1009 ¶¶ 228–229).

Patent Owner further contends that Joseph's power system and processor are not part of the security agent. PO Resp. 36–38. Relying on its proposed construction for "security agent" (which we do not adopt, *see* Section II.B.4, *supra*), Patent Owner contends that "[a person of ordinary skill] also would recognize that the 'power system' and 'processor 48' in

IPR2021-01236
Patent 10,951,632 B2

*Joseph* are not components that operate consistent with how a [person of ordinary skill in the art] would interpret the term security agent." *Id.* at 37.

We do not agree with these arguments by Patent Owner. Petitioner demonstrates that Patent Owner's arguments are not supported by the claims or specification. Pet. Reply. 24. The claims do not indicate that a "security agent" cannot include multiple modules, and the specification discloses that the security agent may have multiple components. *Id.* (citing Ex. 1001, 28:11–20, 28:25–32, Fig. 19).

Petitioner responds (and we agree) that "Patent Owner's argument that Joseph does not disclose a 'security agent' because it does not disclose a 'particular wake signal' or 'particular security services' fails because it is based on an incorrect claim construction." Pet. Reply 23; *see* Section II.B.3, *supra*. We find that Joseph discloses the claimed "particular" wake event and wake signal. *See* Section III.B.1.i, *infra*.

Nor do we agree with Patent Owner's other arguments, for example, that the SDU is "already awake" when it sends that control signal, or that the power system "is in a coma until it is called and returns to a coma once it finishes running." PO Resp. 35–37. The "already awake" argument is unavailing because it suggests that the SDU is not awakened before the security services are performed. Pet. Reply 22. As Petitioner points out, however, the SDU switches to wake mode in response to a wake command before processing the commands for various security services. *Id.* Similarly, Patent Owner's "in a coma" argument fails because "running continuously is not [a] requirement of a security agent" under Patent Owner's proposed construction or under our adopted construction. *See supra*, Section II.B.4.

29

IPR2021-01236
Patent 10,951,632 B2

We find that for the reasons given, Petitioner demonstrates that Joseph teaches element 1.2.b of claim 1.

### e. Claim element 1.2.c

This claim element calls for "the security administrator device having a security administrator processor different than the mobile device processor, the mobile device being remote from the security administrator device." Petitioner refers back to its analysis of element 1.2.a. Pet. 54. Petitioner contends "Joseph's network entity 66 (security administrator device) necessarily and inherently includes a processor because network entity 66 performs a number of tasks, including receiving, processing, and sending messages for user registration and security service activation." *Id.* (citing Ex. 1009 ¶¶ 211–216). Petitioner contends the processors of laptop 12 and network entity 66 are "different" because they are "distinct devices" and are "remote" because they are separated. *Id.* at 54–55.

Patent Owner does not challenge this particular assertion by Petitioner although, as discussed *supra*, in Section III.B.1.c, Patent Owner does challenge Petitioner's identification of the security administrator device in Joseph. *See* PO Resp. 39. This argument challenging Petitioner's identification of a security administrator device in Joseph is discussed in Section III.B.1.c, *supra*. For the reasons given there, we do not agree with this argument by Patent Owner.

We find that for the reasons given, Petitioner demonstrates that Joseph teaches element 1.2.c of claim 1.

30

**Appx30**

IPR2021-01236
Patent 10,951,632 B2

### f. Claim element 1.2.d

This claim element calls for "the mobile device being a first computer system, the security system being a second computer system, the security administrator device being a third computer system, the first computer system, the second computer system and the third computer system being separate computer systems." Petitioner asserts that Joseph discloses this element because "Joseph's laptop 12 (mobile device), security/technical support entity 20 (security system), and network entity 66 (security administrator device) all are separate computer systems." Pet. 55–56 (citing Ex. 1009, Fig. 14).

Patent Owner addresses the "separate computer" limitation only briefly in discussing the related '595 patent and the pending Federal Circuit appeal of the 765 IPR involving the '595 patent. PO Resp. 5 & n.1. Beyond stating that the "architecture" of Joseph "does not include or contemplate such separate computer systems," Patent Owner does not provide any further explanation or evidence on that point in the course of its analysis of Joseph. *Id.* at 6. Accordingly, we do not further consider this statement.[8]

---

[8] Patent Owner states that "[t]his additional ['separate computer'] limitation directly addresses the '595 FWD's reasoning that the claims of the '595 Patent did not limit the mobile device and security system to separate systems and thus were unpatentable. *See, e.g.*, '595 FWD at 23, 28-29, 38." PO Resp. 6. If by this statement Patent Owner is attempting to rely in this proceeding on its "separate computer" arguments in the 765 IPR, we consider that an improper incorporation by reference and do not consider those arguments. *See* 37 C.F.R. § 42.6(a)(3) (prohibiting incorporating arguments by reference from one document into another).

IPR2021-01236
Patent 10,951,632 B2

We find that for the reasons given, Petitioner demonstrates that Joseph teaches element 1.2.d of claim 1.

### g.  Claim elements 1.3 and 1.4.a

These claim elements, together, call for "a security system processor being different than the mobile device processor and different than the security administrator processor, the security system processor being configured to store in the security system memory at least a portion of wake code, the wake code being configured to detect a wake event and to send a wake signal to the mobile device in response to detecting the wake event."

Petitioner identifies Joseph's server 50, server 60, and database 58 as having processors that, "individually and collectively," are the claimed "security system processor." Pet. 57. Petitioner asserts the processors of security/technical support entity 20 and network entity 66 are different processors "because these two systems are separate from one another." *Id.* at 58.

Petitioner explains that in Joseph, during security service activation, security/technical support entity 20 sends a wake signal to SDU 14, initially in sleep mode, to put the SDU in wake mode. *Id.* (citing Ex. 1009 ¶¶ 229–230). *See* discussion in Section II.C.1, *supra*. Petitioner identifies this as a wake signal because it changes the SDU from sleep mode to wake mode. Pet. 58–59.

Petitioner identifies the authorization in Joseph as a wake event "because it is the event that triggers security/technical support entity 20 to send message 148 (wake signal) to wake up SDU 14." *Id.* at 59. Petitioner describes other wake signals in Joseph including the waking of a stolen laptop after being recovered. *Id.* (citing Ex. 1009 ¶¶ 96–97, 126–127, 158–

32

IPR2021-01236
Patent 10,951,632 B2

160).  Petitioner explains that "every wake signal sent by the security/technical support entity 20 necessarily is in response to the occurrence of some well-defined state (in response to detecting a wake event) because it does not send the wake signals randomly."  Pet. 59 (citing Jakobsson Decl. ¶ 159).

Petitioner asserts also that Joseph discloses the recited "wake code." Because the security/technical support entity sends wake signals to the laptop containing the SDU, that entity "necessarily and inherently includes instructions stored in its memory to perform this functionality, and those instructions are wake code."  *Id.* at 59–60 (citing Jakobsson Decl. ¶ 160).

Patent Owner does not challenge the assertion that Joseph meets claim elements 1.3 and 1.4.a in this proceeding.

We find that for the reasons given, Petitioner demonstrates that Joseph teaches elements 1.3 and 1.4.a of claim 1.

### h.  Claim element 1.4.b

This claim element calls for "the security agent of the mobile device being configured to receive the wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal, the security agent of the mobile device being configured to perform security services after the at least a portion of the mobile device has been woken."

Petitioner contends Joseph discloses this "security agent" element by describing a laptop containing an SDU configured to receive messages (wake signals) because on receiving the messages, the laptop wakes up from a sleep mode to a wake mode.  Pet. 60; Jakobsson Decl. ¶ 161.  Petitioner contends Joseph's sleep mode is a "power management mode" because it is

IPR2021-01236
Patent 10,951,632 B2

a low-power mode of operation. Pet. 60 (citing Ex. 1009 ¶ 158). Petitioner explains that when the SDU receives the wake signal, it wakes "at least a portion" of the laptop ("namely itself"). *Id.* at 61 (citing Ex. 1009 ¶¶ 229–230).

Patent Owner challenges Petitioner's identification of a security agent in Joseph. PO Resp. 36–38. This argument is discussed in Section III.B.1.d, *supra*. For the reasons stated there and in Section II.B.4, we do not agree with Patent Owner's construction of "security agent" or its argument that Joseph does not teach a security agent. Nor do we agree that the security agent in Joseph does not perform security services as claimed. *See* PO Resp. 34–35.

Petitioner demonstrates that the SDU, once awakened, performs a variety of security services. Pet. 61–62 (citing Ex. 1009 ¶¶ 75, 134–135, 144; Jakobsson Decl. ¶ 164). For example, after SDU 14 has woken in response to message 148, the security agent performs security services such as erasing, encrypting, and otherwise preventing access to data stored in one or more memory elements (e.g., a hard drive) of memory system 42. Pet. 61; Jakobsson Decl. ¶ 164 (citing Ex. 1009 ¶¶ 75, 134–135). These services are performed by the laptop's processors 48, which are part of the recited "security agent." Pet. 61–62; Jakobsson Decl. ¶ 165 (citing Ex. 1009 ¶ 75). These security services occur after SDU 14 receives a wake signal (message 148). Pet. 62; Jakobsson Decl. ¶ 166 (citing Ex. 1009 ¶¶ 228–229).

We find that for the reasons given, Petitioner demonstrates that Joseph teaches element 1.4.b of claim 1.

34

IPR2021-01236
Patent 10,951,632 B2

### i. Claim elements 1.5, 1.6, 1.7.a, and 1.7.b

These claims elements call for the following:

[1.5] detect a particular wake event;

[1.6] prepare a particular wake signal in response to detecting the particular wake event; and

[1.7.a] send the particular wake signal to the mobile device in response to detecting the particular wake event,

[1.7.b] the security agent of the mobile device being configured to wake the at least a portion of the mobile device in response to receiving the particular wake signal and being configured to perform particular security services after the at least a portion of the mobile device has been woken.

Petitioner demonstrates that each of these limitations is disclosed by Joseph. Pet. 63–64; Jakobsson Decl. ¶¶ 167–172. Petitioner refers back to its analysis of claim element 1.4.a, *supra*, describing receipt of a wake signal by the SDU and the subsequent waking of the SDU. Pet. 63. Petitioner points out that the security system in Joseph (security/technical support entity 20) detects "particular" wake events distinguishable from other wake events. *Id. See also* discussion of "particular" wake events and signals in Section II.B.3, *supra*.

Petitioner explains that "[a]ny wake signal sent to laptop 12 is a particular wake signal because it is distinguishable from the other wake signals that security/technical support entity 20 may send." Pet. 63. Moreover, according to Petitioner, "Joseph discloses performing a variety of security services, and each of these services is a particular service at least because it is distinguishable from the other specific services." *Id.* at 64.

35

IPR2021-01236
Patent 10,951,632 B2

Patent Owner characterizes the "alleged" wake signal in *Joseph* as "generic, not particular" because "the alleged wake signal in *Joseph* is sent whether or not the SDU is actually in sleep mode." PO Resp. 32–33. Again, we disagree. This argument ignores Joseph's disclosure of the SDU being in that wake mode because it received a wake signal. Pet. Reply 22 (citing Ex. 1009 ¶¶ 158–160).

Patent Owner contends that "a wake signal that wakes a device but which is not distinguishable by its nature from any other possible wake signal is *generic*, not *specific* or 'particular.'" PO Sur-reply 3. We disagree that the '632 patent claims require a wake signal that is distinguishable "by its nature." This is a variation on Patent Owner's argument that the claims require a particular "type" of wake event or wake signal, which we rejected as contrary to the language of the claims. *See* discussion in Section II.B.3, *supra*.

We find that Joseph's message 148 is a particular wake signal because it is distinguishable from other wake signals on the basis of the time it was sent and on the event that caused it to be sent (selecting between activation of security services and response to a stolen laptop). Pet. Reply 20–21.

Even under Patent Owner's construction of "particular," which we have not adopted, Joseph's wake signal (message 148) is "particular" because it wakes "at least a portion of the mobile device in response to receiving the particular wake signal." Pet. Reply 21. Specifically, Joseph discloses a wake signal that wakes the SDU. *Id.* As Petitioner points out, Joseph also discloses other particular types of wake events, e.g., detecting that the SDU is authorized to use wireless network 24, and a customer service technician sending a wake signal and security services, e.g., erasing

36

IPR2021-01236
Patent 10,951,632 B2

and encrypting data, upgrading software, and diagnostic and maintenance operations. *Id.* (citing Joseph ¶¶ 96–97). Thus, Joseph discloses the claimed "particular" wake signal, even under Patent Owner's construction.

As discussed *supra*, Patent Owner also challenges Petitioner's identification of the security agent in Joseph. PO Resp. 34–38. This argument is discussed *supra*, in Section III.B.1.d. For reasons discussed there, we do not agree with this argument.

We find that for the reasons given, Petitioner demonstrates that Joseph teaches elements 1.5, 1.6, 1.7.a, and 1.7.b of claim 1.

## 2. Claim 16

Claim 16 is directed to "[a] non-transitory computer readable medium in a security system," but is otherwise similar to claim 1. Petitioner's analysis of claim 16 relies on its analysis of claim 1. Pet. 64–66. Patent Owner does not address claim 16 separately, but combines its analysis of common elements in claim 16 with its analysis of claim 1. *See, e.g.*, PO Resp. 39–40. Taking into account the entire record, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 16 of the '632 patent would have been obvious in light of Joseph for the reasons given for claim 1.

## 3. Summary – Claims 1 and 16

We have considered Petitioner's analysis of claims 1 and 16 in relation to Joseph and the relevant arguments and evidence presented by Patent Owner. Taking into account the entire record, including the Petition, Patent Owner's Response, Petitioner's Reply, and Patent Owner's Sur-reply, as well as the evidence presented by the parties, we determine that Petitioner

IPR2021-01236
Patent 10,951,632 B2

has demonstrated by a preponderance of the evidence that claims 1 and 16 of the '632 patent would have been obvious in light of Joseph.

### 4. Claims 9 and 24

Claims 9 and 24 depend from claim 1 and claim 16, respectively, each adding the limitation "wherein the performing the particular security services includes removing unauthorized data from the mobile device." Petitioner provides an element-by-element analysis of these claims in light of Joseph and Meenan. Pet. 66–67; Jakobsson Decl. ¶¶ 179–184. Petitioner relies on Meenan for teaching the additional limitation of "performing a particular security service that includes removing unauthorized data from the mobile device." Pet. 67.

Petitioner provides a rationale for combining the references. According to Petitioner, "[a person of ordinary skill] also could have removed unauthorized programs after a Joseph laptop receives a wake signal, just as Joseph discloses performing other security services after receiving a wake signal." *Id.* (citing Jakobsson Decl. ¶ 180).

Patent Owner's response to this challenge presents no additional arguments, referring back to its prior arguments addressing claims 1 and 16. PO Resp. 40. For the reasons given, we find that Petitioner has demonstrated a motivation to combine Joseph and Meenan with a reasonable expectation of success. Pet. 67–69; Jakobsson Decl. ¶¶ 180–183. Furthermore, we find that Petitioner has demonstrated that each element of claims 9 and 24 is taught by that combination of references. Pet. 66, 68; Jakobsson Decl. ¶¶ 179, 184. For the reasons given, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 9 and 24 would have been obvious in light of Joseph and Meenan.

IPR2021-01236
Patent 10,951,632 B2

### C. Challenges Based on Hall

Petitioner contends claims 1, 9, 16, and 24 would have been obvious over Hall and claims 9 and 24 would have been obvious over Hall and Meenan. Pet. 4.

### 1. Claim 1

Petitioner's element-by-element analysis of claim 1 in relation to Hall appears at pages 17–38 of the Petition. Petitioner supports its analysis with testimony from its expert, Dr. Jakobsson. Jakobsson Decl. ¶¶ 67–115. For the reasons given by Petitioner and those that follow, we find that Petitioner has demonstrated that each element of claim 1 is disclosed or suggested by Hall.

We focus our discussion here on the claim elements that are challenged by Patent Owner. We adopt Petitioner's analysis for the remaining claim elements.

### a. sending a particular wake signal in response to detecting a particular wake event (claim elements 1.5, 1.6, 1.7.a)

The term "particular wake event" appears in claim elements 1.5. 1.6, and 1.7.a. Petitioner contends that Hall discloses this limitation: "Any wake event that backend service center 150 (a security system) detects is a particular wake event because it is distinguishable from the other wake events that backend service center 150 may detect." Pet. 36. Petitioner further explains that "[f]or example, a wake event would occur at a specific time and therefore be a wake event particular to at least that time." *Id.*; *see also* Pet. Reply 15–16.

Patent Owner contends that "[t]aken as a whole, these claim elements recite a technique whereby a wake event triggers a particular *type* of wake

IPR2021-01236
Patent 10,951,632 B2

signal, which triggers the mobile device's security for a particular *type* of security service." PO Resp. 7. For reasons discussed *supra*, in Section II.B.3, we do not agree with this construction and do not adopt it. Nor do we agree with Patent Owner's argument that "[b]ecause the word 'particular' cannot refer merely to a something that occurs at a specific time, Petitioner's arguments about how *Hall* allegedly teaches these limitations necessarily fails." *Id.* at 21.

Patent Owner contends "there is no concept in *Hall* of preparing a 'particular wake signal' in response to receiving a 'particular wake event.'" *Id.* As we have discussed *supra*, the distinction Patent Owner attempts to draw between "particular" and "generic" wake signals (*see id.* at 22) is not supported by the language of the claims or the specification. *See, e.g.*, discussion in Section III.B.1.i, *supra*.

We find that Petitioner demonstrates that this limitation is met by Hall under the construction we have adopted. *See* Pet. 36 ("Any wake event that backend service center 150 (a security system) detects is a particular wake event because it is distinguishable from the other wake events that backend service center 150 may detect."); Jakobsson Decl. ¶ 110. Similarly, for limitations referring to a "particular" wake signal, Petitioner demonstrates that Hall discloses this element. Pet. 36–37; Jakobsson Decl. ¶¶ 111–112.

We find, also, that Petitioner demonstrates that Hall discloses this limitation even under Patent Owner's construction. Pet. Reply 16. Petitioner shows that Hall discloses a particular type of wake signal (resulting in the laptop entering the "S0" state, citing Ex. 1007 ¶¶ 34, 100) and a particular type of wake event (status of the laptop being set to stolen, citing Ex. 1007 ¶ 26). *Id.*

40

IPR2021-01236
Patent 10,951,632 B2

For the reasons given above and in our discussion of claim
construction, we find that Petitioner demonstrates that Hall teaches or
suggests "a particular wake event" and "a particular wake signal," as
claimed in the '632 patent. *See supra*, Section II.B.3.

> b. *performing particular security services (claim element 1.7.b)*

Patent Owner contends that "*Hall* does not teach performing
particular security services in response to receiving a particular wake signal
for the same reasons established above, namely that the word 'particular' is
used to distinguish between different *types* of 'wake events,' 'wake signals,'
and 'security services,' and not just those that occur at different moments in
time." PO Resp. 22. We disagree for reasons previously discussed.

In the preceding section, we discuss Hall's teaching of "particular"
wake events and wake signals. Petitioner demonstrates also that Hall
discloses "multiple particular types of security services." Pet. Reply 16;
Pet. 37 (citing Ex. 1007, Fig. D); *see also* Jakobsson Decl. ¶ 115. These
include "security services such as 'Logoff user,' 'Force shutdown,' 'Delete
files,' 'Initiate audible alarm,' and 'Encrypt files.'" Pet. 37. Petitioner
explains that "[e]ach of these services is a particular service at least because
it is distinguishable from the other defined services and a user can
specifically select each of these services." *Id.*

Patent Owner's argument that Hall does not teach performing
particular security services "in response to receiving a particular wake
signal" is incorrect for an additional reason. As Petitioner points out, and as
we discuss above, the claims recite that the security agent of the mobile
device is configured to perform security services *after* the at least a portion
of the mobile device has been woken. Pet. Reply 17. The claims do not

41

require performing security services "in response to" receiving a wake signal. *Id.* Thus, Patent Owner's argument is unavailing.

For the reasons given, we find that Petitioner demonstrates that Hall teaches performing particular security services.

### c. security agent (claim elements 1.2.b, 1.4.b)

Claim element 1.2.b calls for "the mobile device including a mobile device processor and including a security agent configured to cooperate with the security system." Claim element 1.4.b recites "the security agent of the mobile device being configured to receive the wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal, the security agent of the mobile device being configured to perform security services after the at least a portion of the mobile device has been woken."

Petitioner identifies the MySync module in Hall and the same module combined with the MyGuard application in Hall as the security agent. Pet. 22–31. Petitioner explains that "[t]he MySync module is a security agent because it provides security services, such as 'services that are used by security-based applications to protect unauthorized access of stored data from or unauthorized usage of the subscriber device.'" *Id.* at 23 (citing Ex. 1007 ¶ 27). Furthermore, "[t]he MyGuard application includes a number of processes directed to security shown in Figure 2B, such as a password manager 280, a remote desktop manager 285, an auxiliary display manager 290, and a shutdown manager 295." Pet. 23 (internal quotation marks omitted).

42

IPR2021-01236
Patent 10,951,632 B2

Patent Owner responds that Hall does not disclose a security agent as claimed because it does not disclose a "particular wake signal" or "particular security services." PO Resp. 23. We disagree. As Petitioner points out, this argument is based on Patent Owner's proposed claim constructions for those terms that we rejected. Pet. Reply 18. We find that under the construction we have adopted, Hall discloses both a particular wake signal and particular security services. *See* discussion in Sections III.C.1.a and III.C.1.b, *supra*.

Patent Owner further contends that Hall "fails to disclose a *security agent* that performs the recited functions." PO Resp. 23–25. Patent Owner explains that Hall "explicitly states that its applications, *not* the MySync module, are responsible for providing services." *Id.* at 25 (citing Goodrich Decl. ¶ 72).

Petitioner replies that the MySync module "establishes network connectivity with the backend service center to receive incoming security-related messages, parses the messages, and routes them to the appropriate application." Pet. Reply 18 (citing Ex. 1007 ¶¶ 93, 41, 52). Petitioner contends that "[b]ecause these services help the security-based applications provide security, they are security services." *Id.*

We disagree with Patent Owner that the MySync module is not responsible for providing security services. As Petitioner explains, "[t]he MySync module is a security agent because it provides security services, such as 'services that are used by security-based applications to protect unauthorized access of stored data from or unauthorized usage of the subscriber device.'" Pet. 23 (quoting Ex. 1007 ¶ 27). We agree.

Petitioner demonstrates that the MySync module receives a wake signal from the backend service center. Pet. 32 (citing Ex. 1007 ¶ 102). In

43

IPR2021-01236
Patent 10,951,632 B2

response to receiving the wake signal it wakes at least a portion of the laptop $110_1$ from one of the power management modes. *Id.* (citing Ex. 1007 ¶ 34). Petitioner explains that the wake message is processed by the MySync module, which performs the awakening. *Id.* at 33 (citing Ex. 1007 ¶ 109).

Further, Petitioner demonstrates that "the MySync module and MyGuard application (together, a security agent) perform actions such as 'Shutdown' using the 'remote desktop manager 285' process." Pet. 34 (citing Ex. 1007 ¶ 86, Fig. 2B).

Patent Owner acknowledges Petitioner's contention that the MyGuard application may be part of a security agent. PO Resp. 26. But we disagree with Patent Owner's contention that Petitioner has failed to "demonstrate how the claims, as properly construed, are disclosed in the art." *Id.* at 27. To the contrary, the Petition identifies both MySync and MyGuard and their relation to challenged claim 1 in its analysis. *See, e.g.*, Pet. 23 ("The MySync module together with the MyGuard application 2701 also are the claimed 'security agent.'").

Moreover, Patent Owner's argument that MyGuard "is not an 'agent' or part of an 'agent'" is based on a claim construction for "agent" proposed by Patent Owner and rejected by the Board. PO Resp. 27. The fact that the MySync module may rely on applications such as MyGuard to provide certain services does not mean that MySync does not perform services itself, such as providing services that are used by security-based applications to protect unauthorized access of stored data from, or unauthorized usage of, the subscriber device. Pet. Reply 18–19 (citing Ex. 1007 ¶¶ 7, 27).

We disagree with Patent Owner that Petitioner is "kluging together the distinct MySync and MyGuard modules to reach the claimed security

IPR2021-01236
Patent 10,951,632 B2

agent." PO Resp. 27. Patent Owner's "kluging" argument is unavailing because, as Petitioner demonstrates, "[t]hese two modules together being a 'security agent' is consistent with the '632 patent embodiment where the security agent includes two modules—'mode module 1904' for waking components from a power management mode and 'component manager 1906' for conducting security services." Pet. 24. In addition, Figure 2B of Hall and the accompanying text demonstrate that the MySync module and MyGuard application communicate with each other and work together. Ex. 1007 ¶ 45. Thus, XML messages received by MySync module 240 are parsed and security-based instructions are routed to MyGuard application $270_1$, which includes a number of processes directed to security. *Id.* In light of this close connection between the MySync module and the MyGuard application, we find that they are properly considered together as a security agent.

For these reasons, we find that Petitioner demonstrates that Hall discloses the claimed security agent.

*d. security administrator device (claim elements 1.2.a, 1.2.c)*

Claim element 1.2.a calls for "a communication interface configured to communicate with a mobile device and configured to communicate over a network with a security administrator device." Petitioner identifies the second subscriber device $110_2$ in Hall as the claimed security administrator device: "The second subscriber device $110_2$ is a security administrator device because it lets a user perform security-related administration of his or her devices, including indicating whether a device has been stolen and what corresponding actions to take with respect to the stolen device." Pet. 18–19.

45

IPR2021-01236
Patent 10,951,632 B2

Patent Owner responds that Hall's second subscriber device $110_2$ is not a security administrator device because it "does *not* manage the security of a security system." PO Resp. 38

We do not agree with Patent Owner's argument because it is based on a construction of "security administrator device" that we did not adopt. *See supra*, Section II.B.2. We have adopted, instead, Petitioner's construction, which is "[t]he plain and ordinary meaning of [security administrator device] includes a device that performs security administration." Pet. 13 (citing Jakobsson Decl. ¶ 65). Hall discloses that a user can use subscriber device $110_2$ to access a user interface and report the status of a subscriber device as "stolen." Pet. 18–20; Ex. 1007 ¶¶ 64–66, Fig. 6D. Under our construction, Hall's subscriber device $110_2$ is a security administrator device because it performs administrative tasks, e.g., establishing an account, configuring an account, and setting status of a device to "stolen." Pet. 18–19; *see* Ex. 1007, Figs. 6A–6D.

We find that Petitioner demonstrates that Hall discloses the claimed security administrator device.

### 2. Claim 16

Petitioner's analysis of claim 16 relies on its analysis of claim 1. Pet. 38–40. Patent Owner does not address claim 16 separately, but combines its analysis of claim 16 with its analysis of claim 1. *See, e.g.*, PO Resp. 31–39. For the reasons given for claim 1, we find that Petitioner has demonstrated that Hall discloses the limitations of claim 16.

### 3. Summary – Claims 1 and 16

We have considered Petitioner's analysis of claims 1 and 16 in relation to Hall and the relevant arguments and evidence presented by Patent

46

IPR2021-01236
Patent 10,951,632 B2

Owner. Taking into account the entire record, including the Petition, Patent Owner's Response, Petitioner's Reply, and Patent Owner's Sur-reply, as well as the evidence presented by the parties, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1 and 16 would have been obvious based on Hall.

### 4.  Claims 9 and 24

Petitioner provides an element-by-element analysis of these dependent claims in light of Hall (Pet. 37–38, 40) and Hall and Meenan (*id.* at 42–45). *See also* Jakobsson Decl. ¶¶ 116, 121–133. In its analysis of the ground based on Hall and Meenan, Petitioner relies on Meenan for teaching "performing a particular security service that includes removing unauthorized data from a mobile device." Pet. 42–43.

Petitioner provides a persuasive rationale for combining Hall and Meenan. For example, according to Petitioner, "[a person of ordinary skill] also could have removed unauthorized programs [as described by Meenan] using Hall's MySync module and MyGuard application (together, a security agent) because they already perform other security services." *Id.* at 43.

Patent Owner's response to this challenge presents no new arguments, referring back to its arguments addressing claims 1 and 16. PO Resp. 31. For the reasons given by Petitioner, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 9 and 24 would have been obvious over Hall and over Hall and Meenan.

### IV.  CONCLUSION

For the foregoing reasons, we determine Petitioner has demonstrated by a preponderance of the evidence that all challenged claims of the '632

IPR2021-01236
Patent 10,951,632 B2

patent would have been obvious and are, therefore, unpatentable. Our conclusions are summarized in the following table.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1, 9, 16, 24 | 103(a) | Hall | 1, 9, 16, 24 | |
| 9, 24 | 103(a) | Hall, Meenan | 9, 24 | |
| 1, 16 | 103(a) | Joseph | 1, 16 | |
| 9, 24 | 103(a) | Joseph, Meenan | 9, 24 | |
| Overall Outcome | | | 1, 9, 16, 24 | |

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 9, 16, and 24 of the '632 patent are unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

48

IPR2021-01236
Patent 10,951,632 B2

PETITIONER:

James Heintz
Michael Burns
Robert Buergi
DLA Piper LLP (US)
jim.heintz@dlapiper.com
michael.burns@dlapiper.com
robert.buergi@dlapiper.com

PATENT OWNER:

Jonathan Caplan
Jeffrey Price
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
jcaplan@kramerlevin.com
jprice@kramerlevin.com

49

Trials@uspto.gov
571-272-7822

Paper 37
Entered: January 17, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

TREND MICRO INC.,
Petitioner,

v.

CUPP COMPUTING AS,
Patent Owner.

———————

IPR2021-01237
Patent 10,951,632 B2

———————

Before THOMAS L. GIANNETTI, GARTH D. BAER, and
SHARON FENICK, *Administrative Patent Judges*.

BAER, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2021-01237
Patent 10,951,632 B2

# I.    INTRODUCTION

## A. Background

Trend Micro Inc. ("Petitioner") filed a Petition requesting *inter partes* review of claims 1, 7, 9, 16, 22, and 24 (the "challenged claims") of U.S. Patent No. 10,951,632 B2 (Ex. 1101, the "'632 patent"). Paper 1 ("Pet."). CUPP Computing AS ("Patent Owner") filed a Preliminary Response. Paper 9. Pursuant to 35 U.S.C. § 314, we instituted this *inter partes* review as to all of the challenged claims and all grounds raised in the Petition. Paper 16 ("Institution Dec.").

Following institution, Patent Owner filed a Response. Paper 25 ("PO Resp."). Subsequently, Petitioner filed a Reply to Patent Owner's Response (Paper 28, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 30, "PO Sur-reply").

On October 18, 2022, we held a consolidated oral hearing with IPR2021-01236, also involving the '632 patent. A transcript of the hearing is included in the record. Paper 36 ("Hearing Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision issued pursuant to 35 U.S.C. § 318(a). For the reasons we discuss below, we determine that Petitioner has proven by a preponderance of the evidence that all challenged claims of the '632 patent are unpatentable.

## B. Related Proceedings

The parties identify the following district court proceeding concerning the '632 patent: *CUPP Cybersecurity LLC v. Trend Micro, Inc., et al.*, No. 3:20-cv-03206 (N.D. Tex.). Pet. 1–2; Paper 7. In addition, Petitioner challenges claims 1, 9, 16, and 24 of the '632 patent in IPR2021-01236 (the

2

IPR2021-01237
Patent 10,951,632 B2

"1236 IPR"). A Final Written Decision in the 1236 IPR is being entered concurrently with this Decision.

A closely related patent, U.S. Patent No. 9,843,595 (the "'595 patent")[1] was before the Board in IPR2019-00765 (the "765 IPR"). A Final Written Decision in the 765 IPR, finding all challenged claims of the '595 patent unpatentable, was entered on August 25, 2020. Ex. 1003. That Decision was appealed to the Federal Circuit and affirmed on November 16, 2022. *CUPP Computing AS v. Trend Micro Inc.*, 53 F.4th 1376 (Fed. Cir. 2022).

### C. REAL PARTY-IN-INTEREST

The Petition identifies Trend Micro as the real party-in-interest. Pet. 1. Patent Owner identifies CUPP Computing AS as the real party-in-interest. Paper 7, 1.

### D. THE '632 PATENT

The '632 patent describes a system and method for providing data and device security between external and host devices. Ex. 1101, 1:30–33. According to the patent, mobile devices are more vulnerable to attacks by malicious code when traveling outside an enterprise network. *Id.* at 1:61–65. The patent thus describes "a small piece of hardware [a 'mobile security system'] that connects to a mobile device and filters out attacks and malicious code." *Id.* at 5:45–47. The patent explains that "[u]sing the mobile security system, a mobile device can be protected by greater security

---

[1] The '632 patent is a continuation (through a chain of continuations) of the '595 patent (Ex. 1104), and shares a common specification with the '595 patent. Ex. 1101, 1:8–26.

IPR2021-01237
Patent 10,951,632 B2

and possibly by the same level of security offered by its associated corporation/enterprise." *Id.* at 5:49–52.

This system is illustrated in Figure 3 of the '632 patent, which follows:



FIG. 3

Figure 3 of the '632 patent is a block diagram of a network system. Ex. 1101, 5:53–54. Network system 300 includes desktop 305, first mobile device 310a, and second mobile device 310b. *Id.* at 5:54–56. First mobile device 310a is within trusted enterprise network 340 and is coupled to the enterprise's intranet 315 via mobile security system 345a. *Id.* at 5:56–59. Figure 3 further shows mobile device 310c that has travelled outside trusted enterprise network 340 and is coupled to untrusted internet 330 via mobile security system 345b. *Id.* at 6:3–5. This mobile device may be in use by an employee of trusted enterprise network 340 who is currently on travel. *Id.* at

4

IPR2021-01237
Patent 10,951,632 B2

6:6–7.  Security administrator 325 manages mobile security systems 345a and 345b and network security system 320 to assure that they include the most current security protection.  *Id.* at 6:7–11.

The '632 patent also describes a wake module configured to wake a mobile device from a power management mode.  Ex. 1101, 21:63–64, Fig. 18.  According to the patent, a power management mode "is a mode wherein the mobile device conserves power, usually after a predetermined period of inactivity (e.g., no input from a mouse and keyboard)."  *Id.* at 21:64–67.  During power management mode, the mobile device may reduce or eliminate power to one or more mobile device components such as a display and/or hard drive.  *Id.* at 21:67–22:3.

E. Illustrative Claim

Claims 1 and 16 are independent.  Claim 1 is representative of the challenged claims.  Claim 1 recites[2]:

> [1.0] A security system, comprising:
>
> [1.1] security system memory;
>
> [1.2.a] a communication interface configured to communicate with a mobile device and configured to communicate over a network with a security administrator device,
>
> [1.2.b] the mobile device including a mobile device processor and including a security agent configured to cooperate with the security system,
>
> [1.2.c] the security administrator device having a security administrator processor different than the mobile device processor, the mobile device being remote from the security administrator device,

---

[2] Paragraph numbering provided by Petitioner has been added.

5

[1.2.d] the mobile device being a first computer system, the security system being a second computer system, the security administrator device being a third computer system, the first computer system, the second computer system and the third computer system being separate computer systems; and

[1.3] a security system processor being different than the mobile device processor and different than the security administrator processor, the security system processor being configured to:

[1.4.a] store in the security system memory at least a portion of wake code, the wake code being configured to detect a wake event and to send a wake signal to the mobile device in response to detecting the wake event,

[1.4.b] the security agent of the mobile device being configured to receive the wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal, the security agent of the mobile device being configured to perform security services after the at least a portion of the mobile device has been woken;

[1.5] detect a particular wake event;

[1.6] prepare a particular wake signal in response to detecting the particular wake event; and

[1.7.a] send the particular wake signal to the mobile device in response to detecting the particular wake event,

[1.7.b] the security agent of the mobile device being configured to wake the at least a portion of the mobile device in response to receiving the particular wake signal and being configured to perform particular security services after the at least a portion of the mobile device has been woken.

6

IPR2021-01237
Patent 10,951,632 B2

Ex. 1101, 31:15–58.

F. ASSERTED GROUNDS OF UNPATENTABILITY

Petitioner asserts the challenged claims are unpatentable on the following grounds:

| Claims Challenged | Basis (35 U.S.C.)[3] | Reference(s) |
|---|---|---|
| 1, 7, 9, 16, 22, 24 | § 103(a) | Gordon,[4] Gardner[5] |
| 7, 22 | § 103(a) | Gordon, Gardner, Chang[6] |
| 9, 24 | § 103(a) | Gordon, Gardner, Meenan[7] |

Pet. 4. In addition, Petitioner submits the Declaration of Dr. Markus Jakobsson (Ex. 1121, "Jakobsson Decl."). Patent Owner submits the Declaration of Michael T. Goodrich, Ph.D. (Ex. 2011, "Goodrich Decl.").

## II.    PRELIMINARY MATTERS

### A. LEVEL OF ORDINARY SKILL

Petitioner contends "[a] person of ordinary skill in the art at the time of the alleged invention of the '632 patent (i.e., August 4, 2008) . . . would have had a bachelor's degree in computer science, electrical engineering, or

---

[3] Because the parties agree that the challenged claims of the '632 patent have an effective filing date before March 16, 2013, we apply the pre-AIA ("America Invents Act") version of § 103. Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011).

[4] U.S. 7,818,803 B2, Oct. 19, 2010 (Ex. 1107, "Gordon").

[5] U.S. 2006/0272020 A1, Pub. Nov. 30, 2006 (Ex. 1108, "Gardner").

[6] U.S. 2011/0264931 A1, Pub. Oct. 27, 2011 (Ex. 1109, "Chang").

[7] U.S. 2006/0101277 A1, Pub. May 11, 2006 (Ex. 1111, "Meenan").

IPR2021-01237
Patent 10,951,632 B2

a comparable field of study, plus at least two years of professional experience with computer security systems, or the equivalent." Pet. 13.

Patent Owner contends "[a] person of ordinary skill in the art of the '632 Patent would be someone with a bachelor's degree in computer science or a related field and either (1) two or more years of industry experience and/or (2) an advanced degree in computer science or a related field." PO Resp. 7. These formulations are similar, differing mainly in the specific reference, in Patent Owner's formulation, to "an advanced degree in computer science or a related field" as a possible alternative to experience in the field.

We adopt Patent Owner's description as it is consistent with the prior art and patent specification before us and supported by credible expert testimony. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). However, our decision would be the same under either formulation.

B. CLAIM CONSTRUCTION

In an *inter partes* review, the claims of a patent shall be construed using the same claim construction standard that would be used to construe the claims in a civil action under 35 U.S.C. § 282(b), including construing the claims in accordance with the ordinary and customary meaning of such claims as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005). Under that standard, and absent any special definitions, we give claim terms their ordinary and customary meaning, as would be understood by one of ordinary skill in the art at the time of the invention. *See In re Translogic Tech., Inc.*, 504 F.3d

8

IPR2021-01237
Patent 10,951,632 B2

1249, 1257 (Fed. Cir. 2007). Any special definitions for claim terms must be set forth with reasonable clarity, deliberateness, and precision. *See In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

We construe claim terms only as relevant to the parties' contentions and only to the extent necessary to resolve the issues in dispute. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

1. *power management mode (all challenged claims)*

This term has been construed in the 765 IPR and in district court litigation involving the '595 patent as "a mode where the mobile device conserves power." Pet. 13–14; PO Resp. 17. There is no dispute over this construction. *See* Ex. 1106, 2.[8] The construction is supported by the '632 patent specification. *See* Ex. 1101, 21:62–64 ("A power management mode is a mode wherein the mobile device conserves power."). We, therefore, agree with this construction and we adopt it for this decision.

2. *security administrator device (all challenged claims)*

Petitioner contends "the plain and ordinary meaning of this term includes a device that performs security administration." Pet. 14 (citing Jakobsson Decl. ¶ 65). Petitioner asserts that "[t]his is consistent with the '632 patent's disclosure that the security administrator device 325 may perform various security administration tasks." *Id.*

---

[8] Unless otherwise indicated, citations to exhibits use the page numbers assigned by the parties, not the original page numbers.

IPR2021-01237
Patent 10,951,632 B2

Patent Owner responds that "[t]his term is defined in the '632 Patent as a device that manages the security of a security system." PO Resp. 14 (citing Ex. 1101, 6:7–11) (emphasis omitted). Patent Owner asserts that "Petitioner's proposed construction includes the phrase 'security administration,' but it is unclear as Petitioner leaves unsaid what 'security administration' does and does not encompass." *Id.* at 16.

We are persuaded to adopt Petitioner's construction. Petitioner's construction reflects its position that "[i]n no place do the claims recite that the 'security administrator device' must manage the 'security system.'" Pet. Reply 12. We agree that a security administrator device need not "*manage*" the security of a security system, as Patent Owner asserts. PO Resp. 14. Our construction is consistent with the term's plain language as well as the '632 patent claims and is supported by expert testimony. Jakobsson Decl. ¶ 65.

As Petitioner points out, the claims themselves make no mention of managing the security of a security system. Pet. Reply 12. Claim 1 recites that the security system is "configured to communicate over a network with a security administrator device." Ex. 1101, 31:18–19. Claim 16 recites that the security administrator device is "a third computer system," but does not recite a relationship between the security administrator device and the security system. *Id.* at 32:61–63; *see also* Jakobsson Decl. ¶ 65 ("The plain and ordinary meaning of this term includes a device that performs security administration.").

Petitioner's construction also is consistent with the '632 patent's disclosure that the security administrator device may perform various security administration tasks. Pet. 14; Ex. 1101, 24:55–57 (describing

10

IPR2021-01237
Patent 10,951,632 B2

security administrator 325 as an "administrator device").  As Petitioner points out, "[a]lthough management is a type of administration, administration includes other activities more broadly related to running a system, such as maintaining routing tables."  Pet. Reply 12 (citing Ex. 1101, 12:28–30; Ex. 1125, 3).

We do not agree with Patent Owner's argument that Petitioner's proposed construction is "unclear."  PO Resp. 16.  As Petitioner points out, the relationship between the security system and the security administrator device is recited in the claims.  Pet. Reply 12.  The claims do not recite that the security administrator device manages the security device, "let alone manage[s] the security of the security system."  *Id.*

We do not agree with Patent Owner's argument that the term "security administrator device" is "defined in the '632 Patent."  PO Resp. 14 (citing Ex. 1101, 6:7–11).  We are not convinced that the reference to this phrase in the '632 patent specification cited by Patent Owner sets forth with sufficient "clarity, deliberateness, and precision" a lexicographic definition.  *See Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998); *In re Paulsen*, 30 F.3d at 1480.  Instead, Patent Owner's argument is an attempt to incorporate limitations from a particular embodiment that are not recited in the claims.  *See* Pet. Reply 13–14.

We, therefore, do not adopt Patent Owner's proposed construction for this term.  Adopting Petitioner's construction, we construe the term as "a device that performs security administration."  Pet. 14; Jakobsson Decl. ¶ 65.

11

IPR2021-01237
Patent 10,951,632 B2

### 3.  *particular wake event/particular wake signal/particular security services (all claims)*

Patent Owner contends that "[t]aken as a whole, these claim elements recite a technique whereby a wake event triggers a particular *type* of wake signal which triggers the mobile device's security for a particular *type* of security service." PO Resp. 7–8.  Citing Merriam-Webster's dictionary, Patent Owner contends that "[t]his interpretation is consistent with the plain and ordinary meaning of the word 'particular,' which is 'of, relating to, or being a single person or thing.'" *Id.* at 8 (citing Ex. 2012, 3).

Petitioner responds that "a 'particular' wake signal includes one that is distinguishable from other wake signals, such as a wake signal that occurs at a specific time." Pet. Reply 1.  Therefore, "[a] wake signal that occurs at a specific time is a specific, single, and individual wake signal, distinguishable from wake signals that occurred at other times.  Thus, it is a 'particular' wake signal." *Id.* at 2.  Petitioner argues that the Board should reject Patent Owner's argument "that these claim terms should be limited to a 'particular type of' wake signal, wake event, and security service." *Id.* at 4–5.

We agree with Petitioner that the claims should not be limited to a particular *type* of wake event or signal.  The claims themselves recite a "particular wake signal," not a particular *type* of wake signal.  The same is true for wake events.  Patent Owner's argument would, therefore, require us to rewrite the claims to make a distinction between what Patent Owner refers to as "generic" wake signals and events and "particular" wake signals and events.  *See* Hearing Tr. 38:26–39:7, 41:6–19.  This distinction is not reflected in the claims or specification.

IPR2021-01237
Patent 10,951,632 B2

At the oral hearing, Patent Owner's counsel was questioned by the
panel exploring the differences between particular and generic wake events.
Hearing Tr. 50:10–51:3. Ultimately, Patent Owner's counsel acknowledged
that a wake event occurring at every hour could be a particular wake event:

> [THE BOARD:] What if there was a wake event that was
> wake at noon and a wake event that was wake at
> midnight? . . . [W]ould one of those qualify as a particular
> wake event?

> [PATENT OWNER'S COUNSEL:] Yeah. I believe each
> one because that's the -- what's described and what's claimed is
> that you -- there is a particular wake event which has to be
> detected. It's not limited to only one, so it could be -- it could be
> every hour. *There could be a particular wake event which is
> each hour.* So, you know, *that's the particular wake event.
> Or it could be just, like you said, at noon -- or at noon or
> at midnight. Those would each be a particular wake event.*

> And then what the claim says or requires is that for
> each particular wake event, there has to be a particular wake
> signal that's associated with that particular. And it could
> be that what you do at noon or what you do at midnight *are
> the same*, or it could be different. And then from whatever
> that particular wake signal is for that particular wake
> event, then you have a particular security service that's
> offered.

Hearing Tr. 50:10–51:3 (emphasis added).

Patent Owner argues that "[u]nder Petitioner's interpretation, the
Challenged Claims would have the same meaning with and without the word
'particular' because *every* detected wake event would occur at some point in
time." PO Resp. 11; *see also* PO Sur-reply 1–2 ("Petitioner's proposal
. . . should be rejected because it renders the word 'particular'
superfluous."). We disagree that under Petitioner's construction, the term
"particular" would be meaningless or superfluous. We agree with Petitioner

13

IPR2021-01237
Patent 10,951,632 B2

and find that "[a] signal sent at time $T_1$ is not the same signal sent at time $T_2$." Pet. Reply 2. As Petitioner explains, "[a]lthough the signals may have the same form, each is individually identifiable." *Id.* Two wake signals of the same form sent at the same time would not be "particular" wake signals because they would not be distinguishable on the basis of time. *Id.* at 2–3. Thus, Petitioner's interpretation provides a meaningful identification of particular wake events and wake signals. For the reasons given, we adopt Petitioner's construction of these claim elements.

This construction will be further discussed in Section III.A.1.i *infra*, in connection with our consideration of the prior art.

4. *security agent (all claims)*

Patent Owner contends that "[t]he plain and ordinary meaning of the term 'security agent' is a security system situated within and a part of an environment that senses that environment and acts on it, over time, in pursuit of its own agenda and so as to effect what it senses in the future." PO Resp. 12 (emphasis omitted). For support, Patent Owner relies on a paper by Franklin titled "Is it an Agent, or just a Program?: A Taxonomy for Autonomous Agents." *Id.* (citing Ex. 2013, 4).

Petitioner responds that "Patent Owner's construction comes from Franklin's definition of '<u>autonomous </u>agent,' not 'security agent' or 'agent.'" Pet. Reply 6. Petitioner explains that "Franklin . . . acknowledges that some agents may not be autonomous." *Id.* (citing Ex. 2013, 6). Petitioner presents several "broader" dictionary definitions of "agent." *Id.* at 7 (citing Exhibits 1124 (from "Barron's Dictionary of Computer and Internet Terms"), 1125 (from "Concise Oxford English Dictionary") and 1126 (from "Merriam-Webster's Collegiate Dictionary")). Petitioner contends that

14

IPR2021-01237
Patent 10,951,632 B2

Merriam-Webster's definition ("a computer application designed to automate certain tasks")[9] has been adopted as an "accepted ordinary meaning" in another proceeding.  *Id.* at 8.

Petitioner contends that Patent Owner's construction is unsupported by the intrinsic evidence.  Pet. Reply 9–10.  Petitioner explains that in the '632 patent, the cited security agent does not act "in pursuit of its own agenda" because it sometimes acts on behalf of the mobile security system. *Id.* at 9 (citing Ex. 1101, 28:25–28; 28:44–53).

We agree with Petitioner that Patent Owner's construction based on Franklin is not supported by the intrinsic evidence.  First, neither the written description nor the claims of the '632 patent themselves recite "autonomous agent."  Nor do Patent Owner's references to the specification demonstrate that the agent described in the '632 patent acts "in pursuit of its own agenda."  PO Resp. 12–13.  In addition, Franklin presents "autonomous" as a property of a special type of agent, one where the agent "exercises control over its own actions." Ex. 2013, 5–6.  For the reasons given, we are not persuaded that the "security agent" recited in the '632 patent claims and described in the specification is an "autonomous" agent as discussed in Franklin.  We, therefore, do not adopt Patent Owner's construction for "security agent."  Instead, we adopt the plain and ordinary meaning best expressed by Merriam-Webster, namely, "a computer program designed to automate certain tasks." Ex. 1126, 3.

[9] The correct quote from the dictionary is "a computer *program* designed to automate certain tasks." Ex. 1025, 3 (emphasis added).  We do not regard this minor error as affecting our analysis.

15

IPR2021-01237
Patent 10,951,632 B2

C. DESCRIPTION OF THE PRINCIPAL PRIOR ART REFERENCE
(GORDON, EX. 1107)

Gordon is a patent titled "Security Module Having a Secondary Agent in Coordination with a Host Agent." Ex. 1107, code (54). Figure 1 of Gordon, annotated by Petitioner, is reproduced below.



Figure 1 of Gordon (annotated by Petitioner) is a schematic functional block diagram showing protected host device 10 (e.g., a laptop computer) with security module 19 (outlined in red). Ex. 1107, 6:14–16, 14:1. The security module includes firmware agent 21 connected to the host. *Id.* at 14:45–46.

16

IPR2021-01237
Patent 10,951,632 B2

The laptop and wireless security module also communicate with monitoring center 70 via a wireless connection. *Id.* at Fig. 2, 5:7–12, 15:12–15.

## III.    ANALYSIS OF THE CHALLENGED CLAIMS
### A. OBVIOUSNESS OF CLAIMS 1, 7, 9, 16, 22, AND 24
#### BASED ON GORDON AND GARDNER

*1. Claim 1*

Petitioner asserts that the combination of Gordon and Gardner teaches each element of claim 1. Pet. 18–44. Petitioner supports its analysis with testimony by its expert, Dr. Jakobsson. Jakobsson Decl. ¶¶ 67–128.

*a. Preamble [1.0]*

The preamble of claim 1 recites a "security system." Petitioner identifies Gordon's host monitoring system and monitoring center 70 as the claimed "security system." Pet. 19–22. Patent Owner's Response does not challenge this contention. We find that for the reasons given, Petitioner demonstrates that Gordon teaches the preamble of claim 1.[10]

*b. Claim element 1.1*

Claim element 1.1 calls for a "security system memory." Petitioner contends Gordon teaches this feature because Gordon's monitoring system includes a monitoring server 3 that is a physical computer, which "inherently and necessarily has a memory." *Id.* at 22–23. Patent Owner's Response does not challenge this contention. We find that for the reasons given, Petitioner demonstrates that Gordon teaches element 1.1.

---

[10] We do not express an opinion on whether the preambles of the '632 patent claims are limiting.

IPR2021-01237
Patent 10,951,632 B2

   *c.  Claim element 1.2.a*

     This claim element calls for "a communication interface configured to communicate with a mobile device and configured to communicate over a network with a security administrator device." Petitioner identifies Gordon's laptop computer A3 as the claimed "mobile device." *Id*. at 24. Petitioner explains further that Gordon refers to Gardner, and that Gardner discloses additional detail about host monitoring system C, including a "'web-based or network based console' . . . that remotely accesses the host monitoring system C." *Id*. at 25 (quoting Jakobsson Decl. ¶ 84). Petitioner corresponds Gardner's network-based console to the claimed "security administrator device." *Id*. According to Petitioner, it would have been obvious to combine Gardner's administrator consoles with Gordon's system "such that 'authorized administrators' could use the consoles to access data in 'host monitoring system C' over a network, as Gardner discloses." *Id*. Moreover, Petitioner asserts, "[m]otivation to do so arises from the fact that Gardner describes the administrator consoles as an extension of the same 'host monitoring system C' that is in Gardner." *Id*. at 26 (citing Ex. 1108 ¶ 57, Fig. 1; Ex. 1107, Fig. 5).

     Patent Owner challenges Petitioner's identification of Gardner's consoles as the claimed "security administrator device." PO Resp. 27–29. According to Patent Owner, "Gardner's computer consoles do ***not*** manage the security of a security system." *Id.* at 28. For reasons that follow, we do not agree with Patent Owner's contention.

     First, Patent Owner notes that Petitioner identified a different component in Gordon/Gardner combination for the claimed "security administrator device" in the '595 IPR. PO Resp. 27. We agree with

IPR2021-01237
Patent 10,951,632 B2

Petitioner that this observation "is irrelevant." Pet. Reply 24. As we stated in our Institution Decision, a petitioner may analyze a prior art reference differently in two different proceedings, including identifying different elements of the prior art with similar elements of different claims. Institution Dec. 20–21. We therefore analyze the disclosure of the reference to determine whether it supports the Petitioner's contentions in this proceeding.

Patent Owner contends Gardner's computer consoles are not administrator devices because they "merely provide access to information through inputs and outputs," and "are not devices that manage the security of a security system." PO Resp. 29. We do not agree with Patent Owner's argument because it is based on a construction of "security administrator device" that we did not adopt. *See* Section II.B.2, *supra*. Patent Owner's construction would require "a device that manages the security of a security system." PO Resp. 14 (emphasis omitted). Instead, we adopt Petitioner's construction based on plain and ordinary meaning, which is "a device that performs security administration." Pet. 14. Under our construction, Gardner's console is a security administrator device because, as Petitioner notes, "it is used by 'authorized administrators' for the administrative purposes of accessing 'location and asset related data.'" *Id.* at 25 (citing Ex. 1108 ¶¶ 59, 56, 60, 191).

We find that for the reasons given above, Petitioner demonstrates that the Gordon and Gardner teach element 1.2.a of claim 1.

  d. *Claim element 1.2.b*

This claim element calls for "the mobile device including a mobile device processor and including a security agent configured to cooperate with

IPR2021-01237
Patent 10,951,632 B2

the security system." Petitioner asserts Gordon includes a mobile device processor because its laptop has a "main processor." Pet. 29 (quoting Ex. 1107, 11:28–29). Petitioner also asserts that together, Gordon's security module 19 and host agent 14 "are a 'security agent.'" *Id*. at 30. As Petitioner notes, "[t]hese two modules together being a 'security agent' is consistent with the '632 patent embodiment where the security agent includes two modules—'mode module 1904' for waking components from a power management mode and 'component manager 1906' for conducting security services." *Id*. (citing Ex. 1101, 28:11–20, 28:25–32, Fig. 19).

Patent Owner challenges Petitioner's identification of the claimed "security agent" in Gordon. PO Resp. 24–27. According to Patent Owner, "Gordon's host agent and security module (via its firmware agent), are capable of autonomous action, and they interact with other agents, namely each other." *Id*. at 25. "Accordingly," Patent Owner asserts, a skilled artisan "would not recognize Gordon's host agent and security module to collectively make up the single 'security agent.'" *Id*. at 26.

We disagree with Patent Owner's argument. First, Patent Owner's discussion about Gordon's host agent and security module both being "capable of autonomous action" is irrelevant because it relies on Patent Owner's construction of security agent that we declined to adopt for the reasons outlined in Section II.B.4, *supra*. In addition, we disagree with Patent Owner's argument that Gordon's host agent and security module cannot together be the claimed security agent because the claims do not restrict the security agent to a single module, and the specification discloses that the security agent may have multiple components. *See* Pet. Resp. 22. (citing Ex. 1101, Fig. 19).

20

IPR2021-01237
Patent 10,951,632 B2

In light of our construction of "agent," *see* Section II.B.4, *supra*, a security agent need only be computer program designed to automate security tasks. We agree with Petitioner that together, Gordon's security module 19 and host agent 14 "are a 'security agent.'" Pet. 30; *see* Pet. Reply 21–24. We find that for the reasons given, Petitioner demonstrates that Gordon teaches element 1.2.b of claim 1.

e.  *Claim element 1.2.c*

This claim element calls for "the security administrator device having a security administrator processor different than the mobile device processor, the mobile device being remote from the security administrator device." Petitioner refers back to its analysis of element 1.2.a. Pet. 32. Petitioner contends "Gardner discloses that the 'web-based or network based console' computer (security administrator device) . . . is a different computer than at least certain of the host laptop devices disclosed in Gordon." *Id.* (citing Ex. 1108 ¶ 57; Ex. 1107, 1:31–33). Petitioner also notes that because Gordon's host laptops may be stolen, they are remote from the administrator's computer console. *Id.* at 33 (citing Ex. 1107, 12:36–39, 13:30–34, 12:35–42, 14:53–60).

Other than as noted above, Patent Owner does not additionally challenge Petitioner's showing for this element. *See* PO Resp. 39. We find that for the reasons given, Petitioner demonstrates that Gordon and Gardner teach element 1.2.c of claim 1.

f.  *Claim element 1.2.d*

This claim element calls for "the mobile device being a first computer system, the security system being a second computer system, the security administrator device being a third computer system, the first computer

21

**Appx70**

IPR2021-01237
Patent 10,951,632 B2

system, the second computer system and the third computer system being separate computer systems." Petitioner asserts that Gordon and Gardner disclose this limitation because the host monitoring system (security system), laptop (mobile device), and administrator console (security administrator device) are all "discrete and separate" systems." Pet. 33–34.

Patent Owner does not challenge Petitioner's showing for this element. We find that for the reasons given, Petitioner demonstrates that Gordon and Gardner teach element 1.2.d of claim 1.

g. *Claim elements 1.3 and 1.4.a*

These claim elements, together, call for "a security system processor being different than the mobile device processor and different than the security administrator processor, the security system processor being configured to store in the security system memory at least a portion of wake code, the wake code being configured to detect a wake event and to send a wake signal to the mobile device in response to detecting the wake event."

Petitioner asserts Gordon's host monitoring system C / monitoring center 70 (a security system) "necessarily and inherently includes a processor," Pet. 34, 35, that is separate from the processors in Gordon's laptop and Gardner's console, *id*. at 35. Petitioner explains that Gordon's monitoring center 70 (the claimed security system) includes the claimed "wake code" that "detect[s] a wake event" because Gardner describes that "the monitoring center may . . . indicate that the firmware agent should wake-up the host." *Id*. at 35–36 (quoting Ex. 1107, 4:58–63). Gordon discloses that the monitoring center 70 sends wake signals in response to detected wake events (as the challenged claims require) because "the monitoring center may send a wake signal if it receives a response to a call

22

IPR2021-01237
Patent 10,951,632 B2

from the laptop's firmware agent 21 instead of the host agent 14." *Id*. at 36 (citing Ex. 1107, 16:23–17:9, Fig. 4). "In this scenario," Petitioner explains, "the receipt of the return call from the firmware agent would be a detected wake event because it triggered the monitoring center to send a wake-up signal." *Id*. at 36–37.

Other than as explained above, Patent Owner does not separately challenge Petitioner's arguments for these elements. We find that for the reasons given, Petitioner demonstrates that Gordon and Gardner teach elements 1.3 and 1.4.a.

> h. *Claim element 1.4.b*

This claim element calls for "the security agent of the mobile device being configured to receive the wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal, the security agent of the mobile device being configured to perform security services after the at least a portion of the mobile device has been woken."

Petitioner contends Gordon discloses this element because Security module 19 and its firmware agent 21 receives the wake signals and in response, security module 19 wakes part of the laptop from a power management mode (i.e. low power, sleep or shut-down modes). Pet. 39–40. In particular, Petitioner explains, security module 19 and its firmware agent 21 wakes up host agent 14, which then performs security services (e.g., deleting data, protecting data, updating software, and deploying software) after a portion of the mobile device has been woken." Pet. 40–41 (citing Ex. 1107).

23

IPR2021-01237
Patent 10,951,632 B2

Other than as outlined above, Patent Owner does not additionally challenge Petitioner's showing for this element. We find that for the reasons given, Petitioner demonstrates that Gordon teaches element 1.4.b of claim 1.

    *i.*   *Claim elements 1.5, 1.6, 1.7.a, and 1.7.b*

These claims elements call for the following:

[1.5] detect a particular wake event;

[1.6] prepare a particular wake signal in response to detecting the particular wake event; and

[1.7.a] send the particular wake signal to the mobile device in response to detecting the particular wake event,

[1.7.b] the security agent of the mobile device being configured to wake the at least a portion of the mobile device in response to receiving the particular wake signal and being configured to perform particular security services after the at least a portion of the mobile device has been woken.

Petitioner demonstrates that each of these limitations is disclosed by Gordon. Pet. 42–44. Petitioner refers back to its analysis of claim element 1.4.a, describing the Gordon's wake event and signal. *Id*. at 42–43. Petitioner points out that Gordon's security system (monitoring center 70 / host monitoring system C) detects "particular" wake events distinguishable from other wake events, such as those that happen at other times. *Id.* at 42; *see* discussion of "particular" wake events and signals in Section II.B.3, *supra*. Moreover, Gordon discloses performing particular security services after a portion of the mobile device has been woken because "Gordon discloses that the laptop's security module 19 and its firmware agent 21 (part of the 'security agent') may receive wake signals to 'wake-up the host so

24

IPR2021-01237
Patent 10,951,632 B2

that a data protection measure can be invoked.'" *Id*. at 44 (quoting Ex. 1107, 4:58–63).

Patent Owner characterizes the "alleged" wake signal in Gordon as flawed because "because the same message is sent whether or not the computer and/or host agent is active." PO Resp. 22. We disagree with this argument because "a prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention." *Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003). As Petitioner notes, Gordon discloses that "[t]he call may involve, for example, an instruction to the firmware agent to switch on the computer and/or wake up the host agent." Pet. Resp. 17 (quoting Ex. 1107, 17:7–9). It does not matter that Gordon's also discloses messages that are not wake calls because the host is already active.

Patent Owner also contends that Gordon's message is insufficient because "it is a generic wake signal, not a particular one." PO Resp. 22. This is a variation on Patent Owner's argument that the claims require a particular "type" of wake event or wake signal, which we rejected as contrary to the language of the claims. *See* Section II.B.3, *supra*. We find that Gordon's SMS call is a particular wake signal because it is distinguishable from other wake signals on the basis of the time it was sent. Pet. Reply 15.

Moreover, even under Patent Owner's construction of "particular," which we have not adopted, Gordon discloses a "a particular type of wake signal" because "Gordon discloses that the SMS call may include 'an instruction to the firmware agent to switch on the computer and/or wake up the host agent.'" Pet. Resp. 16 (quoting Ex. 1107, 17:7–9). As Petitioner

25

IPR2021-01237
Patent 10,951,632 B2

explains, "[t]his passage discloses three particular types of wake signals: 1) one with an instruction to switch on the computer; 2) one with an instruction to wake up the host agent; 3) one with an instruction to do both." *Id*. at 16.

We find that for the reasons given, Petitioner demonstrates that asserted prior art teaches elements 1.5, 1.6, 17.a.1, and 17.a.2 of claim 1.

   *j.*   *Summary*

We have considered Petitioner's analysis of claim 1 in relation to the asserted prior art and the relevant arguments and evidence presented by Patent Owner. Considering the entire record, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 1 of the '632 patent would have been obvious in light of Gordon and Gardner.

*2.  Claim 16*

Claim 16 is directed to "[a] non-transitory computer readable medium in a security system," but is otherwise similar to claim 1. Petitioner's analysis of claim 16 relies on its analysis of claim 1. Pet. 46–48. Patent Owner does not address claim 16 separately, but combines its analysis of common elements in claim 16 with its analysis of claim 1. *See* PO Resp. 19–29. Considering the entire record, we determine that Petitioner has demonstrated by a preponderance of the evidence that claim 16 of the '632 patent would have been obvious in light of Gordon and Gardner for the reasons given for claim 1.

*3.  Claims 7 and 22*

Claims 7 and 22 depend from claim 1 and claim 16, respectively, each adding the limitation "wherein the wake event includes at least detecting a predetermined clock time." wherein the performing the particular security services includes removing unauthorized data from the

26

IPR2021-01237
Patent 10,951,632 B2

mobile device." Petitioner asserts Gordon discloses this limitation because "Gordon discloses that the laptop host device (a mobile device) may call the monitoring center (a security system) at predetermined times, such as every 15 minutes." Pet. 44 (citing Ex. 1107, 15:17–18, 16:60–61); *see id*. at 45, 49. Other than the arguments explained above, Patent Owner does not additionally contest claims 7 and 22. For the reasons given, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 7 and 22 would have been obvious in light of Gordon and Gardner.

4. *Claims 9 and 24*

Claims 9 and 24 depend from claim 1 and claim 16, respectively, each adding the limitation "wherein the performing the particular security services includes removing unauthorized data from the mobile device." Petitioner asserts Gordon teaches this limitation because "Gordon discloses that the services invoked by the security module 19 on a laptop include 'data delete.'" Pet. 45 (citing Ex. 1107, 3:43–45, 7:33–42). Petitioner further explains, with support from its expert, that "[a skilled artisan] would have understood that this 'data delete' process refers to removing unauthorized data because as soon as an administrator or user has determined that certain data should be deleted, that data is no longer authorized to be on the mobile device." *Id*. (citing Jakobsson Decl. ¶ 132). Other than the arguments explained above, Patent Owner does not additionally contest claims 9 and 24. For the reasons given, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 9 and 24 would have been obvious in light of Gordon and Gardner.

IPR2021-01237
Patent 10,951,632 B2

B. ADDITIONAL GROUNDS FOR CLAIMS 7, 9, 22, AND 24

Petitioner contends claims 7 and 22 would have been obvious over Gordon, Gardner, and Chang. Petitioner's challenge mirrors its earlier challenge to these claims based on Gordon and Gardner, except Petitioner relies on Chang for teaching the additional limitation in claim 7 and 22 of "a wake event that includes detecting a predetermined clock time." Pet. 52, 55. According to Petitioner, "[a person of ordinary skill] could implement a Gordon wake signal to be sent in 15 minutes from the present time (a predetermined clock time) or at any other predetermined time in the future, as described by Chang." *Id*. at 53–54. Petitioner explains that a skilled artisan would have been motivated to combine the references based on "Chang's teaching that it would be desirable to send wake signals to computers at certain predetermined clock times." *Id*. at 54 (citing Ex. 1110 ¶ 4). Patent Owner's response does not additionally challenge Petitioner's alternative grounds for claims 7 and 22. For the reasons given, we find that Petitioner has demonstrated that claims 7 and 22 would have been obvious over Gordon, Gardner, and Chang.

Petitioner further contends claims 9 and 24 would have been obvious over Gordon, Gardner, and Meenan. Petitioner's challenge mirrors its earlier challenge to these claims based on Gordon and Gardner, except Petitioner relies on Meenan for teaching the additional limitation in claim 9 and 24 of "wherein the performing the particular security services includes removing unauthorized data from the mobile device." Pet. 56, 60. According to Petitioner, Meenan teaches "a scanner application . . . to detect and remedy 'unauthorized programs.'" *Id*. at 57 (citing Ex. 1111 ¶¶ 16–21, 26, 32, Figs. 1, 2). A skilled artisan would have been motivated to combine

28

IPR2021-01237
Patent 10,951,632 B2

the references as Petitioner proposes "to secure a computer by removing unauthorized programs from it, as disclosed by Meenan." *Id*. at 59 (citing Ex. 1111 ¶ 57). Patent Owner's response does not additionally challenge Petitioner's alternative grounds for claims 9 and 24. For the reasons given, we find that Petitioner has demonstrated that claims 9 and 24 would have been obvious over Gordon, Gardner, and Meenan.

IV.    CONCLUSION

For the foregoing reasons, we determine Petitioner has demonstrated by a preponderance of the evidence that all challenged claims of the '632 patent would have been obvious and are, therefore, unpatentable. Our conclusions are summarized in the following table.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1, 7, 9, 16, 22, 24 | 103(a) | Gordon, Gardner | 1, 7, 9, 16, 22, 24 | |
| 7, 22 | 103(a) | Gordon, Gardner, Chang | 7. 22 | |
| 9, 24 | 103(a) | Gordon, Gardner, Meenan | 9, 24 | |
| **Overall Outcome** | | | 1, 7, 9, 16, 22, 24 | |

V.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 7, 9, 16, 22, and 24 of the '632 patent are unpatentable; and

29

IPR2021-01237
Patent 10,951,632 B2

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

PETITIONER:

James Heintz
Michael Burns
Robert Buergi
Jennifer Nall
DLA Piper LLP (US)
jim.heintz@dlapiper.com
michael.burns@dlapiper.com
robert.buergi@dlapiper.com
jennifer.nall@us.dlapiper.com

PATENT OWNER:

Jonathan Caplan
Jeffrey Price
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
jcaplan@kramerlevin.com
jprice@kramerlevin.com

30



US010951632B2

(12) **United States Patent**
Oz et al.

(10) Patent No.: **US 10,951,632 B2**
(45) Date of Patent: ***Mar. 16, 2021**

(54) **SYSTEMS AND METHODS FOR PROVIDING SECURITY SERVICES DURING POWER MANAGEMENT MODE**

(71) Applicant: **CUPP Computing AS**, Oslo (NO)

(72) Inventors: **Ami Oz**, Bet Halevy (IL); **Shlomo Touboul**, Kefar Haim (IL)

(73) Assignee: **CUPP Computing AS**, Oslo (NO)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/601,466**

(22) Filed: **Oct. 14, 2019**

(65) **Prior Publication Data**

US 2020/0045061 A1     Feb. 6, 2020

**Related U.S. Application Data**

(63) Continuation of application No. 16/404,408, filed on May 6, 2019, which is a continuation of application
(Continued)

(51) **Int. Cl.**
*H04L 29/06* (2006.01)
*H04W 12/06* (2009.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ *H04L 63/1408* (2013.01); *G06F 1/3209* (2013.01); *G06F 21/56* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... H04L 63/1408; H04L 63/14; H04L 63/20; H04L 63/1425; G06F 21/57; G06F 21/56;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

H1944 H   2/2001  Cheswick
6,286,087 B1   9/2001  Ito
(Continued)

OTHER PUBLICATIONS

Liang et al., "Passive Wake-up Scheme for Wireless Sensor Networks," Second International Conference on Innovative Computing, Infornnatio and Control (ICICIC 2007) Year: 2007 | Conference Paper | Publisher: IEEE.*
(Continued)

*Primary Examiner* — Roderick Tolentino
(74) *Attorney, Agent, or Firm* — Sheppard, Mullin, Richter & Hamton LLP

(57) **ABSTRACT**

Systems and methods for providing security services during a power management mode are disclosed. In some embodiments, a method comprises detecting with a mobile security system a wake event on a mobile device, providing from the mobile security system a wake signal, the providing being in response to the wake event to wake a mobile device from a power management mode, and managing with the mobile security system security services of the mobile device. Managing security services may comprise scanning a hard drive of the mobile devices for viruses and/or other malware. Managing security services may also comprise updating security applications or scanning the mobile device for unauthorized data.

**30 Claims, 19 Drawing Sheets**



US 10,951,632 B2

Page 2

### Related U.S. Application Data

No. 16/022,127, filed on Jun. 28, 2018, now Pat. No. 10,404,722, which is a continuation of application No. 15/599,352, filed on May 18, 2017, now Pat. No. 10,084,799, which is a continuation of application No. 15/371,164, filed on Dec. 6, 2016, now Pat. No. 9,843,595, which is a continuation of application No. 14/707,853, filed on May 8, 2015, now Pat. No. 9,516,040, which is a continuation of application No. 14/155,260, filed on Jan. 14, 2014, now Pat. No. 9,106,683, which is a continuation of application No. 12/535,650, filed on Aug. 4, 2009, now Pat. No. 8,631,484.

(60) Provisional application No. 61/086,134, filed on Aug. 4, 2008.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 21/56* | (2013.01) |
| *G06F 1/3209* | (2019.01) |
| *G06F 21/57* | (2013.01) |
| *G06F 8/61* | (2018.01) |

(52) **U.S. Cl.**
CPC .............. *G06F 21/57* (2013.01); *H04L 63/14* (2013.01); *H04L 63/20* (2013.01); *H04W 12/06* (2013.01); *G06F 8/62* (2013.01); *G06F 2221/034* (2013.01); *H04L 63/0227* (2013.01); *H04L 63/0245* (2013.01); *H04L 63/1425* (2013.01)

(58) **Field of Classification Search**
CPC .... G06F 1/3209; G06F 2221/034; G06F 8/62; H04W 12/06
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,466,779 | B1 | 10/2002 | Moles |
| 6,725,294 | B1 | 4/2004 | Moore et al. |
| 6,772,345 | B1 | 8/2004 | elShetty |
| 6,813,682 | B2 | 11/2004 | Bress |
| 7,036,143 | B1 | 4/2006 | Leung |
| 7,065,644 | B2 | 6/2006 | Daniell |
| 7,069,330 | B1 | 6/2006 | McArdle |
| 7,076,690 | B1 | 7/2006 | Todd |
| 7,086,089 | B2 | 8/2006 | Hrastar |
| 7,131,141 | B1 | 10/2006 | Blewett |
| 7,168,089 | B2 | 1/2007 | Nguyen |
| D537,036 | S | 2/2007 | Chen |
| 7,184,554 | B2 | 2/2007 | Freese |
| 7,197,638 | B1 | 3/2007 | Grawrock |
| 7,283,542 | B2 | 10/2007 | Mitchell |
| 7,353,533 | B2 | 4/2008 | Wright |
| 7,359,983 | B1 | 4/2008 | Maufer |
| 7,360,242 | B2 | 4/2008 | Syvanne |
| 7,418,253 | B2 | 8/2008 | Kavanagh |
| 7,529,932 | B1 | 5/2009 | Haustein |
| 7,539,828 | B2 | 5/2009 | Lomnes |
| 7,657,941 | B1 | 2/2010 | Zaitsev |
| 7,665,137 | B1 | 2/2010 | Barton |
| 7,818,803 | B2 | 10/2010 | Gordon |
| 7,894,480 | B1 | 2/2011 | Wang et al. |
| 7,908,476 | B2 | 3/2011 | Kandasamy |
| 7,971,258 | B1 * | 6/2011 | Liao ...................... G06F 21/564 |
| | | | 713/164 |
| 7,984,479 | B2 | 7/2011 | Brabson |
| 7,992,199 | B1 | 8/2011 | Winick |
| 8,180,654 | B2 | 5/2012 | Berkman |
| 8,218,449 | B2 | 7/2012 | Taylor |
| 8,218,558 | B2 | 7/2012 | Tan |
| 8,234,261 | B2 | 7/2012 | Monahan |

| | | | |
|---|---|---|---|
| 8,239,531 | B1 | 8/2012 | Bellovin |
| 8,266,670 | B1 | 9/2012 | Merkow |
| 8,321,934 | B1 | 11/2012 | Cooley |
| 8,402,528 | B1 | 3/2013 | McCorkendale |
| 8,495,700 | B2 | 7/2013 | Shahbazi |
| 8,631,488 | B2 | 1/2014 | Oz |
| RE45,009 | E | 7/2014 | Vange et al. |
| 8,904,523 | B2 | 12/2014 | Gordon |
| 8,978,132 | B2 | 3/2015 | Henry |
| 9,202,070 | B2 | 12/2015 | Rajakarunanayake et al. |
| 9,438,631 | B2 | 9/2016 | Bettini |
| 9,565,202 | B1 | 2/2017 | Kindlund |
| 9,762,614 | B2 | 9/2017 | Ely |
| 9,832,603 | B2 | 11/2017 | Schlaupitz |
| 9,847,020 | B2 | 12/2017 | Davis |
| 9,910,979 | B2 | 3/2018 | Ben-Haim |
| 10,291,656 | B2 | 5/2019 | Ely |
| 2001/0014102 | A1 | 8/2001 | Mattingly |
| 2002/0095540 | A1 | 7/2002 | Zolnowsky |
| 2002/0111824 | A1 | 8/2002 | Grainger |
| 2002/0193015 | A1 | 12/2002 | Milan |
| 2003/0046397 | A1 | 3/2003 | Trace |
| 2003/0055994 | A1 | 3/2003 | Herrmann |
| 2003/0070084 | A1 | 4/2003 | Satomaa |
| 2003/0084319 | A1 | 5/2003 | Tarquini et al. |
| 2003/0097431 | A1 | 5/2003 | Dill |
| 2003/0110391 | A1 | 6/2003 | Wolff |
| 2003/0126468 | A1 | 7/2003 | Markham |
| 2003/0131245 | A1 | 7/2003 | Linderman |
| 2003/0142683 | A1 | 7/2003 | Lam |
| 2003/0148656 | A1 | 8/2003 | Huang |
| 2003/0224758 | A1 | 12/2003 | O'Neill |
| 2003/0229808 | A1 * | 12/2003 | Heintz ................ H04L 63/0272 |
| | | | 726/23 |
| 2004/0003262 | A1 | 1/2004 | England |
| 2004/0019656 | A1 | 1/2004 | Smith |
| 2004/0064575 | A1 | 4/2004 | Rasheed |
| 2004/0078568 | A1 | 4/2004 | Pham et al. |
| 2004/0085944 | A1 | 5/2004 | Boehm |
| 2004/0093520 | A1 | 5/2004 | Lee |
| 2004/0123153 | A1 | 6/2004 | Wright |
| 2004/0148450 | A1 | 7/2004 | Chen et al. |
| 2004/0177274 | A1 | 9/2004 | Aroya |
| 2004/0199763 | A1 | 10/2004 | Freund |
| 2004/0203296 | A1 | 10/2004 | Moreton |
| 2004/0210775 | A1 | 10/2004 | Gbadegesin |
| 2004/0237079 | A1 | 11/2004 | Cox |
| 2005/0055578 | A1 | 3/2005 | Wright |
| 2005/0091522 | A1 | 4/2005 | Hearn |
| 2005/0109841 | A1 | 5/2005 | Ryan |
| 2005/0114711 | A1 | 5/2005 | Hesselink |
| 2005/0114870 | A1 | 5/2005 | Song |
| 2005/0149757 | A1 | 7/2005 | Corbett |
| 2005/0182883 | A1 | 8/2005 | Overtoom |
| 2005/0208967 | A1 | 9/2005 | Buniatyan |
| 2005/0254455 | A1 | 11/2005 | Plehn |
| 2005/0260096 | A1 | 11/2005 | Groenendaal |
| 2005/0265385 | A1 | 12/2005 | Cromer |
| 2005/0278544 | A1 | 12/2005 | Baxter |
| 2006/0020723 | A1 | 1/2006 | Chia-Chun |
| 2006/0022802 | A1 * | 2/2006 | Bridgelall .......... G06K 19/0707 |
| | | | 340/10.33 |
| 2006/0031940 | A1 | 2/2006 | Rozman |
| 2006/0037071 | A1 | 2/2006 | Rao |
| 2006/0056317 | A1 | 3/2006 | Manning |
| 2006/0059092 | A1 | 3/2006 | Burshan |
| 2006/0064391 | A1 | 3/2006 | Petrov |
| 2006/0070129 | A1 | 3/2006 | Sobel et al. |
| 2006/0074896 | A1 | 4/2006 | Thomas |
| 2006/0075494 | A1 | 4/2006 | Beaman |
| 2006/0075501 | A1 | 4/2006 | Thomas |
| 2006/0085528 | A1 | 4/2006 | Thomas |
| 2006/0103199 | A1 | 6/2006 | Ohlhoff et al. |
| 2006/0161985 | A1 | 7/2006 | Zhao |
| 2006/0174342 | A1 | 8/2006 | Zaheer |
| 2006/0206300 | A1 | 9/2006 | Garg et al. |
| 2006/0224794 | A1 | 10/2006 | Stevens |
| 2006/0229741 | A1 | 10/2006 | Achanta |
| 2006/0242686 | A1 | 10/2006 | Toda |

TREND MICRO
EXHIBIT 1001 - PAGE 2

US 10,951,632 B2
Page 3

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| 2006/0277405 | A1 | 12/2006 | Bowler |
| 2007/0005987 | A1 | 1/2007 | Durham |
| 2007/0022474 | A1 | 1/2007 | Rowett |
| 2007/0058642 | A1 | 3/2007 | Eisink |
| 2007/0061887 | A1 | 3/2007 | Hoover |
| 2007/0083939 | A1 | 4/2007 | Fruhauf |
| 2007/0097976 | A1 | 5/2007 | Wood |
| 2007/0104197 | A1 | 5/2007 | King |
| 2007/0110053 | A1 | 5/2007 | Soni et al. |
| 2007/0118874 | A1 | 5/2007 | Adams |
| 2007/0118893 | A1 | 5/2007 | Crawford |
| 2007/0123214 | A1 | 5/2007 | Mock |
| 2007/0124536 | A1 | 5/2007 | Carper |
| 2007/0130433 | A1 | 6/2007 | Safa |
| 2007/0130457 | A1 | 6/2007 | Kamat |
| 2007/0143827 | A1 | 6/2007 | Nicodemus |
| 2007/0143851 | A1* | 6/2007 | Nicodemus ......... G06F 11/3495 |
| | | | 726/25 |
| 2007/0162582 | A1 | 7/2007 | Belali et al. |
| 2007/0192500 | A1 | 8/2007 | Lum |
| 2007/0192854 | A1 | 8/2007 | Kelley |
| 2007/0199060 | A1 | 8/2007 | Touboul |
| 2007/0199061 | A1 | 8/2007 | Byres |
| 2007/0209067 | A1 | 9/2007 | Fogel |
| 2007/0214369 | A1 | 9/2007 | Roberts |
| 2007/0220187 | A1 | 9/2007 | Kates |
| 2007/0233842 | A1 | 10/2007 | Roberts |
| 2007/0240217 | A1 | 10/2007 | Tuvell |
| 2007/0261112 | A1* | 11/2007 | Todd ..................... G06F 21/577 |
| | | | 726/11 |
| 2007/0266265 | A1 | 11/2007 | Zmudzinski |
| 2007/0281664 | A1* | 12/2007 | Kaneko ................... G06F 21/88 |
| | | | 455/410 |
| 2007/0294744 | A1 | 12/2007 | Alessio |
| 2008/0034419 | A1 | 2/2008 | Mullick |
| 2008/0066148 | A1 | 3/2008 | Lim |
| 2008/0083030 | A1* | 4/2008 | Durham ................... G06F 8/656 |
| | | | 726/22 |
| 2008/0083037 | A1 | 4/2008 | Kruse |
| 2008/0084791 | A1 | 4/2008 | Repasi |
| 2008/0098478 | A1 | 4/2008 | Vaidya |
| 2008/0109871 | A1 | 5/2008 | Jacobs |
| 2008/0114990 | A1 | 5/2008 | Hilbert |
| 2008/0134163 | A1 | 6/2008 | Golde |
| 2008/0141340 | A1 | 6/2008 | Lyle |
| 2008/0165957 | A1 | 7/2008 | Kandasamy et al. |
| 2008/0201264 | A1 | 8/2008 | Brown |
| 2008/0235755 | A1 | 9/2008 | Blaisdell |
| 2008/0282337 | A1 | 11/2008 | Crawford |
| 2008/0307240 | A1* | 12/2008 | Dahan ..................... G06F 1/06 |
| | | | 713/320 |
| 2009/0019223 | A1 | 1/2009 | Lection |
| 2009/0054075 | A1 | 2/2009 | Boejer |
| 2009/0106556 | A1 | 4/2009 | Hamid |
| 2009/0135751 | A1 | 5/2009 | Hodges et al. |
| 2009/0143057 | A1* | 6/2009 | Arun ..................... H04M 3/42 |
| | | | 455/414 |
| 2009/0165132 | A1 | 6/2009 | Jain |
| 2009/0249465 | A1 | 10/2009 | Touboul |
| 2009/0253454 | A1* | 10/2009 | Sampson .......... H04M 1/72566 |
| | | | 455/550.1 |
| 2009/0254993 | A1 | 10/2009 | Leone |
| 2010/0064341 | A1 | 3/2010 | Aldera |
| 2010/0186093 | A1 | 7/2010 | Aussel |
| 2010/0195833 | A1 | 8/2010 | Priestley |
| 2010/0218012 | A1 | 8/2010 | Joseph |
| 2010/0225493 | A1 | 9/2010 | Zishaan |
| 2010/0242109 | A1 | 9/2010 | Lee |
| 2010/0251369 | A1 | 9/2010 | Grant |
| 2010/0269172 | A1 | 10/2010 | Xie |
| 2010/0333088 | A1 | 12/2010 | Rogel |
| 2011/0023118 | A1 | 1/2011 | Wright |
| 2011/0154443 | A1 | 6/2011 | Thakur |
| 2011/0154477 | A1 | 6/2011 | Parla |
| 2011/0182180 | A1 | 7/2011 | Riddle |
| 2011/0264931 | A1 | 10/2011 | Chang |
| 2011/0268106 | A1 | 11/2011 | Dalton, Jr. |
| 2011/0269397 | A1 | 11/2011 | Bella |
| 2011/0296397 | A1 | 12/2011 | Vidal et al. |
| 2012/0005756 | A1 | 1/2012 | Hoefelmeyer |
| 2012/0030750 | A1 | 2/2012 | Bhargava et al. |
| 2012/0042391 | A1 | 2/2012 | Risan |
| 2012/0054744 | A1 | 3/2012 | Singh |
| 2012/0084831 | A1 | 4/2012 | Hu |
| 2012/0110320 | A1 | 5/2012 | Kumar |
| 2012/0110331 | A1 | 5/2012 | Falk |
| 2012/0149350 | A1* | 6/2012 | Fan ........................ H04M 3/02 |
| | | | 455/418 |
| 2012/0173609 | A1 | 7/2012 | Kulaga |
| 2012/0185846 | A1 | 7/2012 | Recio |
| 2012/0216273 | A1 | 8/2012 | Rolette |
| 2012/0233695 | A1 | 9/2012 | Mahaffey |
| 2012/0239739 | A1 | 9/2012 | Manglik |
| 2012/0240183 | A1 | 9/2012 | Sinha |
| 2012/0240236 | A1 | 9/2012 | Wyatt |
| 2012/0303971 | A1 | 11/2012 | Palka |
| 2012/0324504 | A1 | 12/2012 | Archer et al. |
| 2013/0031601 | A1 | 1/2013 | Bott |
| 2013/0074144 | A1 | 3/2013 | Narayanaswamy |
| 2013/0091534 | A1 | 4/2013 | Gilde |
| 2013/0097659 | A1 | 4/2013 | Das |
| 2013/0097660 | A1 | 4/2013 | Das |
| 2014/0032314 | A1 | 1/2014 | Gieseke |
| 2014/0058679 | A1 | 2/2014 | Varoglu |
| 2014/0317679 | A1 | 10/2014 | Wade |
| 2016/0105847 | A1 | 4/2016 | Smith |
| 2016/0234204 | A1 | 8/2016 | Rishi |
| 2017/0039367 | A1 | 2/2017 | Ionescu |
| 2017/0103647 | A1 | 4/2017 | Davis |

OTHER PUBLICATIONS

Lim et al., "Adaptive power controllable retrodirective array system for wireless sensor server applications," IEEE Transactions on Microwave Theory and Techniques Year: 2005 | vol. 53, Issue: 12 | Journal Article | Publisher: IEEE.*

Breeden II, John et al., "A Hardware Firewall You Take With You," Government Computer News, located at http:/gcn.com/Articles/ 2005/06/01/A-hardware-firewall-you-take-with-you.aspx?p=1, Jun. 1, 2005.

Claessens, Joris et al., "(How) Can Mobile Agents Do Secure Electronic Transactions on Mobile Hosts? A Survey of the Security Issues and the Current Solutions," ACM Transactions on Internet Technology, vol. 3, No. 1, pp. 28-48, Feb. 2003.

CyberGuard Corporation, "Model 1: Wireless Mobile Security Appliance," located at http://support2.cyberguard.com/products/ oem/model1.htm, 2005.

Entry, Inc., "CyberGuard Develops a Custom Mobile Security Appliance,"SecurityProNews, located at http://www.securitypronews. com/news/securitynews/spn-45-20041007CyberGuardDevelo . . . , Oct. 7, 2004.

Fielding, R. et al., "Hypertext Transfer Protocol—HTTP/1.1," I.E. T.F. Network Working Group, RFC 2616, Jun. 1999.

Hall, Marty, "Core Web Programming: Chapter 16—The Hypertext Transfer Protocol," Prentice Hall PTR, ISBN 0-13-625666-X, pp. 867-911, Dec. 1997.

Hall, Marty, "More Servlets and JavaServer Pages: Chapter 2—A Fast Introduction to Basic Servlet Programming," Prentice Hall PTR, ISBN 0-13-067614-4, pp. 34-118, Dec. 1997.

Henmi, Anne et al., "Firewall Policies and VPN Configurations," Syngress Publishing, Inc., ISBN 1-59749-088-1, pp. 99-133, 291-313, Dec. 2006.

Jakobsson, Markus, "Invasive Browser Sniffing and Countermeasures," Proceedings of the 15th International Conference on World Wide Web, pp. 523-532, May 23, 2006.

Kent, S. et al., "Security Architecture for the Internet Protocol," I.E.T.F. Network Working Group, RFC 4301, pp. 10-11, Dec. 2005.

Lee, Henry C.J. et al., "Port Hopping for Resilient Networks," IEEE 60th Vehicular Technology Conference (VTC2004), Sep. 26, 2004.

TREND MICRO
EXHIBIT 1001 - PAGE 3

US 10,951,632 B2

Page 4

(56)    **References Cited**

OTHER PUBLICATIONS

O'Brien, Kevin J., "Microsoft Hit by Antitrust Complaint for Browser," The International Herald Tribune, Dec. 14, 2007.

PMC-Sierra, Inc., "MSP8120 Multi-Service Security Processor," Product Brief, 2007.

Prevelakis, Vassilis et al., "Drop-In Security for Distributed and Portable Computing Elements," Internet Research: Electronic Networking, Applications and Policy, vol. 13, No. 2, pp. 107-115, located at http://www.cs.columbia.edu/~angelos/Papers/InternetResearch-Final.pdf, 2003.

Sen, Subhabrata et al., "Accurate, Scalable In-Network, Identification of P2P Traffic Using Application Signatures," Proceedings of the 13th International Conference on World Wide Web, pp. 512-521, May 17, 2004.

Shreeve, Jimmy Lee, "Hasta la Vista, Microsoft!: It's Faster than Windows, It Fights Viruses—and It's Free," Independent Extra, Aug. 29, 2007.

Shuler, Rus, "How Does the Internet Work," white paper, 2002 [retrieved online at https://web.stanford.edu/class/msande91si/www-spr04/readings/week1/InternetWhitepaper.htm on Dec. 11, 2018].

Srisuresh, P. et al., "IP Network Address Translator (NAT) Terminology and Considerations," I.E.T.F. Network Working Group, RFC 2663, Aug. 1999.

Srisuresh, P. et al., "Traditional IP Network Address Translator (Traditional NAT)," I.E.T.F. Network Working Group, RFC 3022, Jan. 2001.

WatchGuard Technologies, Inc., "Mobile User VPN and PPTP," Internet Security Handbook, copyright 1998-2001, pp. 1-2, located at http://www.watchguard.com/help/lss/41/handbook/vpn3.htm, believe published Jun. 5, 2003.

World Wide Web Consortium (W3C), "HTTP Request Fields," May 3, 1994 [retrieved online at https://web.archive.org/web/20060110150527/http://www.w3.org:80/Protocols/HTTP/HTRQ_Headers.html on Jan. 24, 2019].

ZyXEL Communications Corp., "ZyXEL Releases Worlds First Palm-Sized Portable Personal Firewall for Ultimate Security: ZyWALL P1 Pushes Network Security to the End-Point PC's with Minimum Administration Effort," ZyXEL News, located at http://global.zyxel.com/news/press.php?indexflag=20050310013432, Mar. 8, 2005.

European Patent Application No. 06821641.5, Examination Report dated Dec. 16, 2016.

European Patent Application No. 06821641.5, Search Report dated May 17, 2011.

European Patent Application No. 08847968.8, Search Report dated Oct. 25, 2011.

European Patent Application No. 13845746.0, Search Report dated Jun. 7, 2016.

International Application No. PCT/IL2006/001428, International Search Report and Written Opinion dated Jul. 15, 2008.

International Application No. PCT/IL2008/000740, International Search Report and Written Opinion dated Nov. 5, 2008.

International Application No. PCT/US2008/055942, International Search Report and Written Opinion dated Apr. 6, 2009.

International Application No. PCT/US2009/065204, International Search Report and Written Opinion dated Jan. 13, 2010.

International Application No. PCT/US2013/064161, International Search Report and Written Opinion dated Apr. 18, 2014.

International Application No. PCT/US2014/045826, International Search Report and Written Opinion dated Oct. 30, 2014.

International Application No. PCT/US2015/015970, International Search Report and Written Opinion dated May 28, 2015.

Decision—Institution of Inter Partes Review of U.S. Pat. No. 8,631,488 entered Aug. 28, 2019 (39 pages).

Decision—Institution of Inter Partes Review of U.S. Pat. No. 9,106,683 entered Aug. 28, 2019 (39 pages).

Decision—Institution of Inter Partes Review of U.S. Pat. No. 9,843,595 entered Aug. 28, 2019 (33 pages).

*CUPP Cybersecurity, LLC and CUPP Computing AS* v. *Trend Micro, Inc., Trend Micro America, Inc., and Trend Micro Incorporated*, Case No. 3:20-cv-03206-K, Complaint for Patent Infringement, filed Oct. 20, 2020, 99 pages.

Decision—Institution of Inter Partes Review of U.S. Pat. No. 9,781,164 entered Jun. 25, 2019, 28 pages.

Decision—Institution of Inter Partes Review of U.S. Pat. No. 8,365,272 entered Jul. 26, 2019, 27 pages.

Decision—Institution of Inter Partes Review of U.S. Pat. No. 9,756,079 entered Jul. 26, 2019, 32 pages.

Decision—Institution of Inter Partes Review of U.S. Pat. No. 8,789,202 entered Sep. 18, 2019, 33 pages.

*Trend Micro Inc.* v. *CUPP Computing AS*, IPR2019-00765, U.S. Pat. No. 9,843,595, Judgement Final Written Decision Determining All Challenged Claims Unpatentable entered Aug. 25, 2020, 47 pages.

*Trend Micro Inc.* v. *CUPP Computing AS*, IPR2019-00803, U.S. Pat. No. 8,789,202, Judgement Final Written Decision Determining All Challenged Claims Unpatentable entered Sep. 15, 2020, 30 pages.

* cited by examiner

TREND MICRO
EXHIBIT 1001 - PAGE 4

TREND MICRO
EXHIBIT 1001 - PAGE 5

Case: 23-1495     Document: 15     Page: 152     Filed: 07/25/2023



FIG. 1
(PRIOR ART)

TREND MICRO
EXHIBIT 1001 - PAGE 6

FIG. 2
(PRIOR ART)

Case: 23-1495    Document: 15    Page: 154    Filed: 07/25/2023

TREND MICRO
EXHIBIT 1001 - PAGE 7



FIG. 3



FIG. 4

TREND MICRO
EXHIBIT 1001 - PAGE 8



FIG. 5

TREND MICRO
EXHIBIT 1001 - PAGE 9



FIG. 5A

TREND MICRO
EXHIBIT 1001 - PAGE 10



FIG. 6

TREND MICRO
EXHIBIT 1001 - PAGE 11

700
NETWORK SECURITY SYSTEM
320
705
SECURITY ENGINES
ANTIVIRUS ENGINE
IPS / IDS ENGINE
FIREWALL ENGINE
715
720
725
730
735
740
ANTIVIRUS POLICIES AND DATA
IPS / IDS POLICIES AND DATA
FIREWALL POLICIES AND DATA
SECURITY POLICIES AND DATA
710
SECURITY ADMINISTRATOR
325
WIZARD
745
UPDATE AUTHORITIES DEVICE
750
MOBILE SECURITY SYSTEM
345
530
SECURITY ENGINES
ANTIVIRUS ENGINE
IPS / IDS ENGINE
FIREWALL ENGINE
755
760
765
770
775
780
ANTIVIRUS POLICIES AND DATA
IPS / IDS POLICIES AND DATA
FIREWALL POLICIES AND DATA
SECURITY POLICIES AND DATA
535/540

FIG. 7



FIG. 8



FIG. 9

TREND MICRO
EXHIBIT 1001 - PAGE 13

**Appx109**



FIG. 10A

FIG. 10B

FIG. 10C

TREND MICRO
EXHIBIT 1001 - PAGE 14

**Appx110**

TREND MICRO
EXHIBIT 1001 - PAGE 15

FIG. 11
(PRIOR ART)

FIG. 12



FIG. 13

TREND MICRO
EXHIBIT 1001 - PAGE 16



FIG. 14

TREND MICRO
EXHIBIT 1001 - PAGE 17

TREND MICRO
EXHIBIT 1001 - PAGE 18



FIG. 15



FIG. 16

TREND MICRO
EXHIBIT 1001 - PAGE 19

**Appx115**



FIG. 17

TREND MICRO
EXHIBIT 1001 - PAGE 20

TREND MICRO
EXHIBIT 1001 - PAGE 21



FIG. 18

TREND MICRO
EXHIBIT 1001 - PAGE 22



FIG. 19



FIG. 20

TREND MICRO
EXHIBIT 1001 - PAGE 23

US 10,951,632 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# SYSTEMS AND METHODS FOR PROVIDING SECURITY SERVICES DURING POWER MANAGEMENT MODE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. nonprovisional patent application Ser. No. 16/404,408 filed May 6, 2019, which is a continuation of U.S. nonprovisional patent application Ser. No. 16/022,127 filed Jun. 28, 2018, now U.S. Pat. No. 10,404,722, which is a continuation of U.S. nonprovisional patent application Ser. No. 15/599,352 filed May 18, 2017, now U.S. Pat. No. 10,084,799, which is a continuation of U.S. nonprovisional patent application Ser. No. 15/371, 164 filed Dec. 6, 2016, now U.S. Pat. No. 9,843,595, which is a continuation of U.S. nonprovisional patent application Ser. No. 14/707,853 filed May 8, 2015, now U.S. Pat. No. 9,516,040, which is a continuation of U.S. nonprovisional patent application Ser. No. 14/155,260 filed Jan. 14, 2014, now U.S. Pat. No. 9,106,683, which is a continuation of U.S. nonprovisional patent application Ser. No. 12/535,650 filed Aug. 4, 2009, now U.S. Pat. No. 8,631,488, which claims priority to U.S. provisional patent application Ser. No. 61/086,134, filed Aug. 4, 2008, all of which are hereby incorporated by reference herein.

## TECHNICAL FIELD

This invention relates generally to computer security, and more particularly provides a system and method for providing data and device security between external and host devices.

## BACKGROUND

The internet is an interconnection of millions of individual computer networks owned by governments, universities, nonprofit groups, companies and individuals. While the internet is a great source of valuable information and entertainment, the internet has also become a major source of system damaging and system fatal application code, such as "viruses," "spyware," "adware," "worms," "Trojan horses," and other malicious code.

To protect users, programmers design computer and computer-network security systems for blocking malicious code from attacking both individual and network computers. On the most part, network security systems have been relatively successful. A computer that connects to the internet from within an enterprise's network typically has two lines of defense. The first line of defense includes a network security system, which may be part of the network gateway, that includes firewalls, anti-virus, antispyware and content filtering. The second line of defense includes individual security software on individual machines, which is not typically as secure as the network security system and is thus more vulnerable to attacks. In combination, the first and second lines of defense together provide pretty good security protection. However, when a device connects to the internet without the intervening network security system, the device loses its first line of defense. Thus, mobile devices (e.g., laptops, desktops, PDAs such as RIM's Blackberry, cell phones, any wireless device that connects to the internet, etc.) when traveling outside the enterprise network are more vulnerable to attacks.

FIG. 1 illustrates an example network system 100 of the prior art. Network system 100 includes a desktop 105 and a mobile device 110, each coupled to an enterprise's intranet 115. The intranet 115 is coupled via a network security system 120 (which may be a part of the enterprise's gateway) to the untrusted internet 130. Accordingly, the desktop 105 and mobile device 110 access the internet 130 via the network security system 120. A security administrator 125 typically manages the network security system 120 to assure that it includes the most current security protection and thus that the desktop 105 and mobile device 110 are protected from malicious code. Demarcation 135 divides the trusted enterprise 140 and the untrusted public internet 130. Because the desktop 105 and the mobile device 110 are connected to the internet 130 via the network security system 120, both have two lines of defense (namely, the network security system 120 and the security software resident on the device itself) against malicious code from the internet 130. Of course, although trusted, the intranet 115 can also be a source of malicious code.

FIG. 2 illustrates an example network system 200 of the prior art, when the mobile device 110 has traveled outside the trusted enterprise 140 and reconnected to the untrusted internet 130. This could occur perhaps when the user takes mobile device 110 on travel and connects to the internet 130 at a cybercafé, at a hotel, or via any untrusted wired or wireless connection. Accordingly, as shown, the mobile device 110 is no longer protected by the first line of defense (by the network security system 120) and thus has increased its risk of receiving malicious code. Further, by physically bringing the mobile device 110 back into the trusted enterprise 140 and reconnecting from within, the mobile device 110 risks transferring any malicious code received to the intranet 115.

As the number of mobile devices and the number of attacks grow, mobile security is becoming increasingly important. The problem was emphasized in the recent Info-Security Conference in New York on Dec. 7-8, 2005. However, no complete solutions were presented.

Similarly, when a host device is connected to an external device such as a USB flash drive, iPod, external hard drive, etc., both devices are vulnerable to receipt of malicious code or transfer of private data. FIG. 11 illustrates an example prior art data exchange system 1100 that includes a host computer (host) 1105 and an external device (ED) 1110. The host 1105 includes an external device (ED) port 1115, such as a USB port, for receiving the external device 1110. The host 1105 also includes ED drivers 1120 for performing enumeration and enabling communications between the external device 1110 and the host 1105. The external device 1110 includes an ED plug, such as a USB plug, for communicating with the ED port 1115. Both of the host 1105 and external device 1110 are vulnerable to receipt of malicious code or transfer of private data.

Accordingly, there is a need for a system and method of providing security to host and external devices.

Another disadvantage to existing security systems is that they require a fully operational system and a significant load on CPU power. To reduce the impact of scanning and updating a system, users often leave their PCs active overnight which consumes power. Further, when the PC is a laptop, the user cannot close the laptop and expect security functions to be performed.

## SUMMARY

Per one embodiment, the present invention provides a security device comprising an external device plug operative to communicatively couple with a host; an external device

TREND MICRO
EXHIBIT 1001 - PAGE 24

US 10,951,632 B2

3

port operative to communicatively couple with an external device; a processor; and memory storing an operating system, an external device driver operative to control communication with the external device, and a security engine operative to enforce a security policy on a data transfer request between the external device and the host. The security device may be operative with a driver on the host. At least one of the external device plug and the external device port may follow a USB standard. At least one of the external device plug and the external device port may include a wireless connection. The security engine may protect against the transfer of at least one of viruses, spyware and adware. The security engine may protect against the unauthorized transfer of private data.

Per one embodiment, the present invention provides a secure data exchange system, comprising a security device including a first external device plug, and a security engine operative to enforce a security policy on data transfer requests received from the host; an external device including a second external device plug; and a host including a first external device port operative to communicatively couple with the first external device plug, a second external device port operative to communicatively couple with the second external device plug, and a redirect driver operative to transfer a data transfer request from the host to the security device before executing the data transfer request. The external device may include a USB drive. The external device may include one of a PDA or a cell phone. The host may include one of a laptop, desktop, PDA or cell phone. The host may launch the redirect driver upon detecting connection of the secure device to the host.

Per one embodiment, the present invention may provide a method comprising communicatively coupling a security device to a host; communicatively coupling an external device to the security device; receiving by the security device a data transfer request from the host; and enforcing by the security device a security policy on the data transfer request before allowing the data transfer request to be performed. The communicatively coupling a security device to a host may include using a wired or wireless connection. The communicatively coupling an external device to the host may include using a wired or wireless connection. The data transfer request may include a request to transfer data from the host to the external device. The data transfer request may include a request to transfer data from the external device to the host. The enforcing may include reviewing the data being transferred for at least one of viruses, spyware and adware. The enforcing may include determining whether the data transfer request includes a request for private data. The enforcing may include requiring an additional security check before allowing the transfer of private data.

Per one embodiment, the present invention provides a method, comprising communicatively coupling a security device to a host; communicatively coupling an external device to the host; receiving by the host a data transfer request; using a redirect driver on the host to redirect the data transfer request to the security device; and enforcing by the security device a security policy on the data transfer request before allowing the data transfer request to be performed. The communicatively coupling a security device to a host may include using a wired or wireless connection. The communicatively coupling an external device to the host may include using a wired or wireless connection. The data transfer request may include a request to transfer data from the host to the external device. The data transfer request may include a request to transfer data from the

4

external device to the host. The enforcing may include reviewing the data being transferred for at least one of viruses, spyware and adware. The enforcing may include determining whether the data transfer request includes a request for private data. The enforcing may include requiring an additional security check before allowing the transfer of private data.

Systems and methods for providing security services during a power management mode are disclosed. In some embodiments, a method comprises detecting with a mobile security system a wake event on a mobile device, providing from the mobile security system a wake signal, the providing being in response to the wake event to wake a mobile device from a power management mode, and managing with the mobile security system security services of the mobile device. Managing security services may comprise scanning a hard drive of the mobile devices for viruses and/or other malware. Managing security services may also comprise updating security applications or scanning the mobile device for unauthorized data. The wake event may comprise the expiration of a predetermined period of time, a specific time of day, or receiving data from over a network.

In some embodiments, a mobile security system comprises a connection mechanism, and a security engine. The connection mechanism may be configured to connect to a data port of a mobile device and for communicating with the mobile device. The security engine may be configured to detect a wake event, provide a wake signal in response to the wake event to wake a mobile device from a power management mode, and manage security services of the mobile device.

An exemplary computer readable medium may store executable instructions. The instructions may be executable by a processor for performing a method. The method may comprise detecting a wake event, providing a wake signal in response to the wake event to wake a mobile device from a power management mode, and managing security services of the mobile device.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of a prior art network system in a first state.

FIG. **2** is a block diagram of a prior art network system in a second state.

FIG. **3** is a block diagram of a network system in accordance with an embodiment of the present invention.

FIG. **4** is a block diagram illustrating details of a computer system in accordance with an embodiment of the present invention.

FIGS. **5** and **5A** are block diagrams illustrating details of the mobile security system in accordance with an embodiment of the present invention.

FIG. **6** is a block diagram illustrating details of the mobile security system in accordance with a Microsoft Window's embodiment.

FIG. **7** is a block diagram illustrating details of a smart policy updating system in accordance with an embodiment of the present invention.

FIG. **8** is a block diagram illustrating details of network security measures relative to the OSI layers.

FIG. **9** is a block diagram illustrating details of the communication technique for spreading security code to the mobile security systems.

TREND MICRO
EXHIBIT 1001 - PAGE 25

US 10,951,632 B2

5

FIGS. **10A-10C** are block diagrams illustrating various architectures for connecting a mobile device to a mobile security system, in accordance with various embodiments of the present invention.

FIG. **11** is a block diagram illustrating a prior art data exchange system.

FIG. **12** is a block diagram illustrating a secure data exchange system, in accordance with an embodiment of the present invention.

FIG. **13** is a block diagram illustrating details of a security device, in accordance with an embodiment of the present invention.

FIG. **14** is a block diagram illustrating details of a security system, in accordance with an embodiment of the present invention.

FIG. **15** is a block diagram illustrating a secure data exchange system, in accordance with another embodiment of the present invention.

FIG. **16** is a flowchart illustrating a method of secure data exchange between a host and an external device, in accordance with an embodiment of the present invention.

FIG. **17** is a block diagram illustrating details of a mobile security system in an embodiment of the present invention

FIG. **18** is a block diagram of a mobile security system in another embodiment of the present invention.

FIG. **19** is block diagram of a mobile device an embodiment of the present invention.

FIG. **20** is a flow chart for performing security functions on a mobile device in an embodiment of the present invention.

DETAILED DESCRIPTION

The following description is provided to enable any person skilled in the art to make and use the invention, and is provided in the context of a particular application and its requirements. Various modifications to the embodiments may be possible to those skilled in the art, and the generic principles defined herein may be applied to these and other embodiments and applications without departing from the spirit and scope of the invention. Thus, the present invention is not intended to be limited to the embodiments shown, but is to be accorded the widest scope consistent with the principles, features and teachings disclosed herein.

An embodiment of the present invention uses a small piece of hardware that connects to a mobile device and filters out attacks and malicious code. The piece of hardware may be referred to as a "mobile security system" or "personal security appliance." Using the mobile security system, a mobile device can be protected by greater security and possibly by the same level of security offered by its associated corporation/enterprise.

FIG. **3** illustrates a network system **300** in accordance with an embodiment of the present invention. Network system **300** includes a desktop **305**, a first mobile device **310**a, and a second mobile device **310**b. The first mobile device **310**a is illustrated as within the enterprise network **340** at this time and is coupled via a mobile security system **345**a to the enterprise's intranet **315**. The desktop **305** and second mobile device **310**b are also within the enterprise network **340** but in this embodiment are coupled to the intranet **315** without an intervening mobile security system **345** such as mobile security system **345**b. The intranet **315** is coupled via a network security system **320** (which may be part of the enterprise's gateway) to the untrusted internet **330**. Accordingly, the first mobile device **310**a, the second mobile device **310**b and the desktop **305** access the untrusted

6

internet **330** via the network security system **320**. Each may also be protected by a personal security system resident thereon (not shown). A third mobile device **310**c is currently outside the enterprise network **340** and is coupled via a mobile security system **345**b to the untrusted internet **330**. The third mobile device **310** may be in use by an employee of the trusted enterprise **340** who is currently on travel. A security administrator **325** manages the mobile security system **345**a, the mobile security system **345**b, and the network security system **320** to assure that they include the most current security protection. One skilled in the art will recognize that the same security administrator need not manage the various devices. Further, the security administrator could be the user and need not be within the trusted enterprise **340**.

Demarcation **335** divides the trusted enterprise **340** and the untrusted publicly accessible internet **330**. Each of mobile device **310**a, **310**b and **310**c may be referred to generically as mobile device **310**, although they need not be identical. Each mobile security system **345**a and **345**b may be referred to generically as mobile security system **345**, although they need not be identical.

As shown, although the mobile device **310**c has traveled outside the trusted enterprise **340**, the mobile device **310**c connects to the untrusted internet **330** via the mobile security system **345**b and thus retains two lines of defense (namely, the mobile security system **345**b and the security software resident on the device itself). In this embodiment, the mobile security system **345** effectively acts as a mobile internet gateway on behalf of the mobile device **310**c. In an embodiment, the mobile security system **345** may be a device dedicated to network security. In an embodiment, each mobile security system **345** may support multiple mobile devices **310**, and possibly only registered mobile devices **310**, e.g., those belonging to enterprise **340**.

Each mobile security system **345** (e.g., **345**a, **345**b) may be a miniature server, based on commercial hardware (with Intel's Xscale as the core), Linux OS and network services, and open-source firewall, IDS/IPS and anti-virus protection. The mobile security system **345** may be based on a hardened embedded Linux 2.6.

In this embodiment, because the security administrator **325** is capable of remotely communicating with the mobile security system **345**b, IT can monitor and/or update the security policies/data/engines implemented on the mobile security system **345**b. The security administrator **325** can centrally manage all enterprise devices, remotely or directly. Further, the security administrator **325** and mobile security systems **345** can interact to automatically translate enterprise security policies into mobile security policies and configure mobile security systems **345** accordingly. Because the mobile security system **345** may be generated from the relevant security policies of the enterprise **340**, the mobile device **310**c currently traveling may have the same level of protection as the devices **305**/**310** within the trusted enterprise **340**.

The mobile security system **345** may be designed as an add-on to existing software security or to replace all security hardware and software on a traveling mobile device. These security applications will preferably operate on different OSI layers to provide maximum security and malicious code detection, as shown in the example system illustrated in FIG. **8**. Operating on the lower OSI layers and doing TCP/IP packets analysis only (by screening firewall or router packets) would miss virus and/or worm behavior. Also, many modern viruses use mobile code implemented on a "higher" level than the 7th OSI layer (Application—HTTP, FTP, etc.)

TREND MICRO
EXHIBIT 1001 - PAGE 26

US 10,951,632 B2

**7**

and therefore cannot be interpreted at the packet layer nor at the application layer. For example, applying anti-virus analysis only at the session or transport layer on a malicious Java Script (that is included in an HTML page), trying to match the signature with packets and without understanding the content type (Java Script), will not detect the malicious nature of the Java Script. To offer greater protection, the mobile security system **345** may act as corporate class security appliance and engage different security applications based on the content type and the appropriate OSI layers, (or even a "higher" level if content is encapsulated in the application layer). The mobile security system **345** may be configured to perform content analysis at different OSI layers, e.g., from the packet level to the application level. It will be appreciated that performing deep inspection at the application level is critical to detect malicious content behavior and improve detection of viruses, worms, spyware, Trojan horses, etc. The following software packages may be implemented on the mobile security system **345**:

Firewall and VPN—including stateful and stateless firewalls, NAT, packet filtering and manipulation, DOS/DDOS, netfilter, isolate user mobile devices from the internet and run VPN program on the device, etc.

Optional web accelerator and bandwidth/cache management based on Squid.

IDS/IPS—Intrusion detection and prevention system based on Snort. Snort is an open source network intrusion prevention and detection system utilizing a rule-driven language, which combines the benefits of signature, protocol-and anomaly-based inspections.

Anti-virus and antispyware based on ClamAV; additional AV and AS engines, e.g., McAfee, Kaspersky, Pandamay, may be offered for additional subscription fees.

Malicious Content Detection—on the fly heuristics that perform content analysis to detect malicious content before having signatures. This will be based on a rule base and updated rules and will be content dependent scanning.

URL Categorization Filtering—based on a commercial engine, such as Surfcontrol, Smart Filters or Websense. May provide around 70 categories of URLs such as gambling, adult content, news, webmail, etc. The mobile device **345** may apply different security policies based on the URL category, e.g., higher restriction and heuristics for Gambling or Adult content web sites, etc.

FIG. **4** is a block diagram illustrating details of an example computer system **400**, of which each desktop **305**, mobile device **310**, network security system **320**, mobile security system **345**, and security administrator **325** may be an instance. Computer system **400** includes a processor **405**, such as an Intel Pentium® microprocessor or a Motorola Power PC® microprocessor, coupled to a communications channel **410**. The computer system **400** further includes an input device **415** such as a keyboard or mouse, an output device **420** such as a cathode ray tube display, a communications device **425**, a data storage device **430** such as a magnetic disk, and memory **435** such as Random-Access Memory (RAM), each coupled to the communications channel **410**. The communications interface **425** may be coupled directly or via a mobile security system **345** to a network such as the internet. One skilled in the art will recognize that, although the data storage device **430** and memory **435** are illustrated as different units, the data storage device **430** and memory **435** can be parts of the same unit, distributed units, virtual memory, etc.

The data storage device **430** and/or memory **435** may store an operating system **440** such as the Microsoft Windows XP, the IBM OS/2 operating system, the MAC OS,

**8**

UNIX OS, LINUX OS and/or other programs **445**. It will be appreciated that a preferred embodiment may also be implemented on platforms and operating systems other than those mentioned. An embodiment may be written using JAVA, C, and/or C++ language, or other programming languages, possibly using object oriented programming methodology.

One skilled in the art will recognize that the computer system **400** may also include additional information, such as network connections, additional memory, additional processors, LANs, input/output lines for transferring information across a hardware channel, the internet or an intranet, etc. One skilled in the art will also recognize that the programs and data may be received by and stored in the system in alternative ways. For example, a computer-readable storage medium (CRSM) reader **450** such as a magnetic disk drive, hard disk drive, magneto-optical reader, CPU, etc. may be coupled to the communications bus **410** for reading a computer-readable storage medium (CRSM) **455** such as a magnetic disk, a hard disk, a magneto-optical disk, RAM, etc. Accordingly, the computer system **400** may receive programs and/or data via the CRSM reader **450**. Further, it will be appreciated that the term "memory" herein is intended to cover all data storage media whether permanent or temporary.

FIG. **5** is a block diagram illustrating details of the mobile security system **345** in accordance with an embodiment of the present invention. Mobile security system **345** includes adapters/ports/drivers **505**, memory **510**, a processor **515**, a preboot flash/ROM memory module **520** storing a secure version of the mobile security system's operating system and other applications, network connection module **525**, security engines **530**, security policies **535**, security data **540**, remote management module **550**, distribution module **555**, and backup module **560**. Although these modules are illustrated as within the mobile security system **345**, one skilled in the art will recognize that many of them could be located elsewhere, e.g., on the security administrator **325** or on third-party systems in communication with the mobile security system **345**. The mobile security system **345** may be in a pocket-size, handheld-size or key-chain size housing, or possibly smaller. Further, the mobile security system **345** may be incorporated within the mobile device **310**.

The adapters/ports/drivers **505** include connection mechanisms (including software, e.g., drivers) for USB, Ethernet, WiFi, WiMAX, GSM, CDMA, Bluetooth, PCMCIA and/or other connection data ports on the mobile security system **345**. In one embodiment, the adapters/ports/drivers **505** may be capable of connection to multiple devices **310** to provide network security to the multiple devices **310**.

Memory **510** and processor **515** execute the operating system and applications on the mobile security system **345**. In this example, the preboot flash **520** stores the operating system and applications. At boot time, the operating system and applications are loaded from the preboot flash **520** into memory **510** for execution. Since the operating system and applications are stored in the preboot flash **520**, which cannot be accessed during runtime by the user, the operating system and applications in the preboot flash **520** are not corruptible. Should the copy of the operating system and applications in memory **510** be corrupted, e.g., by malicious code, the operating system and applications may be reloaded into the memory **510** from the preboot flash **520**, e.g., upon restart. Although described as stored within the preboot flash **520**, the OS and applications can be securely stored within other read-only memory devices, such as ROM, PROM, EEPROM, etc.

TREND MICRO
EXHIBIT 1001 - PAGE 27

US 10,951,632 B2

**9**

As shown in FIG. 5A, memory (including memory **510** and preboot flash **520**) on the mobile security system **345** may be divided into the following zones: read only memory **570**; random access memory **575** for storing a copy of the OS, kernel and security applications; runtime environment **580**; and database **585** for storing application data, log files, etc.

Upon each "hard" restart, the boot loader (resident in read only memory **570**) of the mobile security system **345** copies the kernel and security applications (a fresh unchanged copy) from read only memory **570** to random access memory **575**. This causes a clean version of the OS and applications to be loaded into random access memory **575** each time. That way, if a special attack on mobile security system **345** is developed, the attack will be unable to infect the system, since the OS and applications are precluded from accessing read only memory **570** during runtime. Further, any attack that does reach memory **510** will be able to run only once and will disappear upon a hard restart. A triggering mechanism may be available to restart the mobile security system **345** automatically upon infection detection.

The network connection module **525** enables network connection, e.g., to the internet **330** or the intranet **315** via network communication hardware/software including WiFi, WiMAX, CDMA, GSM, GPRS, Ethernet, modem, etc. For example, if the mobile device **310** wishes to connect to the internet **330** via a WiFi connection, the adapters/ports/drivers **505** may be connected to the PCI port, USB port or PCMCIA port of the mobile device **310**, and the network connection module **525** of the mobile security system **345** may include a WiFi network interface card for connecting to wireless access points. Using the network connection module **425**, the mobile security system **345** may communicate with the network as a secure gateway for the mobile device **310**. Other connection architectures are described in FIGS. **10A**-**10C**.

The security engines **530** execute security programs based on the security policies **535** and on security data **540**, both of which may be developed by IT managers. Security engines **530** may include firewalls, VPN, IPS/IDS, anti-virus, antispyware, malicious content filtering, multilayered security monitors, Java and bytecode monitors, etc. Each security engine **530** may have dedicated security policies **535** and security data **540** to indicate which procedures, content, URLs, system calls, etc. the engines **530** may or may not allow. The security engines **530**, security policies **535** and security data **540** may be the same as, a subset of, and/or developed from the engines, policies and data on the network security system **320**.

To provide a higher security level provided by anti-virus and antispyware software, the security engines **530** on each mobile security system **345** may implement content analysis and risk assessment algorithms. Operating for example at OSI Layer **7** and above (mobile code encapsulated within Layer **7**), these algorithms may be executed by dedicated High Risk Content Filtering (HRCF) that can be controlled by a rules engine and rule updates. The HRCF will be based on a powerful detection library that can perform deep content analysis to verify real content types. This is because many attacks are hidden within wrong mime types and/or may use sophisticated tricks to present a text file type to a dangerous active script or ActiveX content type. The HRCF may integrate with a URL categorization security engine **530** for automatic rule adjustment based on the URL category. In one embodiment, when the risk level increases (using the described mechanism) the mobile security system **345** may automatically adjust and increase filtering to remove more

**10**

active content from the traffic. For example, if greater risk is determined, every piece of mobile code, e.g., Java script, VB script, etc. may be stripped out.

Three aspects for integration with corporate policy server legacy systems include rules, LDAP and active directory, and logging and reporting as discussed below. In one embodiment, a policy import agent running on the security administrator **325** will access the rule base of Checkpoint Firewall-1 and Cisco PIX Firewalls and import them into a local copy. A rule analysis module will process the important rules and will offer out-of-the-box rules and policies for mobile security systems **345**. This proposed policy will offer all mobile security systems **345** a best fit of rules that conform the firewall policy of the enterprise **340**. The agent will run periodically to reflect any changes and generate updates for mobile security system **345** policies **535**. The LDAP and Active Directory may be integrated with the directory service to maintain mobile security system **345** security policies **535** that respond to the enterprise's directory definitions. For example, a corporate policy for LDAP user Group "G" may automatically propagate to all mobile security systems **345** in "G" group. Mobile security system **345** local logs and audit trails may be sent in accordance to a logging and reporting policy to a central log stored at the security administrator **325**. Using a web interface, IT may be able to generate reports and audit views related to all mobile device **310** users, their internet experiences, and attempts to bring infected devices back to the enterprise **340**. IT will be able to forward events and log records into legacy management systems via SYSLOG and SNMP Traps.

The security engines **530** may perform weighted risk analysis. For example, the security engine **530** may analyze HTTP, FTP, SMTP, POP3, IM, P2P, etc. including any traffic arriving from the internet **330**. The security engine **530** may assign a weight and rank for every object based on its type, complexity, richness in abilities, source of the object, etc. The security engine **530** may assign weight based on the source using a list of known dangerous or known safe sources. The security engine **530** may assign weight to objects based on the category of the source, e.g., a gambling source, an adult content source, a news source, a reputable company source, a banking source, etc. The security engine **530** may calculate the weight, and based on the result determine whether to allow or disallow access to the content, the script to run, the system modification to occur, etc. The security engine **530** may "learn" user content (by analyzing for a predetermined period of time the general content that the user accesses) and accordingly may create personal content profiles. The personal content profile may be used to calibrate the weight assigned to content during runtime analysis to improve accuracy and tailor weighted risk analysis for specific user characteristics.

In some embodiments, the security engines **530**, security policies **535** and security data **540** may enable bypassing the mobile security system **345**. The security policy **535**, set by the security administrator **325**, may include a special attribute to force network connection through the mobile security system **325** when outside the trusted enterprise **340**. Thus, if this attribute is set "on," when a mobile device **310** attempts to connect to the internet **330** without the mobile security system **345** and not from within the trusted enterprise **340**, all data transfer connections including LAN connection, USB-net, modem, Bluetooth, WiFi, etc. may be closed. The mobile device **310** may be totally isolated and unable to connect to any network, including the internet **330**.

In one embodiment, to enable this, when first connecting the mobile security system **345** to the mobile device **310**

TREND MICRO
EXHIBIT 1001 - PAGE 28

US 10,951,632 B2

**11**

using for example the USB cable (for both power and USB connection creation), the USB plug & play device driver will be sent into the mobile device **310**. The installed driver may be "Linux.inf" which allows a USB-net connection for the mobile security system **345**. This connection allows the mobile security system **345** to access the internet **330** via the USB port and using the mobile device **310** network connection plus additional code ("the connection client"). In a Windows example, the connection client may be installed at the NDIS level of the mobile device **310** above all the network interface cards of every network connection as shown in FIG. **6**. The implementation will be as an NDIS Intermediate (IM) Driver or NDIS-Hooking Filter Driver. Both implementations may be at the kernel level, so that an end user cannot stop or remove it. When starting the mobile device **310**, the connection client may attempt to connect to the security administrator **325** or the network security system **320** locally within the trusted enterprise **340**. If the node is not found (finding via VPN is considered as not found in local LAN), the connection client will assume it is working from outside the trusted enterprise **340** and expects to find the mobile security system **345** connected, e.g., via USB-net or other connection mechanism. If the mobile security system **345** is not found, the connection client may avoid any communication to any network connection. By a policy definition, this behavior can be modified to allow communication to the enterprise **340** via VPN installed in the mobile device **310**. Similarly, in case of a mobile device system **345** failure, all traffic may be disabled, except for the VPN connection into the enterprise **340**.

It will be appreciated that NDIS is one possible implementation of intercepting traffic at the kernel level. For example, in another embodiment, the system may hook Winsock or apply other ways that may be in future Windows versions.

In an embodiment where the mobile security system **345** supports multiple mobile devices **310**, the security engines **530**, security policies **535** and security data **540** may be different for each mobile device **310** (e.g., based on for example user preferences or IT decision). Alternatively, it can apply the same engines **530**, policies **535** and data **540** for all connected device **310**.

The remote management module **550** enables communication with security administrator **325** (and/or other security administrators), and enables local updating of security engines **530**, security policies **535**, security data **540** including signatures and other applications. In one embodiment, modification to the security policies **535** and data **540** can be done by the security administrator **325** only. The remote management module **550** of the mobile security system **345** may receive updates from an update authorities device (UAD), e.g., on the security administrator **325** via a secured connection. A UAD may operate on an update server at a customer IT center located on the internet **330** to forward updates to mobile security systems **345** that possibly do not belong to an enterprise **540** in charge of managing updates. A UAD may operate on a mobile security system **345**. Security engine **530** updates may modify the anti-virus engine DLL, etc. OS and security application updates may be implemented only from within the enterprise **540** while connecting to the security administrator **325** and via an encrypted and authenticated connection.

The security administrator **325** can modify URL black and white lists for remote support to traveling users. In case of false positives, the security administrator **325** may allow access to certain URLs, by bypassing the proactive heuristics security but still monitoring by firewall, anti-virus,

**12**

IPS/IDS, etc. Additional remote device-management features may enable the security administrator **325** to perform remote diagnostics, access local logs, change configuration parameters, etc. on the mobile security system **345**. The security administrator **325** may delegate tasks to a helpdesk for support.

The remote management module **550** may communicate with a wizard (e.g., wizard **745**), which may be on the security administrator **325**, as illustrated in FIG. **7**, or on another system. Details of the wizard **745** and details of the communication schemes between the remote management module **550** and the wizard **745** are described below with reference to FIG. **7**.

The distribution module **555** enables distribution of updates, e.g., security policy **535** updates including rule updates, security data **540** updates including signature updates, security engine **530** updates, application/OS updates, etc. by the mobile security system **345** to N other mobile security systems **345**. A routing table identifying the N other mobile security systems **345** to whom to forward the updates may be provided to the distribution module **555** to enable system **345** to system **345** communication. Updates may be implemented according to policies set by the security administrator **325**. When forwarding updates, the distribution module **555** acts as a UAD.

Each mobile security system **345** may obtain its routing table with security information updates, periodically, at predetermined times, upon login, etc. The routing tables may be maintained on a server, e.g., the security administrator **325** or another mobile security system **345**. In one embodiment, the mobile security systems **345** may contact the server to retrieve the routing tables. Alternatively, the server may push the routing tables to the mobile security systems **345**.

The distribution module **555** may enable rapid updates as shown in FIG. **9**. Currently, all commercial anti-virus products available do not update devices faster than viruses spread. To assure that a new virus attack does not spread faster than for example signature updates, each mobile security system **345** may be an active UAD. In one embodiment, as shown in FIG. **9**, each mobile security system **345** is responsible for forwarding the signature updates to four other devices **345**. As one skilled in the art will recognize, all devices **345** need to forward to the same number of other devices **345**. Multiple devices **345** may be responsible for forwarding to the same device **345**. When necessary, offline devices **345** being activated may poll the server, e.g., the security administrator **325**, for routing table updates. Many other updating techniques are also possible.

The backup module **560** may constantly backup image and changes of the boot sector and system files of the mobile device **310** into the flash memory **520** or into another persistent memory device. That way, in case of major failure, including a loss of the system or boot sector of the mobile device **310**, the mobile security system **345** may be identified as a CD-ROM during reboot and may launch the backup module (or separate program) to restore the boot sector and system files on the mobile device **310**, thereby recovering the mobile device **310** without the need for IT support. In an embodiment where the network security system **345** supports multiple mobile devices **310**, the backup module **560** may contain separate boot sector and system files for each of the mobile devices **310**, if different.

FIG. **7** is a block diagram illustrating details of a smart policy updating system **700** in accordance with an embodiment of the present invention. System **700** includes the security administrator **325** coupled to the network security

TREND MICRO
EXHIBIT 1001 - PAGE 29

US 10,951,632 B2

**13**

system **320** and to the mobile security system **345**. The network security system **320** includes security engines **705**, including an anti-virus engine **715**, an IPS/IDS engine **720**, a firewall engine **725**, and other security engines. The network security system **320** also includes security policies and data **710**, including anti-virus policies and data **730**, IPS/IDS policies and data **735**, firewall policies and data **740**, and other policies and data. Similarly, the mobile security system **345** includes an anti-virus engine **755**, an IPS/IDS engine **760**, a firewall engine **765**, and other engines. The mobile security system **345** also includes security policies and data **535/540**, including anti-virus security policies and data **770**, IPS/IDS security policies and data **775**, firewall security policies and data **780**, and other security policies and data.

The security administrator **325** includes a wizard **745** for enabling substantially automatic initial and possibly dynamic setup of the security engines **530**, security policies **535** and security data **540** on the mobile security system **345**. In one embodiment, the wizard **745** may automatically load all security engines **705** and policies and data **710** of the network security system **320** as the security engines **530** and policies and data **535/540** on the mobile security system **345**. In another embodiment, the wizard **745** may include all security engines **705** and policies and data **710** except those known to be irrelevant, e.g., those related to billing software used by accounting, those relating to web software running only on the web servers, etc. In another embodiment, the engines **530** would need to be loaded by an IT manager, and would not be loaded automatically by the wizard **745**.

In one embodiment, the wizard **745** may determine whether the mobile security system **345** requires a particular security engine **530**, e.g., an anti-virus engine **755**, IPS/IDS engine **760**, firewall engine **765**, etc. If so determined, then the wizard **745** would load the engine **530** onto the mobile security system **345**. The wizard **745** would then determine which policies and data sets, e.g., some for anti-virus engine **755**, some for the IPS/IDS engine **760**, some for the firewall engine **765**, etc. are important to the mobile security system **345**. The wizard **745** will then determine which of the anti-virus policies and data **730** on the network security system **320** are relevant to the anti-virus policies and data **770** on the mobile security system **345**, which of the IPS/IDS policies and data **735** on the network security system **320** are relevant to the IPS/IDS policies and data **775** on the mobile security system **345**, which of the firewall policies and data **740** on the network security system **320** are relevant to the firewall policies and data **780** on the mobile security system **345**, and which of the other policies and data on the network security system **320** are relevant to the policies and data on the mobile security system **345**. As stated above, the wizard **745** may determine that all security engines **705** or just a subset are needed on the mobile security system **345**. The wizard **745** may determine that all policies and data **710** for a given engine type or just a subset should be forwarded. The wizard **745** may determine which relevant policies and data **710** should be forwarded to the mobile security system **345** based on rules developed by an IT manager, based on item-by-item selection during the setup procedure, etc. Alternative to the wizard **745**, an IT manager can setup the engines **530** and policies and data **535/540** on the mobile security system **345** without the wizard **745**.

The security administrator **325** may also include an update authorities device **750**. The update authorities device **750** may obtain security system updates (e.g., signature updates) and may send the updates to the network security

**14**

system **320** and to the mobile security system **345**. One skilled in the art will recognize that the updates to the network security system **320** and the updates to the mobile security system **345** need not be the same. Further, the update authorities device **750** may obtain the updates from security managers, security engine developers, anti-virus specialists, etc. The update authorities device **750** may forward the updates to all network security systems **320** and all mobile security systems **345**, or may forward routing tables to all mobile security systems **345** and the updates only to an initial set of mobile security systems **345**. The initial set of mobile security systems **345** may forward the updates to the mobile security systems **345** identified in the routing tables in a P2P manner, similar to the process illustrated in FIG. **9**. As stated above, each mobile security system **345** operating to forward updates is itself acting as an update authorities device **750**.

Other applications may be included on the mobile security system **345**. For example, add-on applications for recurring revenue from existing customers may include general email, anti-spam, direct and secured email delivery, information vaults, safe skype and other instant messaging services, etc.

Email Security and Anti-spam—implementation of mail relay on mobile security systems **345** (including the web security engine above) and a local spam quarantine (based on SendMail or similar process) may implement a complete mail security suite (SMTP and POP3) including anti-spam with real time indexing (via online web spam quarries). Users may have access to the quarantine to review spam messages, release messages, modify and custom spam rules, etc., via a web interface.

Direct and Secured Email Delivery based on mail relay will allow the mobile security system **345** to send user email directly from one mobile security system **345** to another mobile security system **345** without using in route mail servers. This allows corporate users to send emails that need not travel in the internet, thus leaving trace and duplicates on different unknown mail servers in route. This combined with the ability to use a secured pipe between two mobile security systems is valuable to corporations. Without such methodology, people could trace emails exchange without accessing to the enterprise's mail server, by tracking down copies in intermediate mail servers that were used to deliver the messages.

Information Vault—Application to encrypt and store end user information on the mobile security system **345** may be available only to authorized users via a web interface and a web server implemented on every mobile security system **345** (e.g., BOA, Apache, etc.)

Safe Skype and Other IM—implementing an instant messaging client on the mobile security system **345** can guarantee that the instant messaging system or P2P application has no access to data on the mobile device **310**. Adding a chipset of AC/97 to provide a sound interface on the mobile security system **325** could allow users to talk and receive calls directly from/to the mobile security system **325**.

Although not shown, a small battery may be included with the mobile security system **345**. This battery may be charged by the USB connection during runtime or using the power adapter at any time. The battery may guarantee proper shutdown, e.g., when user disconnects the USB cable from the mobile security system **345**. It will be signaled by the system which will launch applications and system shutdown. This will ensure a proper state of the file system and flashing open files buffers.

A multi-layered defense and detection abilities is required. This may be done by a special code that is

TREND MICRO
EXHIBIT 1001 - PAGE 30

US 10,951,632 B2

15 | 16

constantly monitoring the scanning result by different systems (anti-virus, IDS/IPS, firewall, antispyware, URL category, etc.) and at different levels to build a puzzle and identify an attack even if it's not recognized by each of the individual subsystems. By doing this, the mobile security system **345** will maintain and in some cases even improve the security level provided within the enterprise **540**.

One available benefit of the mobile security system **345** is its ability to enforce the policy of the enterprise **540** on the end user while they are traveling or working from home. Since the mobile security system **345** uses similar security engines and policy as when connected from within the enterprise **540** and since the end user cannot access the internet **330** without it (except via VPN connection into the enterprise **540**), IT may be capable of enforcing its security policy beyond the boundaries of the enterprise **540**. The OS may be under the entire supervision of IT, while the mobile security system **345** OS acts as an end user OS under his control. This resolves the problems of who controls what and how security and productivity face minimal compromise.

A standalone version of the mobile security system **345** may offer the same functionality, and may provide a local management interface via web browser. Attractive to home users and small offices that lack an IT department, the mobile security system **345** enables the end user to launch a browser, connect to the mobile security system **345**, set the different policies (update policy, security rules, etc.) including modifying the white and black URL lists, etc. There is also an opportunity to provide end users with a service of remote management of the mobile security systems **345** by subscription.

FIGS. **10**A, **10**B and **10**C illustrate three example architectures of connecting a mobile security system **345** to a mobile device **310**, in accordance with various embodiments of the present invention. In FIG. **10**A, the mobile device **310** is coupled to the mobile security system **345** via USB connections **1015** and **1020** and is coupled to the internet **330** via an NIC card **1005**. The mobile device **310** receives internet traffic from the internet **330** via its NIC card **1005**. A kernel-level redirector **1010** (e.g., via NDIS, Winsock, etc.) on the mobile device **310** automatically redirects the internet traffic via the USB connections **1015** and **1020** to the mobile security system **345**, which scans, cleans and returns the cleaned internet traffic to the mobile device **310** via the USB connections **1015** and **1020**. In FIG. **10**B, the mobile device **310** is coupled to the mobile security system **345** via USB connections **1025** and **1030**. The mobile security system **345** includes a NIC card **1035** for receiving internet traffic from the internet **330**. The mobile security system **345** scans, cleans and forwards the internet traffic via the USB connections **1025** and **1030** to the mobile device **310**. In FIG. **10**C, the mobile device **310** is coupled to the mobile security system **345** via NIC cards **1040** and **1045**. The mobile security system **345** receives internet traffic from the internet **330** via its NIC card **1045**. The mobile security system **345** scans, cleans and forwards the internet traffic wirelessly via the NIC cards **1040** and **1045** to the mobile device **310**. Other connection architectures are also possible.

FIG. **12** is a block diagram illustrating a secure data exchange system **1200**, in accordance with an embodiment of the present invention. The secure data exchange system **1200** includes a host computer (host) **1205** coupled via a security device **1210** to an external device **1110**. The host **1205** may include a laptop, desktop, PDA, mobile phone, or other processor-based device. The external device **1110** may be any external device with memory such as a USB drive,

external hard drive, PDA, music player, cell phone, etc. The security device **1210** is communicatively coupled to the host **1205** via an ED port **1225** (USB, serial, parallel, Firewire, Ethernet, WiFi, WiMAX, GSM, CDMA, Bluetooth, PCMCIA and/or other connection) and an ED plug **1230** (USB, serial, parallel, Firewire, Ethernet, WiFi, WiMAX, GSM, CDMA, Bluetooth, PCMCIA and/or other connection). The external device **1110** is communicatively coupled to the security device **1210** via an ED port **1235** (USB, serial, parallel, Firewire, Ethernet, WiFi, WiMAX, GSM, CDMA, Bluetooth, PCMCIA and/or other connection) and ED plug **1120** (USB, serial, parallel, Firewire, Ethernet, WiFi, WiMAX, GSM, CDMA, Bluetooth, PCMCIA and/or other connection). The connector type of the ED port **1225** and ED plug **1230** combination may be different that the connector type of the ED port **1235** and ED plug **1120** combination. In one embodiment, all ports **1225**/**1235** and plugs **1230**/**1120** are USB. Although the plugs **1120**/**1230** are illustrated as male and ports **1225**/**1235** are shown as female, one skilled in the art will recognize that the opposite is possible (plugs **1120**/**1230** may be female and ports **1225**/**1235** may be male).

The host **1205** includes ED drivers **1220** for performing enumeration and enabling communication with the security device **1210**. Similarly, the security device **1210** includes ED drivers **1245** for performing enumeration and enabling communication with the external device **1110**.

In one embodiment, the security device **1210** includes a programmable hardware appliance capable of enforcing security policies to protect against malicious code such as viruses, spyware, adware, Trojan Horses, etc. and to protect against transfer of private data. In one embodiment, the security device **1210** is configured to protect both the host **1205** and the external device **1215**. In one embodiment, the security device **1210** is configured to protect only one of the external device **1110** or the host **1205**. Additional details of the security device **1210** are provided with reference to FIGS. **13** and **14**.

FIG. **13** is a block diagram illustrating details of the security device **1210**, in accordance with an embodiment of the present invention. The security device **1210** include a processor **1305**, such as an Intel Pentium® microprocessor or a Motorola Power PC® microprocessor, coupled to a communications channel **1315**. The security device **1210** further includes an ED plug **1230**, an ED port **1235**, a communications interface **1310**, storage **1320** such as an EEPROM, and memory **1325** such as Random-Access Memory (RAM) or Read Only Memory (ROM), each coupled to the communications channel **1315**. The communications interface **1310** may be coupled to a network such as the internet. One skilled in the art will recognize that, although the storage **1320** and memory **1325** are illustrated as different units, the data storage device **1320** and memory **1325** can be parts of the same unit, distributed units, virtual memory, etc. The term "memory" herein is intended to cover all data storage media whether permanent or temporary. One skilled in the art will recognize that the security device **1210** may include additional components, such as network connections, additional memory, additional processors, LANs, input/output lines for transferring information across a hardware channel, the internet or an intranet, etc.

As shown, memory **1325** stores an operating system **1330** such as the Microsoft Windows XP, the IBM OS/2 operating system, the MAC OS, Unix OS, Linux OS, etc. It will be appreciated that a preferred embodiment may also be implemented on platforms and operating systems other than those mentioned. An embodiment may be written using JAVA, C,

TREND MICRO
EXHIBIT 1001 - PAGE 31

US 10,951,632 B2

**17**

and/or C++ language, or other programming languages, possibly using object oriented programming methodology. The memory **1325** also stores ED drivers **1245** and a security system **1335**. The ED drivers **1245** may include standard drivers for standard external devices **1110** and proprietary drivers for proprietary external devices **1110**. The ED drivers **1245** may be transferred onto the memory **1325** via ED plug **1230**. The security system **1335** includes code for enforcing security policies on data transfer actions between the host **1205** and external device **1110**.

FIG. **14** is a block diagram illustrating details of a security system **1335**, in accordance with an embodiment of the present invention. The security system **1335** includes a security manager **1405**, security engines **1410**, security policies **1415**, and security data **1420**.

In one embodiment, the security manager **1405** includes code for performing enumeration, namely, to identify the external device **1110** or external device **1110** type and to identify the corresponding ED driver **1245** capable of establishing communication between the security device **1210** and the external device **1110**. The security manager **1405** also includes code to control execution of the various security engines **1410** based on the security policies **1415** and security data **1420** to evaluate data transfer requests or other device requests. Further, the security manager **1405** includes code to communicate with the host **1205**, which will be the source of the data transfer and/or other requests.

In one embodiment, the security engines **1410** includes code for securing the transfer of data between the host **1205** and the external device **1110** based on the security policies **1415** and security data **1420**. The security engines **1410** may include firewalls, anti-virus, antispyware, malicious content filtering, multilayered security monitors, Java and bytecode monitors, etc. The security engines **1410** may also include data privacy modules to enforce data privacy policies **1415**. Each security engine **1410** may have dedicated security policies **1415** and security data **1420** to indicate which procedures, URLs, system calls, content, ID, etc. the data requested for transfer may contain or whether the data requested for transfer is considered nontransferable (or nontransferable without additional security measure such as a password and ID).

To provide a higher security level, the security engines **1410** may implement content analysis and risk assessment algorithms. In one embodiment, a security engine **1410** assigns a weight and rank for every transfer object based on its type, complexity, richness in abilities, source, etc. The security engine **1410** may assign weight based on the source using a list of known dangerous or known safe sources. The security engine **1410** may assign weight to objects based on the category of the source, e.g., a gambling source, an adult content source, a news source, a reputable company source, a banking source, etc. The security engine **1410** may calculate the weight, and based on the result determine whether to allow or disallow access to the content, the script to run, the system modification to occur, etc. The security engine **1410** may "learn" user content (by analyzing for a predetermined period of time the general content that the user accesses) and accordingly may create personal content profiles. The personal content profile may be used to calibrate the weight assigned to content during runtime analysis to improve accuracy and tailor weighted risk analysis for specific user characteristics.

Thus, upon receiving a data transfer and/or other request from the host **1205**, the security manager **1405** will launch the appropriate security engines **1410** based on the security policies **1415**. For example, the security policies **1415** may

**18**

be configured not to allow specific ActiveX controls to be loaded from the host **1205** onto the external device **1110**. The security policies **1415** may be configured not to allow data transfer from private folders on the host **1205** to the external device **1110**. The security manager **1405** will launch the appropriate security engines **1410** to assure that these example security policies **1415** are met. Further, the security engines **1410** may use security data **1420**, which may include definition files of malicious ActiveX controls, locations of private folders, etc.

Although not shown, the security system **1335** may include additional components such as the preboot flash **520** with OS and applications, the remote management module **550**, the distribution module **555**, and the backup module **560** discussed above with reference to FIG. **5**. Other components are also possible.

FIG. **15** is a block diagram illustrating a secure data exchange system **1500**, in accordance with another embodiment of the present invention. The secure data exchange system **1500** includes a security device **1505** communicatively coupled to the host **1520** via an ED plug **1515** on the security device **1505** and a first ED port **1525** on the host **1520**. The secure data exchange system **1500** also includes an external device **1110** communicatively coupled to the host **1520** via the ED plug **1120** on the external device **1110** and a second ED port **1535** on the host **1520**.

Because the external device **1110** is not directly coupled to the security device **1505**, the security device **1505** is not physically intercepting the data transfer requests between the external device **1110** and the host **1520**. Accordingly, in this embodiment, the host **1520** includes a redirect driver **1530**, which is configured to redirect data transfer requests between the external device **1110** and the host **1520** regardless of data transfer direction. In one embodiment, the security device **1505** may be configured to protect only one of the external device **1110** or the host **1520**. Further, in one embodiment, the security device **1505** does not contain any ED drivers, e.g., ED drivers **1245**.

In one embodiment, if the security device **1505** is not coupled to the host **1520**, the host **1520** uses the ED drivers **1540** to communicate with the external device **1110**. In one embodiment, the host **1520** is configured not to communicate with the external device **1110** until the security device **1505** is coupled to the host **1520**. In one embodiment, the host **1520** uses the ED drivers **1540** to communicate with the external device **1110** only if additional security measures are taken, such as receipt of a password and ID, or until the security device **1505** is coupled to the host **1520**.

In one embodiment, the host **1520** may conduct enumeration of the security device **1505** upon connection of the security device **1505** to the ED port **1525**. Upon identifying the security device **1505** or security device **1505** type, the host **1520** may initiate the redirect driver **1530** to redirect all data transfer requests or other external device **1110** requests from all other ED ports **1535** to the security device **1505**. In one embodiment, the redirect driver **1530** only accepts data transfer requests from the security device **1505**, which presents the requests of the external device **1110** as a proxy. In one embodiment, the redirect driver **1530** performs data transfer requests received from the external device **1110** only after the security device **1505** has conducted its check and given its authorization. Other protocols are also possible.

FIG. **16** is a flowchart illustrating a method **1600** of secure data exchange between a host and an external device, in accordance with an embodiment of the present invention. The method **1600** begins in step **1605** with the security device **1505** being connected to the first ED port **1525** of the

TREND MICRO
EXHIBIT 1001 - PAGE 32

US 10,951,632 B2

19                                                                        20

host **1520**. The external device **1110** in step **1610** is connected to the second ED port **1535** of the host **1520**. The host **1505** in step **1615** performs enumeration techniques to identify the security device **1505** and the external device **1110** and to install the appropriate drivers **1530/1540** to enable communication with the security device **1505** and the external device **1110**. The redirect driver **1530** in step **1620** receives a data transfer request from either the host **1505** to the external device **1110** or from the external device **1110** to the host **1505**. The redirect driver **1530** in step **1625** redirects the data transfer request to the security device **1505**, which in step **1630** enforces its security policies (anti-virus, anti-spyware, anti-adware, data privacy, etc.) on the data transfer request. The security device **1505** in step **1635** determines whether the data transfer request passes the security policies. If so, then the security device **1505** in step **1640** authorizes the data transfer request and the host **1520** in step **1645** performs the data transfer request. If not, then the security device **1505** in step **1650** rejects the data transfer request. Method **1600** then ends.

It will be appreciated that, in one embodiment, the security device **1210/1505** may be implemented as part of the host **1205/1520**, e.g., within the housing of the host **1205/1520** and/or as a security procedure executed by the host **1205/1520**.

In various embodiments, a mobile security system (discussed herein) may be coupled to a mobile device, digital device or other computer system (e.g., computer system **400**). A digital device is any device with a processor. After a predetermined duration, the mobile device may enter a power management mode. During power management mode, the mini-computer may wake the mobile device or take control of one or more components of the mobile device to manage security services (e.g., perform security functions). Security services may include, but are not limited to, scanning the mobile device, updating the mobile device, and/or performing maintenance functions. Once the security services are completed, the mobile device and/or components of the mobile device may return to power management mode.

Scanning the mobile device may comprise scanning the hard drive, memory (e.g., RAM), and/or peripherals of the mobile device for malware (e.g., viruses, worms, Trojan horses, root kits, key loggers, spyware, and tracking cookies). Scanning the mobile device may also comprise scanning for unauthorized data such as unauthorized programs, unauthorized data, or inappropriate content (e.g., adult media).

Security services may also comprise taking corrective action if malware or unauthorized data is found. In one example, corrective action comprises reporting if malware or unauthorized data is found. In another example, corrective action may comprise deleting or quarantining the malware and/or unauthorized data.

Updating the mobile device may comprise updating security applications (e.g., anti-virus application, firewall application, and anti-spyware application), updating an operating system (e.g., with patches), updating drivers, and/or updating other files and applications. Performing maintenance may comprise, for example, defragmenting memory (e.g., a hard drive), emptying trash, emptying a recycle bin, deleting temporary files, and/or removing cookies.

In some embodiments, the mobile security system detects a wake event and then may either take control of one or more components of the mobile device or terminate the power management mode of the mobile device in order to perform the security services. A wake event may comprise the occurrence of a certain time of day (e.g., 3:00 AM) or the expiration of a predetermined period of time (e.g., two hours after the mobile device enters into power management mode).

The wake event may also comprise the mobile security system receiving data. In one example, the mobile security system may receive a flag, update, and/or alarm from another digital device over a network (e.g., security administrator—see security administrator **325** of FIG. **3**). The mobile security system may then wake the mobile device and/or one or more components of the mobile device based on the flag, update, and/or alarm. The mobile security system may then perform the security services.

FIG. **17** is block diagram illustrating details of a mobile security system **1702** in some embodiments of the present invention. The mobile security system **1702** comprises a processor **1704**, a memory module **1706**, a storage module **1708**, a communication system **1710**, and a power system **1712** coupled to a bus **1714**. The processor **1704** is configured to execute instructions (e.g., programs). The mobile security system **1702** may be the mobile security system **345** discussed with respect to FIG. **3** herein. A module may comprise hardware (e.g., circuitry and/or firmware), software, or a combination of both.

The mobile security system **1702** may reside in a digital device. In various embodiments, the memory module **1706**, storage module **1708**, and the communication system **1710** may reside in flash memory devices, communication chips, or processors (e.g., network processors, general purpose processors, communication processors, or DSPs). The mobile security system **1702** may comprise instructions **1718** (e.g., instructions to manage security services) associated with a variety of programs (e.g., applications) including a firewall, network address translator (NAT), VPN client, intrusion detection and prevention system, HTTP proxy, FTP proxy, POP3 proxy, SMTP proxy, anti-virus program, anti-spyware program, anti-phishing program, anti-spam program, URL CAT, L-8 security engine, MLA security agent, DRM application, anti-leakage program, malicious content filter, multilayered security monitor, Java monitor, bytecode monitor and/or data access client.

In various embodiments, the processor **1704** is configured by the instructions **1718** to manage security services such as analyze data for the presence of malicious code (e.g., malware). The processor **1704** may comprise circuitry capable of processing the instructions **1718**. In some embodiments, the processor **1704** is virtualized. In other embodiments, the processor **1704** comprises a CPU, DSP, FPGA, or any processing unit.

The memory module **1706** includes memory (e.g., RAM, ROM, preboot flash **520**, or a ram cache). The instructions **1718** may be loaded into the memory module **1706**.

The storage module **1708** is any storage configured to retrieve and store data. Some examples of the storage module **1708** are flash media, hard drives, optical drives, and/or magnetic tape. In some embodiments, the mobile security system **1702** includes a memory module **1706** in the form of RAM and a storage module **1708** in the form of flash memory. Both the memory module **1706** and the storage module **1708** comprise computer readable media which may store instructions (e.g., instructions **1718**) that are executable by a computer processor including the processor **1704**.

The communication system **1710** is any device that receives data over link **1716**. In some embodiments, the communication system **1710** is coupled to a network (e.g., internet **130**) via the link **1716**. Further, the communication

TREND MICRO
EXHIBIT 1001 - PAGE 33

US 10,951,632 B2

21                                                                22

system **1710** may also support wired and/or wireless communication (e.g., 802.11 a/b/g/n, WiMax).

The optional power system **1712** comprises any power supply that provides power to the mobile security system **1702**. In some embodiments, the mobile security system **1702** is part of a thumb drive, mini-computer, or other digital device. The power system **1712** may power the thumb drive, mini-computer, or other digital device. In some embodiments, the power system **1712** is a capacitor, battery, or other power source.

In various embodiments, the power system **1712** receives power from a digital device (e.g., computer system **400** or mobile device described further herein) that is coupled to the mobile security system **1702**. In one example, the mobile security system **1702** is part of a digital device with an interface (e.g., USB) that is configured to be coupled with another digital device. Power may be received by the power system **1712** via the interface from the other digital device. In some embodiments, the power system **1712** may not have the capacity to store power. Alternately, the power system **1712** may have the capacity to store power received via the interface. In various embodiments, the power system **1712** may receive power from the interface and provide the power to the mobile security system **1702**, provide the power to other components, and/or store the power.

The mobile security system **1702** as well as one or more of the components of the mobile security system **1702** (e.g., processor **1704**, the memory module **1706**, the storage module **1708**, and the security router **1710**) may be virtualized. Further, those skilled in the art will appreciate that the mobile security system **1702** may be a part of a larger digital device. In one example, the processor **1704** used by the mobile security system **1702** may be the same processor used by the digital device.

Further, the memory module **1706** may comprise all or a portion of RAM memory within a digital device with one or more other components. In one example, a digital device may comprise 2 gigabytes of RAM memory. Some or all of that memory may be shared by the CPU of the digital device and the memory module **1706**. In one example, the CPU scans data, cleans data, analyzes data, or otherwise protects the digital device from malware.

Similarly, the storage module **1708** may comprise all or a portion of the storage of the digital device. In one example, the digital device may comprise a one terabyte hard drive. Some or all of the one terabyte hard drive may be shared with the storage module **1708**. In one example, the storage of the digital device stores instructions **1716**.

Those skilled in the art will appreciate that the mobile security system **1702** may comprise more processors, modules, security routers, and/or other components than those depicted in FIG. **17**. Further, the mobile security system **1702** may comprise fewer modules than those depicted in FIG. **17**. For example, multiple functions may be performed by a single module.

FIG. **18** is a block diagram of a mobile security system **1702** in another embodiment of the present invention. The mobile security system **1702** comprises a security engine **1800**, a power module **1812**, and a policy database **1814**. The security engine **1800** comprises a wake module **1802**, a wake event module **1804**, a scan module **1806**, an update module **1808**, and a maintenance module **1810**.

The wake module **1802** is configured to wake a mobile device from a power management mode. A power management mode is a mode wherein the mobile device conserves power, usually after a predetermined period of inactivity (e.g., no input from a mouse and keyboard). During power management mode, the mobile device may reduce or eliminate power to one or more mobile device components such as a display and/or hard drive. In one example, the mobile device may save data in RAM to the hard drive and then reduce or eliminate power to the RAM and/or hard drive while in power management mode. Those skilled in the art will appreciate that power management mode may be a sleep mode, hibernation mode, or any other kind of mode wherein power is conserved. Traditionally, the mobile device may wake from a power management mode in response to an input from the user (e.g., via keyboard or mouse) or processor activity (e.g., data is received from a network).

The wake module **1802** may be configured to wake the mobile device from power management mode. In some embodiments, the mobile device (described further herein) is configured with a security agent that is configured to wake the mobile device or wake components of the mobile device when a wake signal from the wake module **1802** is received. In one example, the wake module **1802** sends a wake command to the security agent that is resident on the mobile device. The security agent receives the wake command and may wake the mobile device from the power management mode. When the mobile device is woken from the power management mode, the mobile device may enter into an active state such that security functions may be executed (e.g., the hard drive may be scanned, updates installed, and maintenance performed).

In some embodiments, the security agent may wake only one or more components of the mobile device without fully terminating the power management mode. In one example, in response to the wake command, the security agent may activate the hard drive in order to execute security functions but not pull the mobile device from power management mode (e.g., the display may remained unpowered). In various embodiments, while the mobile device is in power management mode, the security agent may selectively activate various components of the mobile device and perform security functions.

The wake module **1802** may also be configured to provide a power management signal to the mobile device to put the mobile device back to power management mode. Those skilled in the art will appreciate that the mobile device (or various components of the mobile device) may be configured to enter power management mode automatically without receiving a power management signal from the wake module **1802**. In one example, the mobile device may be configured to enter into power management mode after a predetermined period of inactivity. In other embodiments, the wake module **1802** may be configured to provide the power management signal to the mobile device to put various components of the mobile device back to power management mode.

In various embodiments, encryption may be used to confirm the authenticity of the wake signal. In one example, an encrypted wake signal is provided from the wake module **1802** to the security agent of the mobile device. The security agent may decrypt the wake signal before waking the mobile device or waking components of the mobile device. Those skilled in the art will appreciate that signals associated with the security functions commanded by the mobile security system **1702** may also be encrypted in order to provide additional security to the mobile device. In some embodiments, the mobile security system **1702** may be required to provide a user name and/or password that must be accepted before the wake signal is accepted by the security agent or before the security agent will allow security functions to be performed.

TREND MICRO
EXHIBIT 1001 - PAGE 34

US 10,951,632 B2

<table>
<tr><td>23</td><td>24</td></tr>
</table>

The wake event module **1804** is configured to detect a wake event to trigger providing a wake signal from the wake module **1802**. The wake module **1802** may be configured to trigger the wake signal being provided from the wake module **1802** in response to any number of wake events. A wake event may comprise a predetermined time or a predetermined duration. In one example, the wake event module **1804** triggers a wake signal at a predetermined time such as 3:00 AM daily. The wake event module **1804** may also be configured to trigger a wake signal at a predetermined date as well as time (e.g., 2:00 AM, the first and third Monday of the month). Those skilled in the art will appreciate that the wake signal may be triggered at any time and/or date. In some embodiments, a user or administrator may configure to the wake event module **1804** to trigger a wake signal at a date and/or time. The user may also configure the wake event module **1804** to trigger a wake signal at a recurring time and/or date (e.g., every day, twice a week, or twice a month).

The wake signal may also be triggered at a predetermined duration. In one example, the wake event module **1804** either monitors or is notified when the mobile device enters into the power management mode. After a predetermined period of time while the power management mode is still active, the wake event module **1804** may trigger a wake signal. The predetermined period may be a number of seconds, minutes, hours, and/or days. In some embodiments, the security agent on the mobile device indicates to the wake event module **1804** when the mobile device enters into power management mode. In various embodiments, the wake event module **1804** may determine that the mobile device is in power management mode. In one example, the wake event module **1804** determines that the mobile device in power management mode based on network activity (e.g., data received from a network, data provided to the network, or lack of data to or from the network).

The wake event may also comprise the wake event module **1804** receiving data such as a flag (e.g., an alarm) or file. In one example, the wake event module **1804** may detect a wake event when a flag or alarm is received. The flag or alarm may be sent from an security administrator (e.g., a security administrator **325** or the network security system **320** of FIG. **3**). In another example, the wake event module **1804** may detect a wake event when an update is received. The update may be for a security application (e.g., virus definitions for an anti-virus program, whitelist of safe network sites, a blacklist of unsafe network sites, or junk email lists), operating system (e.g., operating system updates), and/or any application. The updates may be received from a digital device on the network including, but not limited to the security administrator **325** of FIG. **3**, the network security system **320** of FIG. **3**, or any digital device on the network.

In some embodiments, the wake event module **1804** may also be configured to trigger a power conservation mode signal to be provided to the mobile device. The mobile device may be configured (e.g., via the security agent) to enter into the power conservation mode or to place one or more components in the power conservation mode in response to the power conservation mode signal. The wake event module **1804** may be configured to trigger the power conservation mode signal based on any number of power conservation events, including, but not limited to the completion of one or more security services. In some embodiments, the scan module **1806**, the update module **1808**, and/or the maintenance module **1810** may, either in

combination or separately, trigger the power conservation signal to be provided to the mobile device.

The scan module **1806** may be configured to scan the mobile device. In some embodiments, the scan module **1806** scans all or some memory of the mobile device (e.g., RAM and/or hard drive) as well as peripherals of the mobile device (e.g., external hard drives coupled to the mobile device). In one example, the scan module **1806** scans the registry, boot record, cookies, and applications of the mobile device for malware. In another example, the scan module **1806** performs a full scan of one or more hard drives, logical volumes, and/or petitions. In some embodiments, the scan module **1806** provides a scan signal to one or more security applications on the mobile device to perform the scans.

In various embodiments, the scan module **1806** scans the mobile device for malware such as, but not limited to, viruses, worms, Trojan horses, spyware, and tracking cookies. In one example, the scan module **1806** triggers an anti-virus application in the mobile security system to perform the scan on the mobile device.

If malware is found, the scan module **1806** may take corrective action such as delete or quarantine the malware and log the incident. In some embodiments, the scan module **1806** may issue a report on the scan, when the scan occurred, the type of scan, the results of the scan, and/or any corrective action. The report may be provided to an administrator, another digital device, and/or the mobile device. The scan module **1806** may also maintain a report and provide the report to an administrator, security administrator, or user (e.g., during an audit).

The scan module **1806** may also scan the mobile device for unauthorized data such as applications or files (e.g., media files, word processing files, databases, or records). In some embodiments, the scan module **1806** scans for applications that the user has installed without authorization on the mobile device. For example, the scan module **1806** may scan for toolbars, games, file transfer applications, new browsers, and the like.

The scan module **1806** may also scan for unauthorized data, such as files that the user and/or mobile device are not authorized to have access (e.g., salary data or operating information regarding products in a division that is unrelated to the mobile device or the user of the mobile device). In one example, the scan module **1806** scans metadata of the files to determine if the user and/or the mobile device have rights to the data. In some embodiments, the scan module **1806** may scan file names and documents for unauthorized information. The scan module **1806** may also be authorized to identify any files of a certain type as unauthorized. For example, the scan module **1806** may be configured to remove all music files and/or images.

In some embodiments, the scan module **1806** scans for unauthorized data based on information from one or more security policies stored in the policy database **1814** discussed further herein. The scan module **1806** may also be configured by an administrator, and administrator device (e.g., security administrator **325**), and/or a user. In one example, the scan module **1806** receives a list of authorized data that the mobile device is authorized to access and the scan module **1806** identifies and/or removes all data not on the list. In another example, the scan module **1806** receives a list of unauthorized data that the mobile device is unauthorized to access or includes general categories (e.g., filters) which instructs the scan module **1806** to identify data as unauthorized any data that meets certain criteria. In one example, based on a filter, the scan module **1806** may scan data on the mobile device for words or phrases in file names

TREND MICRO
EXHIBIT 1001 - PAGE 35

US 10,951,632 B2

<table>
<tr><td>25</td><td>26</td></tr>
</table>

and/or content of files to identify unauthorized content (e.g., adult content). The scan module **1806** may also scan for inappropriate network sites visited by the user by scanning the history of browsers, cookies, and/or temporary network files in cache.

If unauthorized data is found, the scan module **1806** may remove the unauthorized data (e.g., uninstall applications and/or delete files), quarantine unauthorized data, and/or generate a report regarding the found unauthorized data and any corrective action taken.

The scan module **1806** may also scan the mobile device and/or peripherals of the mobile device to determine if applications or files are stored on the mobile device. If one or more applications and/or files are not stored on the mobile device, the scan module **1806** may report the status of the mobile device or trigger applications or files to be downloaded from a network server and/or otherwise stored on the mobile device.

Those skilled in the art will appreciate that the scan module **1806** may be configured to provide a signal or report to an administrator or administrator device to trigger the mobile device to be re-imaged over a network. For example, a network administrator may maintain one or more images (including an OS, applications and data) for digital devices such as the mobile device that are coupled to a network. Upon a signal from the scan module **1806**, the mobile device may be reimaged (either automatically based on the signal from the scan module **1806** or manually) with one or more images associated with the mobile device thereby replacing all or some of the stored data (including applications, operating system, and files) on the mobile device.

The update module **1808** is configured to update the mobile device. In some embodiments, the update module **1806** updates security applications on the mobile device (e.g., anti-virus programs, firewalls, antiphishing programs, and white filters, black filters), an operating system (e.g., update Microsoft Windows with available patches), drivers, and/or other applications. In one example, the update module **1808** may search for available updates for the mobile device, download the updates, and install the updates on the mobile device.

In some embodiments, an administrator device or another digital device may download selected updates that are to be available to the mobile device. For example, an administrator device may determine specific operating system patches are to be available to the mobile device but others should not be made available until testing on the patches are performed. The administrator device may download the approved updates to the mobile security system **1702** or, alternately, the scan module **1806** may contact the administrator device to determine if approved updates are available. Those skilled in the art will appreciate that there may be many ways to receive the updates for the mobile device.

In some embodiments, the update module **1808** provides a signal to the mobile device to trigger an application on the mobile device to determine if an update is available, download the update, and/or install the update. Those skilled in the art will appreciate that updating the mobile device may be performed by a variety of functions. For example, the update module **1808** may receive specific patches from the administrator device to provide to the mobile device. Further, the update module **1808** may send an update signal to trigger an anti-virus application on the mobile device to search for available updates (e.g., virus definitions and/or program updates), download the updates if available, and install the downloaded updates, if any. The installation of

one or more updates may be performed by the mobile security system **1702**, the mobile device, or a combination of the two.

A maintenance module **1810** may be configured to perform maintenance on the mobile device and/or peripherals of the mobile device. Maintenance may include, but is not limited to, defragmenting the hard drive, deleting unneeded files (e.g., from the recycle bin, temporary files, cookies, and/or temporary files), and/or scanning a registry for errors.

In some embodiments, the maintenance module **1810** may be configured to trigger maintenance functions by the mobile device and/or peripherals of the mobile device. In one example, the maintenance module **1810** may provide a maintenance signal to the mobile device. In response to the maintenance signal, the mobile device may perform one or more maintenance functions (e.g., defragmentation, file deletion, or registry scan). Those skilled in the art will appreciate that the maintenance module **1810** may be configured to perform some functions on the mobile device and provide a maintenance signal to the mobile device so that the mobile device may perform other maintenance functions.

The maintenance module **1810** may also be configured to perform performance evaluations and take corrective action based on the performance evaluation. In one example, the maintenance module **1810** may be configured to run one or more tests to test the performance of the mobile device and/or peripherals of the mobile device. If the performance does not meet one or more predetermined thresholds, the maintenance module **1810** may analyze the results and/or perform testing to determine if corrective action can be taken. If corrective action can be taken automatically, the maintenance module **1810** may perform the corrective action. In one example, the maintenance module **1810** may determine that test performance was sluggish, and that one cause of the poor performance may be that there are too many files in cache. The maintenance module **1810** may then delete files in the cache. The maintenance module **1810** may then retest the mobile device, report the performance and corrective action, or take no further action. If corrective action may not be taken automatically, then the maintenance module **1810** may generate a report regarding the performance test and/or potential corrective action that may be taken.

Those skilled in the art will appreciate that the scan module **1806**, the update module **1808**, and the maintenance module **1810** may be configured to perform or not perform a variety of actions. In one example, a user of the mobile device or an administrator may configure the scan module **1806** to perform a quick scan of the mobile device, configure the update module **1808** to update the operating system, and configure the maintenance module **1810** to remove temporary files.

In some embodiments, a user or administrator may configure the mobile security system **1702** based on a calendar where one or more scans, updates, and maintenance functions are performed on different dates, after a predetermined period of time (e.g., every two weeks), and at different times. In one example, an administrator may configure the mobile security system **1702** such that a complete scan of the mobile device and peripherals occurs weekly at 2:00 AM on Monday morning, that defragmentation occurs one a month at 1:00 AM Saturday morning, and that virus updates are downloaded every time a wake event occurs. Those skilled in the art will appreciate that the mobile security system **1702** may be configured to perform any number of functions and/or trigger the performance of any number of functions at any time.

TREND MICRO
EXHIBIT 1001 - PAGE 36

US 10,951,632 B2

27

The optional power module **1812** may be configured to power the mobile security system **1702**. In some embodiments, the power module **1812** receives power from the mobile device (e.g., via USB or other interface). The power module **1812** may also be configured to power the mobile security system **1702** when no power or limited power is received from the mobile device. In one example, the power module **1812** comprises a battery and/or capacitor.

Those skilled in the art will appreciate that the mobile device may power the mobile security system **1702** via an interface even while the mobile device is in a power management mode. In some embodiments, however, power to the mobile security system **1702** from the mobile device may be reduced or eliminated while the mobile device is in power management mode. The power module **1812** may continue to power the mobile security system **1702** and allow the mobile security system **1702** to perform the functions described herein.

In some embodiments, the power module **1812** monitors stored power (e.g., of a battery). If the mobile security system **1702** does not receive power from the mobile device while in power management mode, the power module **1812** may wake the mobile device from the power management mode when stored power is low, critically low, or below a predetermined threshold. Once the mobile device wakes from the power management mode, the mobile device may power the mobile security system **1702**. The power module **1812** may keep the mobile device from entering the power management mode or continue to wake the mobile device from the power management mode until the stored power of the mobile security system **1702** is above a another predetermined threshold.

A policy database **1814** is any data structure configured to store one or more security policies. A security policy, as discussed herein, may further store instructions to configure the mobile security system **1702** and/or the components of the mobile security system **1702**. In some embodiments, the security policy may configure the mobile security system **1702** to perform security functions at specified wake events when the mobile device is in a power management mode.

Those skilled in the art will appreciate that the mobile security system **1702** may comprise any number modules beyond those displayed in FIG. **18**. For example, the mobile security system **1702** may comprise fewer modules than those displayed in FIG. **18**. Alternately, the mobile device **1900** may comprise more components or modules than those displayed in FIG. **18**.

Although FIG. **18** is discussed as communicating and interfacing with a mobile device, those skilled in the art will appreciate the mobile security system **1702** may communicate and interface with (e.g., provide wake signals and manage security services of) any digital device, not only those devices that are mobile.

FIG. **19** is block diagram of a mobile device **1900** an embodiment of the present invention. In various embodiments, the mobile device **1900** is a laptop which enters into power management mode when the laptop lid is shut. The mobile security system **1702** may wake the mobile device **1900** or components of the mobile device **1900** upon the occurrence of wake event and perform security services even while the lid of the laptop remains shut. The mobile device **1900** comprises a security agent **1902**, a security module **1908**, a communication module **1910**, and a power module **1912**. The security agent **1902** comprises a mode manager **1904** and a component manager **1906**.

The mobile device **1900** may be any digital device (e.g., a device with memory and a processor). The mobile device

28

**1900**, for example, may comprise a laptop, computer, server, personal digital assistant, smart phone, cell phone, media tablet, or net book.

The security agent **1902** is optional. In some embodiments, the security agent **1902** is installed by a user or administrator to communicate with the mobile security system **1702** and/or provide security services. The security agent **1902** may be configured to notify the mobile security system **1702** when the mobile device **1900** enters into a power management mode.

In various embodiments, the security agent **1902** comprises a mode module **1904** that is configured to wake one or more components of the mobile device **1900** from the power management mode without waking the entire mobile device **1900**. In one example, the mobile security system **1702** provides a wake signal to the mode manager **1904** to wake the hard drive of the mobile device **1900**. The security agent **1902** and/or the mobile security system **1702** may perform security services such as scanning, updating, performing maintenance, and taking corrective action. In some embodiments, after the security services are completed, the mobile security system **1702** and/or the security agent **1902** may put one or more components back to the power management mode.

The security agent **1902** may also comprise a component manager **1906** configured to allow the mobile security system **1702** to control or perform security services on one or more components of the mobile device **1900**. In some embodiments, the mobile security system **1702** conducts security services on one or more components of the mobile device **1900** without waking the mobile device **1900** from the power management mode. When the security functions are completed, the control of the components may return to the mobile device **1900**. In some embodiments, the component manager **1906** may interrupt security functions if the mobile device **1900** wakes from the power management mode. In another embodiments, the component manager **1906** only interrupts security functions upon input from a user (e.g., input is received from a mouse or keyboard or a laptop is opened).

The security module **1908** may comprise security applications (e.g., anti-virus applications and firewalls) as well as security data (e.g., anti-virus definitions, phishing filters, spam filters, and cookie filters). In various embodiments, the mobile security system **1702** may provide one or more signals to trigger various scans, updates, and maintenance functions by the security module **1908** rather than performing one or more security functions by the mobile security system **1702**. Those skilled in the art will appreciate that the security module **1908** may perform some security functions based on input from the mobile security system **1702** and the mobile security system **1702** may perform other security functions.

Those skilled in the art will also appreciate that the security agent **1902** may be configured to perform one or more security services with or without a signal from the mobile security system **1702**. In one example, the security agent **1902** may perform some security services (e.g., quick scan of RAM and the MBR as well as download and install new anti-virus definitions) upon termination of a power management mode or the waking of one or more components. In various embodiments, the security agent **1902** may be configured to perform one or more security functions without input or with only limited input from the mobile security system **1702**. For example, the security agent **1902** may scan the mobile device **1900** at certain times and dates (e.g., recurring after a predetermined period of time) and

TREND MICRO
EXHIBIT 1001 - PAGE 37

US 10,951,632 B2

29                                                    30

update the mobile device **1900** at other times and dates. Those skilled in the art will appreciate that the security agent **1902** may perform any number of security functions at any time.

The communication module **1910** may be configured to communicate between the mobile device **1900** and the mobile security system **1702** or a network coupled to the mobile device **1900**. In various embodiments, the security agent **1902** communicates with the mobile security system **1702** only after communication is authenticated (e.g., via digital signature or password). In one example, communication between the mobile security system **1702** and the security agent **1902** is encrypted. The mobile security system **1702** and the security agent **1920** may comprise encryption keys such that communication is secured and authenticated before security services are performed, the mobile device **1900** is accessed, or control of one or more components of the mobile device **1900** are allowed.

The power module **1912** may control the power management mode of the mobile device **1900**. In various embodiments, the power management mode is triggered by inactivity of the mobile device **1900** and/or lack of input from the user. In some embodiments, the power management module **1912** may trigger a power management mode when the mobile device **1900** is closed (e.g., when a laptop cover is closed). There may be many different power management modes which reduce or eliminate power to any number of components. Those skilled in the art will appreciate that the security services may be performed on one or more of the components of the mobile device **1900** and/or peripherals of the mobile device **1900** after the mobile device **1900** enters into any power management mode. The power module **1912** may also be configured to provide power to the mobile security system **1702** even during a power management mode.

Those skilled in the art will appreciate that the mobile device **1900** may comprise any number of components and modules beyond those displayed in FIG. **19**. Further, those skilled in the art will appreciate that the mobile device **1900** may comprise fewer components or modules than those displayed in FIG. **19**. Alternately, the mobile device **1900** may comprise more components or modules than those displayed in FIG. **19**.

FIG. **20** is a flow chart for performing security functions on a mobile device **1900** in an embodiment of the present invention. In step **2002**, the wake event module **1804** detects a wake event. In one example, the wake event module **1804** keeps track of time and checks if the mobile device **1900** is in a power management mode at specific times or intervals. If the mobile device **1900** is in a power management mode at the appointed time, a wake event is detected. In other embodiments, the security agent **1902** may indicate when the mobile device **1900** has entered a power management mode. The wake event module **1804** may detect a wake event if the mobile device **1900** has not terminated the power management mode after a predetermined period of time. In another embodiment, the wake event module **1804** may detect a wake event when the mobile security system **1702** receives an alarm or receive data from another digital device.

In step **2004**, the wake module **1802** may provide a wake signal to the mobile device **1900**. The wake module **1802** may provide the wake signal based on the detection of the wake event. In response to the wake signal, the mobile device **1900** may terminate the power management mode. The mobile security system **1702** may then perform security services and/or trigger security functions on the mobile

device **1900**. In other embodiments, in response to the wake signal, the mobile device **1900** may terminate the power management mode only for one or more components of the mobile device **1900** while leaving other components in the power management mode thereby allowing security functions to be performed on the components that are "awake."

In step **2006**, the scan module **1806** performs one or more scans for malware on one or more components of the mobile device **1900** and/or on one or more peripherals of the mobile device **1900**. In some embodiments, the scan module **1806** may trigger scans performed locally (e.g., by the security module **1908**) on the mobile device **1900**.

In step **2008**, the scan module **1806** may execute corrective functions if malware is found. For example, the malware may be deleted, quarantined, overwritten, or otherwise removed. The scan module **1804** may generate a report or log information about the scan, malware, and/or any other corrective action taken. The scan module **1806** may also provide an alert to an administrator, administrator device, and/or the mobile device **1900**.

In step **2010**, the scan module **1806** may scan one or more components of the mobile device **1900** and one or more peripherals of the mobile device **1900** for unauthorized data. Unauthorized data may comprise applications and data that the user is not authorized to have loaded, stored, and/or installed on the mobile device **1900**.

In step **2012**, the scan module **1806** performs corrective functions if unauthorized data is found. For example, the unauthorized data may be deleted, quarantined, overwritten, or otherwise removed. The scan module **1804** may generate a report or log information about the scan, malware, and/or any other corrective action taken. The scan module **1806** may also provide an alert to an administrator, administrator device, and/or the mobile device **1900**.

In step **2014**, the update module **1808** may update various applications and data of the mobile device **1900**. In some examples, the update module **1808** updates security applications, security files (e.g., anti-virus definitions), operating system, and driver files on the mobile device **1900**. In some embodiments, the update module **1808** updates security applications and security definitions of the mobile security system **1702**. The update module **1808** may update the mobile security system **1702** prior to the mobile security system **1702** performing scans and/or any other security functions on the mobile device **1900**.

In step **2016**, the maintenance module **1810** performs maintenance on the mobile device **1900**. The maintenance module **1810** may be configured to provide a maintenance signal such that local applications on the mobile device **1900** perform one or more maintenance functions.

In optional step **2018**, the wake module **1802** may provide a sleep signal to the mobile device **1900** to trigger a power management mode of the mobile device **1900**, the peripherals of the mobile device **1900**, and/or any components of the mobile device **1900**.

The foregoing description of the preferred embodiments of the present invention is by way of example only, and other variations and modifications of the above-described embodiments and methods are possible in light of the foregoing teaching. Although the network sites are being described as separate and distinct sites, one skilled in the art will recognize that these sites may be a part of an integral site, may each include portions of multiple sites, or may include combinations of single and multiple sites. The various embodiments set forth herein may be implemented utilizing hardware, software, or any desired combination thereof. For that matter, any type of logic may be utilized which is

TREND MICRO
EXHIBIT 1001 - PAGE 38

**31**

capable of implementing the various functionality set forth herein. Components may be implemented using a programmed general purpose digital computer, using application specific integrated circuits, or using a network of interconnected conventional components and circuits. Connections may be wired, wireless, modem, etc. The embodiments described herein are not intended to be exhaustive or limiting. The present invention is limited only by the following claims.

Further, the each term "comprising," "including," "having," "with," and "containing" is inclusive or open-ended and does not exclude additional, unrecited elements or method steps.

The invention claimed is:

**1**. A security system, comprising:

security system memory;

a communication interface configured to communicate with a mobile device and configured to communicate over a network with a security administrator device, the mobile device including a mobile device processor and including a security agent configured to cooperate with the security system, the security administrator device having a security administrator processor different than the mobile device processor, the mobile device being remote from the security administrator device, the mobile device being a first computer system, the security system being a second computer system, the security administrator device being a third computer system, the first computer system, the second computer system and the third computer system being separate computer systems; and

a security system processor being different than the mobile device processor and different than the security administrator processor, the security system processor being configured to:

store in the security system memory at least a portion of wake code, the wake code being configured to detect a wake event and to send a wake signal to the mobile device in response to detecting the wake event, the security agent of the mobile device being configured to receive the wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal, the security agent of the mobile device being configured to perform security services after the at least a portion of the mobile device has been woken;

detect a particular wake event;

prepare a particular wake signal in response to detecting the particular wake event; and

send the particular wake signal to the mobile device in response to detecting the particular wake event, the security agent of the mobile device being configured to wake the at least a portion of the mobile device in response to receiving the particular wake signal and being configured to perform particular security services after the at least a portion of the mobile device has been woken.

**2**. The security system of claim **1**, wherein the communication interface is configured to communicate with the mobile device via a wireless connection.

**3**. The security system of claim **1**, wherein the communication interface is configured to communicate with the mobile device via an external port.

**4**. The security system of claim **1**, wherein the communication interface is configured to communicate with the mobile device via an internal port.

**32**

**5**. The security system of claim **1**, wherein the particular wake event includes at least receiving an alert from a security administrator and determining that the alert is authentic.

**6**. The security system of claim **1**, wherein the particular wake event includes at least detecting that a predetermined time has elapsed.

**7**. The security system of claim **1**, wherein the wake event includes at least detecting a predetermined clock time.

**8**. The security system of claim **1**, wherein the particular wake event includes at least receiving an update file.

**9**. The security system of claim **1**, wherein the performing the particular security services includes removing unauthorized data from the mobile device.

**10**. The security system of claim **1**, wherein the performing the particular security services includes uninstalling applications from the mobile device.

**11**. The security system of claim **1**, wherein the performing the particular security services includes re-imaging the mobile device.

**12**. The security system of claim **1**, wherein the performing the particular security services includes sending log information to the security administrator device or another security administrator device.

**13**. The security system of claim **1**, wherein the performing the particular security services includes performing a malware scan of the mobile device.

**14**. The security system of claim **1**, wherein the performing the particular security services includes performing a data security scan of the mobile device.

**15**. The security system of claim **1**, wherein the performing the particular security services includes performing a malware scan or a data security scan of one or more peripherals coupled to the mobile device.

**16**. A non-transitory computer readable medium in a security system, the non-transitory computer readable medium storing:

at least a portion of wake code executable by a security system processor of the security system, the wake code when executed by the security system processor being configured to detect a wake event and to send a wake signal to a mobile device in response to detecting the wake event, the mobile device including a security agent and a mobile device processor, the security system processor being different than the mobile device processor, the security agent of the mobile device being configured to receive the wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the wake signal, the security agent of the mobile device being configured to perform security services after the at least a portion of the mobile device has been woken, the wake code when executed by the security system processor being configured to detect a particular wake event, the wake code when executed by the security system processor being configured to prepare a particular wake signal to send to the mobile device in response to detecting the particular wake event, the mobile device being a first computer system, the security system being a second computer system, the security administrator device being a third computer system, the first computer system, the second computer system and the third computer system being separate computer systems; and

a communication interface when executed by the security system processor configured to send the particular

TREND MICRO
EXHIBIT 1001 - PAGE 39

US 10,951,632 B2

33

34

wake signal to the mobile device, the security agent of the mobile device being configured to receive the particular wake signal, the security agent of the mobile device being configured to wake at least a portion of the mobile device from a power management mode in response to receiving the particular wake signal, the security agent of the mobile device being configured to perform particular security services after the at least a portion of the mobile device has been woken.

**17**. The non-transitory computer readable medium of claim **16**, wherein the communication interface is configured to send the particular wake signal to the mobile device via a wireless connection.

**18**. The non-transitory computer readable medium of claim **16**, wherein the communication interface is configured to communicate with the mobile device via an external port.

**19**. The non-transitory computer readable medium of claim **16**, wherein the communication interface is configured to communicate with the mobile device via an internal port.

**20**. The non-transitory computer readable medium of claim **16**, wherein the particular wake event includes at least receiving an alert from a security administrator and determining that the alert is authentic.

**21**. The non-transitory computer readable medium of claim **16**, wherein the particular wake event includes at least detecting that a predetermined time has elapsed.

**22**. The non-transitory computer readable medium of claim **16**, wherein the particular wake event includes at least detecting a predetermined clock time.

**23**. The non-transitory computer readable medium of claim **16**, wherein the particular wake event includes at least receiving an update file.

**24**. The non-transitory computer readable medium of claim **16**, wherein the performing the particular security services includes removing unauthorized data from the mobile device.

**25**. The non-transitory computer readable medium of claim **16**, wherein the performing the particular security services includes uninstalling applications from the mobile device.

**26**. The non-transitory computer readable medium of claim **16**, wherein the performing the particular security services includes re-imaging the mobile device.

**27**. The non-transitory computer readable medium of claim **16**, wherein the performing the particular security services includes sending log information to a security administrator device.

**28**. The non-transitory computer readable medium of claim **16**, wherein the performing the particular security services includes performing a malware scan of the mobile device.

**29**. The non-transitory computer readable medium of claim **16**, wherein the performing the particular security services includes performing a data security scan of the mobile device.

**30**. The non-transitory computer readable medium of claim **16**, wherein the performing the particular security services includes performing a malware scan or a data security scan of one or more peripherals coupled to the mobile device.

\* \* \* \* \*

TREND MICRO
EXHIBIT 1001 - PAGE 40

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(B)</u>

1.     This brief complies with the type-volume limitation of Fed. Cir. R.

32(b) because this brief contains 11,961 words, exclusive of the items exempted by

Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Word

in Times New Roman 14 point font.

Respectfully submitted,

Dated: July 25, 2023          By: */s/ Paul J. Andre*
                              Paul J. Andre
                              James Hannah
                              Kramer Levin Naftalis & Frankel LLP
                              333 Twin Dolphin Drive, Suite 700
                              Redwood Shores, CA 94065
                              pandre@kramerlevin.com
                              jhannah@kramerlevin.com

                              Jeffrey H. Price
                              Kramer Levin Naftalis & Frankel LLP
                              1177 Avenue of the Americas
                              New York, NY 10036
                              jprice@kramerlevin.com

                              *Attorneys for Appellant*
                              CUPP Computing AS